# MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION...................................................................................1

II.   FACTUAL BACKGROUND ................................................................3

    A.    Defendants' Heater ..................................................................3

    B.    Testimony of Plaintiff's Expert, Kenneth R. McLauchlan, P.E....................5

III.  APPLICABLE LAW AND ARGUMENT ..................................................9

    A.    Summary Judgment Standard ....................................................9

    B.    Plaintiff's Claim for Breach of Warranty is Barred by the Statute of Limitations.......................................................10

    C.    Plaintiff Cannot Prove its Product Liability Claims .........................10

        1.    Standard for Proving a Product Defect ....................................10

        2.    McLauchlan's testimony, taken at face value, does not demonstrate the existence of a defect with the heater .............................14

        3.    McLauchlan cannot and does not provide Plaintiff with reliable expert testimony in any event.......................................17

            a.    McLauchlan lacks expertise to render an opinion in this case...............................................................17

            b.    McLauchlan's testimony lacks scientific support and is unreliable.............................................................19

            c.    McLauchlan's opinion lacks a factual basis ....................21

    D.    Plaintiff Cannot Prove its Misrepresentation Claims .........................23

VI.   CONCLUSION ................................................................................26

INDEX OF EXHIBITS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SELECTIVE INSURANCE COMPANY,      *
As subrogee of SMULLENS SALVAGE
AND TOWING,      *

     Plaintiff and Third-Party Plaintiff     *

v.      *

EMPIRE COMFORT SYSTEMS     *     Civil Action No.
          WMN 03 CV 178

     Defendant, Third-Party Plaintiff,     *
     and Cross Defendant

       *

v.      *

BSH Electrodomesticos Espana, S.A.     *

     Defendant     *

v.      *

SHARP ENERGY, INC.     *

     Defendant, Third-Party Defendant,     *
     and Cross Claimant

    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

This is a products liability action arising out of a fire that occurred at Smullens Salvage

and Towing, Inc. ("Smullens") in Princess Anne, Maryland.  Selective Insurance, Inc.

("Selective"), as subrogee of Smullens, alleges that the fire was caused by a defectively designed

propane gas room heater manufactured by BSH Electrodomesticos Espana, S.A ("BSH") and distributed by Empire Comfort Systems, Inc. ("Empire").  Plaintiff seeks relief under three product liability counts – negligence (Count I), strict liability (Count II), and breach of warranty (Count IV) – and further alleges that the Defendants either negligently or fraudulently misrepresented the manner in which its product could be used (Count III).  See Plaintiff's Amended Complaint.

BSH and Empire are entitled to summary judgment on Plaintiff's breaches of warranty claims as they are barred by Maryland's four-year statute of limitations.  Furthermore, BSH and Empire are entitled to summary judgment on Plaintiff's product liability claims due to a complete lack of competent expert testimony establishing a product defect, either as to design of the heater or the adequacy of warnings.  Kenneth R. McLauchlan, P.E. ("McLauchlan"), Smullens' retained expert, who lacks the requisite qualifications, does not provide testimony sufficient to show that the heater was unreasonably dangerous or that there was an alternative design available.  Significantly, McLauchlan's opinion as to the cause of the fire also lacks a factual basis and relies entirely on a scientific theory that has been rejected by the only federal court to consider it and whose own proponents acknowledge has not been reliably established.

Defendants are similarly entitled to summary judgment on Selective's misrepresentation count as Plaintiff has failed to produce evidence of any misrepresentation, reliance on any misrepresentation or injury caused by any misrepresentation.

## II.     FACTUAL BACKGROUND

### A.     Defendant's Heater

On November 1, 2000, a fire significantly damaged Smullens' place of business in Princess Anne, Maryland.  The local fire department put out the fire after it destroyed part of the office area, including a portion of the interior office wall, and damaged office equipment and used auto parts in the warehouse area.  A majority of the damages sought in this subrogation claim are for damage to used auto parts.

Based on testimony from its expert, Kenneth R. McLauchlan, P.E., a mechanical engineer, Selective contends that the fire was started by a defective heater.  The heater, a Corcho CH-18 unvented room radiant heater, was manufactured by Defendant BSH Electrodomesticos Espana, S.A ("BSH") in Spain in 1987.  (Exhibit 1, Plaintiff's Responses to Empire's Request for Admissions, No. 11).  The heater was used by Smullens when the weather was cold and turned down at night to the lowest setting.  (Exhibit 6, William Smullens' Deposition Excerpts, pp. 62-63, 150).  It operated without incident for over ten years, before the fire which occurred at approximately 9:00 p.m. on November 1, 2000.  The heater was on its lowest setting and no one was present at the time of the fire.  (Exhibit 6, William Smullens' Deposition Excerpts, p. 150.)

Defendant Sharp Energy, Inc. ("Sharp")  installed the heater on a paneled wall in the interior office of Smullens in February, 1990. (Exhibit 1, Plaintiff's Responses to Empire's Request for Admissions, No. 20).  The back of the heater has four circular offsets, one in each

corner, which project out from the heater at a depth of 3/8-inch.  (Exhibit 2, Affidavit of John F.

Davis, ¶ 10).  The heater is installed by inserting a screw through a hole in each offset and then

fastening the screw through the paneling into a wall stud.  (Id.)  Once fastened, a 3/8-inch air-

gap clearance is present between the heater and the wall.  (Id.)  The only change to the heater

occurred in 1993, when Smullens had Sharp install a new blower motor in the heater.

(Exhibit 6, William Smullens' Deposition Excerpts, pp. 60-61.)

        The heater has three manual settings:  low (marked as "1"), which produces 6,000 BTUs,

medium (marked as "2"), which produces 12,000 BTUs and high (marked as "3"), which

produces 18,000 BTUs.  (Exhibit 2, Affidavit of John F. Davis, ¶ 8). BSH, then known as Safel,

made a room heater in 1988 known as a Super Ser P-18 which is identical to the CH-18.

(Exhibit 2, Affidavit of John F. Davis, ¶ 6).  In 1988, the American Gas Association

Laboratories ("AGAL") tested all gas appliances to specific design standards established by the

American National Standards Institute ("ANSI") and AGAL.  Safel submitted the Super Ser P-

18 to the AGAL for testing and it was certified on November 30, 1988 as meeting AGAL and

the ANSI design standards for gas-fired and unvented room heaters.  (Exhibit 1, Plaintiff's

Responses to Empire's Request for Admissions, No. 5).  In 1989, the AGAL granted an

extension to the Corcho CH-18 for Empire. (Exhibit 1, Plaintiff's Responses to Empire's

Request for Admissions, No. 6).  A copy of the 1988 AGAL certificate for the P-18 is attached

as Exhibit 3.  A copy of the AGAL extension for the CH-18 is attached as Exhibit 4.

In 1990, Empire was a United States distributor of the CH-18 ("the heater") and CH-18T

for BSH.  (Exhibit 2, Affidavit of John F. Davis, ¶ 5).  The CH-18T is identical in design to the

CH-18 except that it has a thermostat while the CH-18 operates manually.  (Exhibit 2, Affidavit

of John F. Davis, ¶ 7).  From 1988 through 1994, Empire sold 40,909 Corcho CH-18 and 9,721

CH-18T units.  (Exhibit 2, Affidavit of John F. Davis, ¶ 11).

 The subject CH-18 room heater was sold by Empire to Sharp sometime in 1989 or 1990.

Sharp, then known as Chesapeake Utilities, Inc., is a propane gas distributor on the Eastern

Shore of Maryland.  Each CH-18 was sold with an Installation and Owner's Guide, attached

hereto as Exhibit 5.  The subject heater was purchased in February 1990 by Smullens, a dealer in

the car salvage and automobile parts business. (Exhibit 1, Plaintiff's Responses to Empire's

Request for Admissions, No. 14).  Smullens would acquire wrecked vehicles, salvage their parts

and sell the used auto parts.  The sale of the auto parts was made from a building which

contained an interior office and a large storage area.

**B. Testimony of Plaintiff's expert, Kenneth R. McLauchlan, P.E.**

 Selective retained Kenneth R. McLauchlan, P.E., a mechanical engineer, of the firm

McLauchlan and Associates, Inc., as an expert to investigate the cause of the fire.

Approximately 80 - 85% of McLauchlan's work over the past five years has been forensic in

nature.  (Exhibit 7, McLauchlan's Deposition Excerpts, pp. 18-19).  The majority of

McLauchlan's forensic work, about 70%, involves testifying in support of subrogation claims.

(Id.)  McLauchlan holds himself out as a forensic engineer in many different areas including

mechanical systems and equipment failures on HVAC systems, analyses of fire causation and smoke flow, diesel engine generator and support systems, hydraulic power systems, analysis of precision-controlled IT facilities, cost-estimating and value engineering, mechanical power transmissions, water and wastewater treatment plant equipment, automatic control systems, building code interpretations, steam power-plant systems and asbestos abatement design. (Exhibit 8, McLauchlan's Curriculum Vitae). Mr. McLauchlan has testified in over 55 trials in the last 10 years. (Exhibit 9, McLauchlan's Trial Testimony List).

McLauchlan visited the fire scene on November 10, 2000 and removed the heater and the wood studs to which it was attached.  (Exhibit 7, McLauchlan's Deposition Excerpts, pp. 85-86). Notwithstanding his testimony on a variety of other issues, McLauchlan had no familiarity with the design of this type of wall-mounted heater prior to his retention in this case.  (Exhibit 7, McLauchlan's Deposition Excerpts, p. 127).  He has never designed a wall-mounted gas heater or taken any courses involving their design.  (Exhibit 7, pp. 46-47, 50-51.)  Nor has he ever tested or participated in the manufacture of a wall-mounted gas heater (Exhibit 7, pp. 47, 50-51). McLauchlan has never testified as an expert on the issue of adequacy of warnings or instructions in owners' manuals for gas appliances or gas heaters and he has no experience writing instruction manuals for gas heaters.  (Exhibit 7, pp. 52-53).  Finally, he has never been offered or accepted as an expert in the design of gas heaters or the creation of warnings for gas heaters. (Exhibit 7, p. 53).

On May 12, 2005, McLauchlan issued a written report, which concludes that the Smullens' fire was caused by the heater. McLauchlan theorized that the wood paneling on which the heater was mounted, was subjected to an alleged chemical change known as pyrophoric decomposition or pyrolysis, which allowed it to catch on fire at a lower than normal temperature. (Exhibit 10, McLauchlan's Report, p. 5). He set forth his opinion as follows:

> The fire was caused by pyrophoric decomposition of the wood paneling that the subject Empire Corcho CH-18 propane gas-fired room heater was mounted on. Pyrophoric decomposition is a chemical change that occurs as a result of long term low temperature heating of wood. This phenomenon has been known for many years, and is an identified cause of fires in wood in close proximity to heat sources (See Ignition Handbook, by Vytenis Babrauskas, Ph.D.). The pyrophoric decomposition at the subject heater was caused by radiant, convection and conduction heat transfer from the rear of the heater to the wood paneling. The pyrophoric decomposition resulted in ignition of the wood paneling at an abnormally low temperature. A significant factor in the heat transfer that caused the pyrophoric decomposition was the presence of combustible lint, dust and other heat conducting debris at the rear of the heater. This resulted in the wood paneling being exposed to significantly higher temperatures than would result from exposure to the heat transfer had the appropriate clearance been maintained. The failure to maintain an appropriate amount of clearance was the result of combination of factors.

(Exhibit 10, p. 5; Exhibit 11, Ignition Handbook Excerpts).

McLauchlan also opined that the design of the heater was such that dust, lint, and other ambient debris was able to accumulate in the rear of the heater, building a bridge of combustible material that extended from the hot surface of the back of the heater to the combustible wall. (Exhibit 10, McLauchlan's Report, p. 5). He contends that the design of the heater is such that there is no way to guarantee that the 3/8-inch clearance will be maintained throughout the life of

7

the product as it does not address the possibility that the wall surface behind the heater could be subject to movement or warping, thus eliminating any clearance provided by the "dimples" on the casing.  (Exhibit 10, McLauchlan's Report, p. 5).   Lastly, McLauchlan opines that the heater's Installation and Owner's Guide did not provide any instruction regarding maintenance of the heater to protect against the accumulation of combustible material, and did not provide any warnings regarding the fire hazard associated with pyrolysis of combustible surfaces behind the heater or blockage of the vents in the heater.  (Exhibit 10, McLauchlan's Report, p. 4).

McLauchlan admits that the heater "complies with the ANSI [and] has complied with the testing at the AGA lab."  (Exhibit 7, p. 121).  He testified that when it was put on the market in 1990 or 1991, the heater met existing industry standards.  (Exhibit 7, p. 136).  McLauchlan further testified that the owner's manual in this case was reviewed and approved by the AGAL.  (Exhibit 7, p. 136).

McLauchlan made no attempt to determine whether, in 1990, any other heaters on the market prevented the accumulation of lint, dust or other debris.  (Exhibit 7, pp. 125-127).  He was unaware of any studies or data indicating that such accumulation occurs or can be a hazard.  (Exhibit 7, pp. 125-127).

McLauchlan's opinion that the fire started because of pyrophoric decomposition of the wood paneling behind the heater is solely based upon the theories of Dr. Vytenis Babrauskas, an engineer who has written on the topic.  (Exhibit 7, p. 149).  Dr. Babrauskas has theorized that long term, low temperatures can ignite wood.  (Exhibit 11, Ignition Handbook Excerpts).

McLauchlan never tested this theory and, instead, has simply relied on Dr. Babrauskas' papers to support his opinion.  (Exhibit 7, pp. 149-152).   McLauchlan does not know the ignition temperatures or conductive properties of dust, lint and other ambient debris and, similarly, does not know the temperature on the back of the subject heater which was allegedly transferred to the wall paneling via dust and lint. (Exhibit 7, pp. 149-152).

In his report, McLauchlan made much of alleged contradictions between statements in the Installation and Owner's Guide relating to the required clearance for the back of the heater and the actual clearance allowed by the design of heater.  (Exhibit 10, McLauchlan's Report, p. 5).  At deposition, however, he agreed that there were, in fact, no misrepresentations in the installation manual.  (Exhibit 7, McLauchlan's Deposition Excerpts, pp. 162-163).

## III.    APPLICABLE LAW AND ARGUMENT

### A.    Summary Judgment Standard

Pursuant to Rule 56(c), summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ⋯ show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts and inferences are to be viewed in the light most favorable to the non-moving party, but the ultimate burden of demonstrating a genuine issue of material fact is upon the Plaintiff.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002).

**B.     Plaintiff's Claim for Breach of Warranty is Barred by the Statute of Limitations**

Count IV of Plaintiff's Amended Complaint alleges that Empire and BSH breached an implied warranty of merchantability and of fitness for a particular purpose. (See Plaintiff's Amended Complaint, pp. 6-7). A party alleging breach of warranty in the sale of goods must bring a cause of action within four years of the breach. MD. CODE ANN., COMM. LAW § 2-725; Lee v. Baxter Healthcare Corp., 721 F.Supp. 89, 96 (D.Md. 1989), aff'd, 898 F.2d 146. A breach of warranty occurs "when tender of delivery is made." MD. CODE ANN., COMM. LAW § 2-725(b); In re Lone Star Indus., Inc., Concrete R.R. Cross Ties Litig., 776 F.Supp. 206, 219 (D.Md. 1991). The time limit set in Section 2-725 is applicable to a person claiming to be a third party beneficiary, i.e., the ultimate user. Mills v. International Harvester Co., 554 F. Supp. 611, 612 (D.Md. 1982); Fredericks v. General Motors Corp., 278 Md. 304, 316, 363 A.2d 460 (1976) ("The four year period of limitations in § 2-725 is fully applicable to actions by injured third party beneficiaries.").

In this case, the Defendants' alleged breaches occurred in or before 1989, prior to Smullens' 1990 purchase of the unit from Sharp. Thus, Selective's breach of warranty claim is time-barred and BSH and Empire are entitled to summary judgment.

**C.     Plaintiff Cannot Prove its Product Liability Claims**

**1.     Standard for Proving a Product Defect**

Selective alleges that the heater at issue in this case was defective in its design and that there were inadequate warnings provided with the heater. The law in Maryland regarding the

proof necessary to make out a product liability claim is clear: "Regardless of the recovery

theory, the plaintiff in product litigation must satisfy three basics from an evidentiary standpoint:

1) the existence of a defect; 2) the attribution of the defect to the seller; and 3) a causal relation

between the defect and the injury."  Jensen v. American Motors Corp., 50 Md. App. 226, 234,

437 A.2d 242 (1981).  The Jensen factors were summarized by this Court as follows:

> It is settled that, under Maryland law, there is no products liability recovery at all
> unless the plaintiff proves the existence of a defect, that the defect is attributable to
> the seller, and that there is a causal relationship between the defect and the injury.
> The first element – the existence of a defect – may be proved by competent
> evidence of something wrong with the manufacture of the product, the design of
> the product, or a lack of adequate warnings on the proper use, which caused the
> injury.  There can be no products liability recovery in Maryland simply on the *post
> hoc* conclusion that the mere happening of the accident shows the existence of a
> defective product.

Stalnaker v. General Motors Corp., 934 F. Supp. 179, 180 (D. Md. 1996), aff'd., 120 F.3d 262

(4th Cir. 1997)(citations omitted).

    The plaintiff must produce evidence that the defect existed at the time the product left the

defendant's possession to recover.  Ford Motor Co. v. General Accident Ins. Co., 365 Md. 321,

334, 779 A.2d 362 (2001); see also Undeck v. Consumer's Discount, 29 Md. App. 444, 455, 349

A.2d 635 (1975).  The mere happening of an accident involving a product is not sufficient to

support a products claim under Maryland law.  See  Lee v. Baxter Healthcare Corp., 721 F.

Supp. at 96 ("Proof of a defect in a products liability case must rise above speculation and

recovery cannot be predicated on a presumption from the mere happening of an accident.");

Tauber v. Nissan Motor Corp., 671 F. Supp. 1070, 1073-74 (D. Md. 1987); Jensen, 50 Md. App. at 232.

Where a design defect is alleged, the focus of the Court's inquiry is not on the conduct of the manufacturer, but rather on whether the product is unreasonably dangerous. See Phipps v. General Motors Corp., 278 Md. 337, 344 (1976); Nissan Motor Co. Ltd. v. Nave, 129 Md.App. 90, 118 (1999). In determining whether a specific design is unreasonably dangerous, Maryland employs the "risk/utility" balancing test. Phipps, 278 Md. at 348; Nissan Motor Co. Ltd., 129 Md.App. at 118. The test inquires as to "whether a manufacturer, knowing the risks inherent in [the] product, acted reasonably in putting it on the market." Ziegler v. Kawasaki Heavy Indus., Ltd., 74 Md.App. 613, 621 (1988) (quoting Singleton v. International Harvester Co., 685 F.2d 112, 115 (4th Cir. 1981)). To determine the manufacturer's reasonableness, the court weighs "the utility of the risk inherent in the design against the magnitude of the risk." Phipps, 278 Md. at 345.

Thus, under Maryland law, a Plaintiff in a design defect case is required to prove the following six elements: 1) the existence of an alternative design that is safer than the design used in the suspect product; 2) the technological feasibility of manufacturing a product with the alternative design at the time the suspect product was manufactured; 3) the availability of the materials required to produce the alternative design; 4) the cost of production of a product that incorporates the alternative design; 5) the price to the consumer of a product incorporating the alternative design; and 6) the chances of consumer acceptance of a model incorporating the

Plaintiff's suggested alternative design. <u>Nissan Motor Co. Ltd. v. Nave</u>, 129 Md.App. 90, 120

(1999); <u>See also Singleton v. International Harvester Co.</u>, 685 F.2d 112, 115 (4th Cir. 1981).

This Court has explained the burden of proof with regard to an alleged product defect

based on a failure to warn as follows:  "Products liability law imposes on a manufacturer a duty

to warn if the item produced has an inherent and hidden danger that the producer knows or

should know could be a substantial factor in causing an injury." <u>Shreve v. Sears, Roebuck &</u>

<u>Company</u>, 166 F.Supp.2d 378 (D.Md. 2001) (<u>citing</u> <u>Virgil v. "Kash N' Karry" Service Corp.</u>, 61

Md.App. 23 (1984)); <u>Owens-Illinois, Inc. v. Zenobia</u>, 325 Md. 420, <u>reh'g</u> <u>denied</u>, 325 Md. 665

(1992) (stating that to be held liable for failing to warn, a manufacturer must have "knowledge,

or by application of reasonable, developed human skill and foresight should have knowledge, of

the presence of the … danger.").  Thus, "[t]here must be evidence that the defendant knew or

should have known of the danger posed by the product for there to be a duty to warn of such

danger." <u>Shreve</u>, 166 F.Supp.2d at 413 (<u>citing</u> <u>Zenobia</u>, 325 Md. at 433).

In order to establish the existence of a defect, Plaintiff must put forth competent expert

testimony.  Expert testimony is necessary in a product liability case "'when the subject of the

inference is so particularly related to some science or profession that it is beyond the ken of the

average layman.'" <u>Wood v. Toyota Motor Corp.</u>, 134 Md. App. 512, 518, 760 A.2d 315, <u>cert.</u>

<u>denied</u> 362 Md. 189, 763 A.2d 735 (2000); <u>Lee v. Baxter Heathcare Corp.</u>, 721 F. Supp at 95;

<u>Tauber</u>, 671 F. Supp. at 1073-74; <u>see</u> <u>also</u> <u>Adams v. NVR Homes, Inc.</u>, 142 F. Supp.2d 649, 654

(D.Md. 2001).

In the present case, Selective alleges that the heater was defectively designed and that it lacked adequate warnings.  Whether there were industry standards regarding these issues, and whether the Defendants complied with them, are issues that involve application of specialized knowledge outside the ken of the average layman.  See Moser v. Agway Petroleum Corp., 866 F.Supp. 262, 264 (D.Md. 1994) (Smalkin, J.) (holding that "a heater involves mechanical parts, combustion, and electrical circuits, and is not so simple a device that the average layperson's understanding and knowledge permit proceeding…without expert testimony.")

**2.    McLauchlan's testimony, taken at face value, does not demonstrate the existence of a defect with the heater**

Even assuming, *arguendo*, that McLauchlan's testimony were sufficiently reliable, it still does not demonstrate that the heater was defective.  McLauchlan acknowledged that AGAL and ANSI, the organizations setting the industry standards for gas heaters, certified Empire's heater before it was sold.  (Exhibit 7, McLauchlan's Deposition Excerpts, pp. 117-118).  Though compliance with industry standards is not conclusive of negligence, such proof "is often weighty evidence that the act in question is reasonable and nonnegligent." Western Maryland Ry. Co. v. Griffis, 253 Md. 643, 653 (1969); See Dudley v. Baltimore Gas & Elec. Co., 98 Md.App. 182, 196 (1993); Honolulu Ltd. v. Cain, 244 Md. 590, 598 (1966).  After AGAL and ANSI approval, almost 160,000 units of this identical model were sold by Empire between 1988 and 2004 without any report of fires caused by debris accumulation or the warping of an adjacent wall. (Exhibit 2, Affidavit of John F. Davis, ¶¶ 11-13).

Plaintiff contends that the design of the heater was defective because it allowed lint, dust and ambient debris to accumulate and because the warping of a wall to which it is affixed can reduce the spacing. (Exhibit 10, McLauchlan's Report, p. 5). While there are no facts demonstrating that either of these happened in this case, McLauchlan's testimony is insufficient under the risk/utility test in any event, because he could not demonstrate the existence of a feasible and safer alternative design for the heater.

McLauchlan testified that "[i]f the fan had drawn air from, for example, the top of the heater, rather than the space between the heater and the back of the wall, then there would be less chance of you trapping material between a hot surface and a combustible surface." (Exhibit 7, McLauchlan's Deposition Excerpts, p. 167). He did not state, however, whether such a design was technologically feasible, whether materials were available to produce this design, what it would cost or whether consumers would have accepted such a model. See Nissan Motor Co. Ltd., 129 Md.App. at 120. He testified that he had not personally designed, manufactured, tested or even seen such a heater design and that he did not know whether any heaters employed such design in 1990. (Exhibit 7, pp. 167-169). He also admitted to having done no calculations or design studies to determine whether such a design would have been functional or feasible. (Id.)

Even in cases where, unlike here, a Plaintiff has shown that a safer alternative design exists, Plaintiff is required to produce evidence that such a design can actually be incorporated into a product without impairing its use or function. Nissan Motor Co. Ltd. v. Nave, 129

15

Md.App. 90, 122 (1999).  McLauchlan did nothing more than suggest that a different design may have been possible.  He failed to furnish a design demonstrating the actual placement of his suggested top-side heat intake system or to explain how it could have been integrated into the heater back in 1990.  Equally important, Plaintiff has failed to show whether such a design would have or even could have prevented the fire at Smullens.  These failures by Plaintiff's expert leave it without the testimony needed to send this case to a jury on the issue of the heater's design.

Plaintiff similarly lacks evidence to support its failure to warn theory of liability. McLauchlan admits that the accumulation of lint, dust and other ambient debris had never been reported in identical heaters and was never considered a hazard at the time this heater left possession of the Defendants.  (Exhibit 7, McLauchlan's Deposition Excerpts, p. 173). McLauchlan presented no evidence that the theory on which he relies – the danger of pyrolysis – was accepted as reliable[1] or that it should have been known and accepted by the Defendants in 1987 when this heater was manufactured.  Indeed, the sale of 160,000 units without the occurrence of any fire related to the hazards about which Plaintiff complains, compels the conclusion that the Defendants had no basis for believing there was a hazard about which Plaintiff should have been warned.

---

[1] In fact, as discussed below, there is no evidence that the alleged danger associated with pyrolysis is accepted as reliable even today.

**3.    McLauchlan cannot and does not provide Plaintiff with reliable expert testimony in any event**

The admissibility of expert testimony in a federal court whose jurisdiction is based on diversity is controlled by federal law and the Federal Rules of Evidence.  Scott v. Sears, Roebuck & Co., 789 F.2d 1052 (4th Cir. 1986).  Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

Analysis of proffered expert testimony under Rule 702 requires a two-step inquiry: "(1) whether the witness is qualified, and (2) if qualified, whether his opinion is reliable, in that it is based on sufficient facts and sound methodology."  Berlyn, Inc. v. Gazette Newspapers, Inc., 214 F.Supp.2d 530, 534 (D.Md. 2002).  McLauchlan's testimony should be rejected based on both of these considerations.

　　　　　　　　a.    McLauchlan lacks expertise to render an opinion in this case.

McLauchlan simply has no specialized knowledge, skill, experience, education or training regarding the design of wall-mounted propane gas heaters or warning labels generally used in the heater industry.  He has never been employed by a heater manufacturer, never been involved in the design of heaters and has no familiarity with the design of wall-mounted heaters or with any issues generally related to such heaters.  (Exhibit 7, McLauchlan's Deposition

Excerpts, pp. 47, 127-128).  He has never tested wall-mounted heaters to ANSI standards, never taken any courses involving the design of wall-mounted heaters, and has no experience writing warnings or instructions in owner's manuals for gas heaters (Exhibit 7, pp. 51,53,177).  He has no knowledge of the hazard he alleges here ever having occurred in similar heaters.  (Exhibit 7, p. 128).

"Although it would be incorrect to conclude that [the witness'] occupation as a professional expert alone requires exclusion of…[the witness'] testimony, it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying." Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 800 (4th Cir. 1989).  Of course, McLauchlan does not even claim relevant experience based on his forensic work.  He concedes that he has never been offered as an expert in a case involving the design or manufacture of wall mounted gas heaters or offered an opinion on the adequacy of warnings or instructions given in owner's manuals for gas heaters or any gas appliances.  (Exhibit 7, pp. 52-53).

McLauchlan's lack of experience, training and knowledge related to the issues presented in this case render him unqualified to offer an opinion.  See Shreve v. Sears, Roebuck and Company, 166 F.Supp.2d 378, 400-403 (D. Md. 2001) (excluding an expert where he had no experience in designing, manufacturing, testing, marketing or operating the product he criticized).  His testimony would simply mislead the jury and confuse the issues and it should be excluded.  See Fed.R.Evid. 403.  Absent competent expert testimony on whether a wall-mounted gas heater is defectively designed, Plaintiff's case cannot go forward.

      b.    <u>McLauchlan's testimony lacks scientific support and is unreliable</u>.

McLauchlan's testimony must also be rejected as unreliable because his theory that the fire started due to a process known as pyrolysis, lacks scientific support even from the author of the papers on which he relies.

The reliability of proffered expert testimony is judged upon the Court's assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid." <u>Daubert v. Merrell Dow Pharms., Inc.,</u> 509 U.S. 579, 592-593 (1993) and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 147 (1999).[2]  Plaintiff bears the burden of showing that "principles and methodology" used in reaching the expert's conclusions are scientifically sound, that the testimony is reliable and that it will assist the ultimate trier of fact.  Fed.R.Evid. 702; <u>Westberry v. Gislaved Gummi AB</u>, 178 F.3d 257, 261 (4th Cir. 1999) (<u>quoting</u> <u>Daubert</u>, 509 U.S. at 595). Thus, "even if a witness is qualified to offer an expert opinion, that opinion can be excluded if it is based on inadequate facts or flawed methodology." <u>Berlyn</u>, 214 F.Supp.2d at 536.   In sum, in its role as gatekeeper, the Court must "make certain than an expert…employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Cooper v. Smith & Nephew, Inc</u>., 259 F.3d 194, 200 (4th Cir. 2001) (<u>quoting</u> <u>Kumho</u>, 526 U.S. at 152)

---

[2] The Supreme Court laid out five non-exclusive factors that a court may consider in determining whether to admit an expert opinion as reliable:  (1) whether a "theory or technique…can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"; (3) whether the techniques' uses have a high "known or potential rate of error"; (4) whether there are "standards controlling the technique's operation"; and (5) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."  509 U.S. at 592-94.

In support of his pyrolysis opinion, McLauchlan identifies excerpts from the Ignition

Handbook, by Dr. Vytenis Babrauskas, which discuss pyrophoric decomposition as a cause of

fires.  (Exhibit 10, McLauchlan's Report, p. 6; Exhibit 11, Ignition Handbook Excerpts).  This

theory maintains that long term, low-temperature ignition of wood can occur.  (Exhibit 11,

Ignition Handbook Excerpts, p. 956).  Significantly, however, this theory has gained no traction

in the courts based in part on Dr. Babrauskus' acknowledgment, as well as that of other

proponents of the theory, that there remain significant questions concerning its validity.

Indeed, in Truck Insurance Exchange v. MagneTek, Inc., 360 F.3d 1206, 1212 (10th Cir.

2004), the court upheld the exclusion of an expert's testimony that a fire started due to pyrolysis.

As in the present case, the expert in MagneTek, when faced with an inability to explain how a

product malfunction could result in temperatures high enough to ignite wood, offered that the

fire started due to pyrophoric decomposition.  Id. at 1208-09.

The expert in MagneTek introduced three publications to support pyrolysis as a cause of

ignition, none of which provided sufficient scientific support for the theory.  Id.  The first

publication "gave 'only vague parameters' to the conditions required for such an event to occur,

and that neither described testing that could have specified those conditions."  Id.  The second,

written by Dr. Babrauskas and titled "Pyrophoric Carbon: The Jury is Still Out," suggested that

a "number of things [are] not known about the process" and many of those things may not be

known for decades until a sufficiently improved theory is able to prove them.  Id. at 1211-1212.

The trial court specifically noted Dr. Babrauskas' conclusion that "the phenomenon of long-

term, low-temperature ignition of wood has neither been proven nor successfully disproven at this time." Id. The third article also "highlight[ed] unanswered questions about the interaction of important factors" and stated that "the time needed to adequately cook wood to the point of uninhibited self-heating at different temperatures is not well known." Id. at 1212.

Like the engineer in MagneTek, McLauchlan also failed to introduce tests he conducted that showed 1) that dust, lint and debris could transfer heat between the heater and the wall and 2) the heat would be sufficient to ignite the wall.[3] (Exhibit 7, McLauchlan Deposition Excerpts, pp. 155-162). Just as the opinions in MagneTek, McLauchlan's testimony must be excluded due to "the insufficient testing of [pyrolysis], as well as a lack of evidence showing how [his] opinion could be tested and his theory's applicable rate of error, and questions about the theory in the scientific community." Id. at 1212-13. Just as the Tenth Circuit observed of the experts in its case, "the analytical gaps in [McLauchlan's] opinions are too broad for [his] testimony to endure under the strictures of Daubert and Rule 702." Id. (citing Mitchell v. Gencorp Inc., 165 F.3d 778, 781 (10th Cir. 1999)).

        c.    McLauchlan's opinion lacks a factual basis.

The goal of the trial judge as gatekeeper goes beyond determining whether an expert's methods and principles are reliable, but also includes an obligation to determine whether the

---

[3] In contrast, Defendants' expert Thomas Marciniak conducted tests on a similarly designed 18,000 BTU wall heater that was affixed to a paneled wood wall. (Exhibit 12, Affidavit of Thomas Marciniak, Ph.D., ¶ 6-9). At the medium setting with two of the burner operating the temperature on the back of the wall was 210°F and the temperature on the paneled wall was 105°F. (Exhibit 12 at ¶ 7). At the highest setting, the temperature on the back of the heater was 209°F and the wall temperature was 116°F. (Id. at ¶ 8). Even with the heater on the highest setting and the blower off, the temperature on the back of the heater was 250°F and the wall temperature was 186°F, about the temperature of a cup of hot coffee. (Id. at ¶ 9). The minimum temperature to ignite wood is 450°F. (Exhibit 12, Affidavit of Thomas J. Marciniak, ¶ 5).

principles and methods have been applied faithfully to the facts of the case.  Berlyn, Inc. v. Gazette Newspapers, Inc., 214 F.Supp.2d 530, 536 (D.Md. 2002).  "When the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court." Berlyn, 214 F.Supp.2d at 536 (quoting Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137, 144 (4th Cir.1994)) (citations omitted).

McLauchlan's opinions are founded on factual assumptions unsupported in the record. He contends that the heater design allowed lint, dust and debris to accumulate between the back of the heater and the wall to which it was attached, (Exhibit 7, McLauchlan's Deposition Excerpts, pp. 158-62, 193-94; Exhibit 10, McLauchlan's Report, pp. 4-5), and that the wall to which the heater was affixed warped, resulting in the rear of the heater coming in contact with the wall and accelerating the pyrolysis process, (Exhibit 7, McLauchlan's Deposition Excerpts, pp. 170-171).

McLauchlan asserted that he found support for his assertion that debris accumulated behind the heater in Mr. Smullens' deposition.  (Exhibit 7, pp. 101-102).  In fact, Mr. Smullens never gave such testimony.  (Exhibit 7, p. 103).  The only thing Mr. Smullens testified to was that five or six years prior to the fire, he attempted to clean the heater's interior blower blades which had caked dust on them.  (Exhibit 6, William Smullens' Deposition Excerpts, pp. 56-61). He did not comment on debris or dust accumulating behind the unit.  Further, McLauchlan admitted that he is not aware of any fire ever having been attributed to lint, dust or debris accumulation in this type of wall heater, and he admitted that the accumulation of such debris

has not been reported previously as a hazard in identical heaters.[4]   (Exhibit 7, McLauchlan's

Deposition Excerpts, p. 173).

Similarly, the allegation that the wall warped and came into contact with the heater is

unfounded.  Mr. Smullens never testified to such an occurrence and McLauchlan has no

knowledge through experience or research that such warping has ever occurred.  (Exhibit 7,

pp. 171-173).  In fact, the only condition which causes the warping or delamination of wood

paneling is prolonged exposure to moisture.  (Exhibit 12, Affidavit of Thomas Marciniak, Ph.D.,

¶ 7).

Expert testimony must be based upon sufficient facts.  <u>See</u> Fed.R.Evid. 702; <u>Berlyn</u>, 214

F.Supp.2d at 536.  Plaintiff has failed to present evidence of lint, dust or debris accumulation

behind the heater or that the wood paneling warped and came in direct contact with the heater.

McLauchlan's unsupported factual assumptions further demonstrate the lack of reliability of his

opinions.

Having failed to satisfy the requirements of Federal Rule of Evidence 702, <u>Daubert</u> and

its progeny, McLauchlan should be precluded from testifying and summary judgment should be

entered in favor of Defendants.

**D.    Plaintiff Cannot Prove its Misrepresentations Claims**

Smullens asserts that in the Owner's Guide, Defendants misrepresented, either

"negligently" or "fraudulently," that the heater in question was a zero clearance unit that could

---

[4] In fact, lint and dust are insulators, not thermal conductors of heat. (Exhibit 12, Affidavit of Thomas Marciniak, Ph.D., ¶ 10).

be safely placed in close proximity to a wall without posing a risk of fire.  (Amended Complaint, Count III).

     To sustain a claim for negligent misrepresentation in Maryland, a Plaintiff must prove the following:  1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; 2) the defendant intends that his statement will be acted on by the plaintiff; 3) the defendant has knowledge that the plaintiff will probably rely on the statement which, if erroneous, will cause loss or injury; 4) the plaintiff, justifiably, takes action in reliance on the statement; and 5) the plaintiff suffers damage proximately caused by the defendant's negligence. Foster v. American Home Products Corp., 29 F.2d 165, 171 (4th Cir. 1994) (citing Martens Chevrolet v. Seney, 292 Md. 328 (1982); See also Paul M. Sandler & James K. Archibald, Pleading Causes of Action in Maryland § 3.29, at 222-23 (2d. ed. 1998 (citing Gross v. Sussex, Inc., 332 Md. 247 (1993)).  A claim for fraudulent misrepresentation includes the same elements, but requires proof that the defendant knowingly made a false statement or did so with such a reckless indifference to truth as to be equivalent to actual knowledge and with the intent of defrauding plaintiff . Aerospeca Ltd. v. Butler Aviation Int'l Inc., 44 Md. App. 610, 619-20 (1980) (quoting Gittings v. Van Dorn, 136 Md. 10, 15 (1920)).  Furthermore, Plaintiff must prove its fraud claim by clear and convincing evidence.  Id. at 623.

     Plaintiff's claims must fail because there is no evidence of a misrepresentation, that Defendants had reason to believe they made a false statement, that Defendants intended to

defraud Plaintiff, or that Plaintiff relied on the statements in the Owner's Guide in purchasing the heater.

McLauchlan's report asserts that "[t]he manufacturer and distributor misrepresented to consumers and installers that zero clearance was required between the back of the heater and combustible material," (Exhibit 10, McLauchlan's Report, p. 5.), but provides no factual basis for the conclusion. Indeed, at deposition, Defendants' counsel asked McLauchlan directly, "so you would agree that there is no misrepresentation in the installation manual, is there?" (Exhibit 7, McLauchlan's Deposition Excerpts, pp. 162-63). Agreeing, McLauchlan answered, "I guess the – no." (Id.) Moreover, even if the Owner's guide misrepresented that this heater could operate with zero-clearance, McLauchlan admitted that the presence of dimples on the back of the heater necessarily creates the requisite gap between the wall and the unit. (Exhibit 7, McLauchlan's Deposition Excerpts, pp. 162-63). Most importantly, Mr. Smullens testified that he does not remember ever seeing, reading or otherwise relying on the Installation and Owner's Guide. (Exhibit 6, William Smullens' Deposition Excerpts, pp. 49-50).

With Plaintiff having failed to demonstrate a genuine issue of material fact, Empire and BSH are entitled to summary judgment on Count III of Plaintiff's Amended Complaint.

## VI.    CONCLUSION

For all the foregoing reasons, Defendants, Empire Comfort Systems, Inc. and BSH

Electrodomesticos Espana, S.A., respectfully request that this Court grant Defendants' Motion

for Summary Judgment against Plaintiff.


                                                          /s/

                                                    James A. Rothschild (Bar No. 00624)
ANDERSON, COE & KING, LLP
201 North Charles Street, Suite 2000
Baltimore, Maryland 21201
(410) 752-1630
***Attorney for Empire Comfort Systems, Inc. and BSH
Electrodomesticos Espana, S.A.***

26

## <u>INDEX OF EXHIBITS</u>

Exhibit 1 – Plaintiff's Responses to Empire's Request for Admissions

Exhibit 2 - Affidavit of John F. Davis

Exhibit 3 - 1988 AGAL Certificate for P-18

Exhibit 4 - 1988 AGAL Extension for CH-18

Exhibit 5 - Installation and Owner's Guide

Exhibit 6 - William Smullens' Deposition Excerpts

Exhibit 7 - McLauchlan's Deposition Excerpts

Exhibit 8 - McLauchlan's Curriculum Vitae

Exhibit 9 – McLauchlan's Trial Testimony List

Exhibit 10 - McLauchlan's Report

Exhibit 11 - Ignition Handbook Excerpts

Exhibit 12 - Affidavit of Thomas Marciniak, Ph.D.