August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SELECTIVE INSURANCE COMPANY,   :

as subrogee of SMULLENS        :

SALVAGE AND TOWING,            :

      Plaintiff,             :

  vs.                          :

EMPIRE COMFORT SYSTEMS, INC., : Civil Action No.

      Defendant and Third-   : WMN 03 CV 178

      Party Plaintiff,       :

  vs.                          :

SHARP ENERGY, INC.,            :

      Third-Party Defendant:

--------------------

Deposition of KENNETH R. MCLAUCHLAN,

taken on Friday, August 11, 2006, at 12:12 p.m.,

at the offices of Anderson, Coe & King, LLP, 201

North Charles Street, Baltimore, Maryland, before

Paul A. Gasparotti, Notary Public.

--------------------

Reported by:  Paul A. Gasparotti

EXHIBIT
tabbies
7
_____

Case 1:03-cv-00178-WMN    Document 70-9    Filed 12/14/2006    Page 2 of 22

August 11, 2006    Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 18

1 their design handbooks. The majority of indoor
2 air quality problems, when they do exist, are
3 really problems that come about because the
4 design of the system or the operation of the
5 system is really outside of what standard design
6 practices would be.
7    Q. When you talk about a system, are you
8 talking about an HVAC type system?
9    A. Yes.
10    Q. And forensic work, when did forensic --
11 at some point in time, did forensic work become
12 the majority of your work?
13    A. Yes.
14    Q. And when was that?
15    A. I would say, again, that would be in the
16 early 1990s.
17    Q. And in the last five years, what
18 percentage of your compensation has related to
19 work in the forensic area?
20    A. Probably 80 percent or 85 percent, just
21 guessing.

Page 19

1    Q. And in the last five years, what
2 percentage of your compensation has arisen from
3 subrogation claims, that is, a claim where an
4 insurance company has paid a claim to its insured
5 and then is seeking to collect, get reimbursement
6 from a third party?
7    A. Is your question related to subrogation
8 from the plaintiff or subrogation insurance
9 defense?
10    Q. First of all, subrogation not from the
11 plaintiff, but subrogation from a third party,
12 the insurance company becoming a plaintiff and
13 then seeking reimbursement of whatever it has
14 paid by a third party?
15    A. I would estimate 70 percent.
16    Q. And the rest of your forensic work, who
17 are your, what other types of clients do you
18 have, if they are not insurance companies?
19    A. Well, they are insurance companies where
20 I'm retained on the insurance defense side.
21    Q. Now, are there certain companies in the

Page 20

1 last five years that have been regular, insurance
2 companies that have been regular clients of yours
3 on the subrogation side?
4    A. Yes.
5    Q. And who are they?
6    A. I would say Nationwide Insurance, Chubb
7 Group, and to a lesser extent, State Farm,
8 Allstate.
9    Q. And what's your current rate, hourly
10 rate, if that's how you're paid, to insurance
11 companies for your forensic work?
12    A. 170 per hour.
13    Q. Do you give a discount to any insurance
14 companies if they give you a certain volume of
15 work?
16    A. No.
17    Q. Have you previously been retained by
18 Selective Insurance to provide forensic services?
19    A. You mean prior to this case in 2000?
20    Q. Yeah, prior to this case.
21    A. I don't recall having any other cases

Page 21

1 with Selective prior to this case.
2    Q. How about since this case?
3    A. Yes.
4    Q. How many other cases have you been
5 retained by Selective to provide forensic
6 services?
7    A. I can think of three other cases.
8    Q. Could you identify those, please?
9    A. One is involving a fire in southern
10 Virginia, I don't believe any litigation ended up
11 being filed, but it was an investigation of a
12 fire related to a propane-fired boiler, I
13 believe. The next one would be a fire in
14 downtown Annapolis, Maryland, involving the
15 Zacherys, Z-A-C-H-E-R-Y-S, jewelry store on Main
16 Street.
17    Q. Did that become subject to litigation?
18    A. I don't know. I'm not certain at this
19 point.
20    Q. Did you give a deposition in that case?
21    A. No.

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 46

1 at a hardware store, and analyzing the claim of a
2 leak from a propane-fired forklift.
3    Q. Allstate versus Zeiller Plumbing.
4    A. That's a sump pump case.
5    Q. Are these all the cases that you have
6 given testimony in, either in deposition or --
7 oh, these are trial testimony, just trial
8 testimony?
9    A. Yes, that's trial testimony.
10    Q. And then you have a whole other list for
11 deposition testimony?
12    A. Yes. There is probably some overlap
13 there.
14    Q. And I'll ask you the same question I
15 asked you with regard to trial testimony. For
16 the deposition testimony, do any of these cases
17 involve a wall-mounted propane heater such as was
18 the appliance in this case?
19    A. (Perusing.) No.
20    Q. In your work history, did you ever
21 design a wall-mounted gas heater?

Page 47

1    A. No.
2    Q. Do you have any experience designing
3 zero tolerance wall-mounted gas heaters, or zero
4 clearance?
5    A. No.
6    Q. Do you have any experience testing zero
7 clearance wall-mounted gas heaters, prior to this
8 case?
9    A. Not testing them, no.
10    Q. Prior to this case, did you have any
11 involvement with, in any way with zero clearance
12 gas, wall-mounted gas heaters?
13    A. Yes.
14    Q. In what capacity?
15    A. I have had three cases now where the
16 issue in the case was whether a fire started as a
17 result of the operation of a zero clearance
18 gas-fired wall furnace.
19    Q. What were the other two cases?
20    A. Well, actually there are three in
21 addition to the one we're here for today. The

Page 48

1 first one was at a residence in Delaware, I think
2 it's Greensboro, Delaware, and the claim was that
3 the furnace caused ignition of combustibles that
4 were too close to it.
5    Q. When you say furnace, what do you mean?
6    A. I should say the heater, the direct
7 vented heater.
8    Q. And where was the heater in that case,
9 in the Greensboro case?
10    A. It was in a mobile home.
11    Q. And where was it located in the home?
12    A. Unfortunately, I never got to see the
13 fire scene. The fire scene was destroyed and I
14 was simply given the heaters to look at.
15    Q. And what did you determine?
16    A. I determined that I couldn't reach any
17 conclusions simply looking at the heaters
18 themselves.
19    Q. Is that one case?
20    A. Yes.
21    Q. And when were you involved in that case?

Page 49

1    A. I'm thinking that was the early 1990s.
2    Q. Was there another case in which you
3 looked at a zero clearance or what you thought
4 was a zero clearance gas heater?
5    A. Yes.
6    Q. What was that?
7    A. That was a case probably five years ago
8 involving a heater, I believe this also was in
9 Delaware. And in that case the heater was
10 installed so that when the, when a door that was
11 next to it was in the open position, it was in an
12 area which the manufacturer specifically
13 indicated there should be no combustibles.
14    Q. So the door would be against the front
15 of the heater?
16    A. Yes.
17    Q. Who did you testify for in that case?
18    A. I didn't testify.
19    Q. Did you render a report?
20    A. Just an oral report to the client.
21    Q. And who did you represent?

Page 50

1    A. I was representing, I believe it was the

2 owner of the building where the fire occurred.

3    Q. And was your conclusion in that case

4 that allowing the door to come in contact with

5 the front of the heater was the cause of the

6 fire?

7    A. Yes.

8    Q. Have you ever had a case prior to this

9 case involving an opinion with regard to the

10 design of a zero clearance gas heater for a

11 residence, or a building?

12    A. No.

13    Q. Ever been involved in manufacturing a

14 zero clearance wall heater?

15    A. No.

16    Q. I think you indicated you have a

17 bachelor's degree from the University of

18 Maryland; is that correct?

19    A. Yes.

20    Q. Do you have any degrees beyond that?

21    A. No.

Page 51

1    Q. Have you taken any courses involving the

2 design of gas wall heaters?

3    A. No.

4    Q. Is this the first case where you have

5 been asked to look at the design of a zero

6 clearance gas heater, the design of it?

7    A. I would say in all the prior cases that

8 I had, I considered the design of the heater as

9 part of my investigation.

10    Q. Do you know what kind of heater it was

11 in the case involving the door, who the

12 manufacturer was?

13    A. No, I don't.

14    Q. Was it similar, was the heater similar

15 to the heater in this case in terms of its design

16 and function?

17    A. I would say that it was generally

18 similar.

19    Q. It was gas, what, LP gas?

20    A. It was propane-fired and it had specific

21 clearances from combustibles; however, it was a

Page 52

1 zero clearance.

2    Q. It was a zero clearance?

3    A. Yes, at the rear.

4    Q. Did you examine that heater?

5    A. Yes.

6    Q. Have you ever testified as an expert on

7 the issue of the adequacy of warnings and

8 instructions in owner's manuals for gas or

9 electrical appliances, first of all, for gas

10 appliances?

11    A. I don't believe so.

12    Q. Have you ever been offered and accepted

13 as an expert in a case involving the design of

14 zero clearance gas heaters?

15    A. I have never been offered, no.

16    Q. Have you ever been accepted as an expert

17 on the issue, adequacy of the warnings on an

18 appliance, on a gas heater?

19    A. I can't think of any case.

20    Q. I might have asked you this already.

21 Have you ever previously rendered an opinion on

Page 53

1 the adequacy of warnings and instructions in an

2 owner's manual for a zero clearance gas heater?

3    A. Not that I can recall.

4    Q. Do you have any experience as an expert

5 on the testing of wall-mounted zero clearance gas

6 heaters, prior to this case?

7    A. No.

8    Q. Do you have any experience writing

9 instructional manuals for zero clearance gas

10 heaters?

11    A. No.

12    Q. Do you have any experience as an expert

13 on the issue of design of wall-mounted gas

14 heaters, where the issue was design of the

15 heater?

16    A. No.

17    Q. When did you become involved in this

18 case, when were you first notified?

19    A. It would have been shortly before the

20 joint site inspection that was November 10th of

21 2000.

Case 1:03-cv-00178-WMN    Document 70-9    Filed 12/14/2006    Page 5 of 22
August 11, 2006                                         Multi-Page Deposition of - KENNETH R. MCLAUCHLAN
                                     Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 82

1    A. Correct.
2    Q. And they show a significant amount of
3  charring?
4    A. Yes.
5    Q. Based on the studs facing into the
6  warehouse; is that correct?
7    A. Yes.
8    Q. When Miss Foerster called you, did she
9  indicate to you that she believed that the heater
10  was the source of the fire?
11    A. No.
12    Q. Did she tell you there was a heater?
13    A. Yes.
14        MR. ROTHSCHILD: Let me have this marked
15  as 2-F, please.
16        (McLauchlan Exhibits 2-F and 2-G,
17  photographs, marked for identification.)
18    Q. Can you tell me, please, what 2-F is a
19  picture of?
20    A. 2-F shows some hangers that the uniforms
21  were on. There's also some thermal insulation

Page 83

1  visible, and there is visible paneling in the
2  background, and there is a bucket.
3    Q. Can you tell what's in the bucket?
4    A. It looks like fire debris in the bucket.
5    Q. And where is this seen in relationship
6  to inside the office or outside the office?
7    A. This is located outside the office more
8  in the direction away from the heater.
9    Q. Is this on the other side of the wall
10  from the heater?
11    A. Yes. Well, it's not directly on the
12  other side of the wall from the heater, it's
13  displaced laterally in the direction of I believe
14  the exterior wall.
15    Q. The exterior wall that faces the
16  warehouse?
17    A. There is actually a photo that shows its
18  location, that probably makes it easier to look
19  at than me describing it.
20    Q. Let me ask you to look at 2-G. Can you
21  tell me what that is a picture of?

Page 84

1    A. Yes. This photograph 2-G shows that
2  area that appeared in the photograph I was
3  looking at last, which was 2-F.
4    Q. And does that show the area to be right
5  behind where the outside wall was facing into the
6  warehouse?
7    A. That photograph is taken looking at the
8  outside surface of the office wall.
9    Q. And why did you take these two pictures,
10  2-F and 2-G?
11    A. To document the area where the heater
12  was, the general area.
13        MR. ROTHSCHILD: Let me have this marked
14  as 2-H.
15        (McLauchlan Exhibit 2-H, photograph,
16  marked for identification.)
17    Q. Is this another picture you took facing
18  the heater? This is 2-H.
19    A. Yes.
20    Q. Did you make any observation, were you
21  able to make any observations as to what was

Page 85

1  behind the heater? Was there anything behind the
2  heater when you were on the fire scene?
3    A. Just the remnants of the hangers and
4  uniforms, and really the only thing left was fire
5  debris.
6    Q. How about on the back of the heater, was
7  there anything on the back of the heater,
8  attached to the back of the heater?
9    A. No, the paneling was burned out at the
10  back of the heater.
11    Q. Was there anything on the top of the
12  heater that you observed?
13    A. Could I look at the photos again?
14    Q. Sure. I'll give them all to you.
15    A. (Perusing.) No.
16    Q. Did you at some point remove the heater
17  from the office?
18    A. Yes.
19    Q. When was that?
20    A. That was the day of the joint
21  inspection, which was November 10, 2000.

Case 1:03-cv-00178-WMN   Document 70-9   Filed 12/14/2006   Page 6 of 22
August 11, 2006                               Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
                                      Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 86

1    Q. Did you remove any other objects from
2 the fire scene?
3    A. The junction box, receptacle, and a
4 section of the branch circuit wiring that was the
5 circuit serving the heater.
6    Q. Now you identified that Terry Wagner was
7 on site that day?
8    A. Yes.
9    Q. To your knowledge, was he representing
10 Selective?
11    A. Yes.
12    Q. Did he, to your knowledge, remove
13 anything from the fire scene?
14    A. I don't know.
15    Q. Did you make an observation of him
16 removing anything?
17    A. I don't recall seeing him remove
18 anything.
19    Q. And you took the heater, and the studs
20 it was on, and the junction box to your site in
21 Annapolis then?

Page 87

1    A. Yes.
2    Q. I'm going to ask you some questions now
3 about your report that you entered in this case.
4    (Discussion off the record.)
5    (McLauchlan Exhibit 8, report of witness
6 of 5/12/05, marked for identification.)
7    Q. Prior to -- let me show you your report.
8 Prior to this report, did you author any other
9 reports about this case?
10    A. Yes.
11    Q. And when did you, what other reports did
12 you author?
13    A. There was a report, a preliminary report
14 was in 2003. It's probably there.
15    Q. Yes, I'm having it copied. And who did
16 you send the preliminary report to?
17    A. Mr. Bartolacci.
18    Q. And did you discuss the preliminary
19 report with him?
20    A. Yes.
21    Q. Did you have a meeting or telephone

Page 88

1 conversation?
2    A. I discussed it over the phone with him.
3    Q. Did he request any changes to the
4 preliminary report?
5    A. No.
6    MR. ROTHSCHILD: Let me have this marked
7 as Number 9, please.
8    (McLauchlan Exhibit 9, report of witness
9 of 6/28/03, marked for identification.)
10    Q. Number 9 is the preliminary report?
11    A. Yes.
12    Q. And how does the preliminary report
13 differ, of June 28, 2003, differ from the report
14 of May 12th, 2005, which was produced to us as
15 your expert report?
16    A. The difference is that by the time I did
17 the report in 2005, I had the benefit of looking
18 at the deposition testimony, and also expert
19 report of Mr. Bajek, I think his name is
20 pronounced, the expert for Empire, and that's
21 really the major difference.

Page 89

1    Q. Okay, let's go through the report. Now
2 prior to writing the report, did you interview
3 anyone?
4    A. Are we talking about Exhibit 8 now?
5    Q. Well, Exhibit 8, yes, the report that
6 was produced to us.
7    A. The interview would have been the
8 interview of Mr. Cameron on the date of my site
9 inspection.
10    Q. And did he, is that all contained in
11 what you testified to already from your notes of
12 the site inspection?
13    A. Yes.
14    Q. And you are relying in your report on
15 the determination of the area of origin made by
16 Mr. Wagner; is that correct?
17    A. Yes.
18    Q. Now on page three of your report, excuse
19 me, page two, at the bottom of the page, you
20 describe how the heater was mounted on the wall
21 at the bottom, the beginning of the last

Case 1:03-cv-00178-WMN    Document 70-9    Filed 12/14/2006    Page 7 of 22

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 98

1    A. That's correct.
2    Q. And again, your statement that the
3 ventilation louvres at the rear of the heater
4 casing were effectively blocked by the wall
5 surface, in fact, that's just speculation on your
6 part because the wall surface wasn't there to
7 examine; isn't that correct?
8    A. It is an opinion that I base on the fact
9 that the wall surface, if it's assuming that it's
10 flat, would be very close to the louvres where
11 they formed into the rear surface of the heater.
12    Q. But if it was installed as stated in the
13 instruction manual, there should be a
14 three-eighths-inch gap between the louvres and
15 the wall surface; isn't that correct?
16    A. I'm trying to recall whether the louvres
17 actually projected slightly into that space. I
18 would have to look at my photographs for a
19 minute. (Perusing.) The louvres project inward
20 so they would not reduce that space.
21    Q. So there was at least a three-eighths,

Page 99

1 if the heater was mounted as per the
2 instructions, there would have been at least a
3 three-eighths-inch air gap between the back
4 surface of the heater where the louvres were and
5 the wall surface; isn't that correct?
6    A. That would be the way that it should be
7 installed, yes.
8    Q. And isn't it correct that you have no
9 basis for saying that the louvres were
10 effectively blocked by the wall surface, you have
11 no factual basis in this case?
12    A. Given that the wall is, and any debris
13 that accumulates there is burned away, I don't
14 have any factual evidence I could point to.
15    Q. You have never tested one of these, you
16 have never even tested a similar wall heater to
17 determine whether the louvres that are that
18 close, louvres that distance from a wall surface
19 effectively are blocked; isn't that correct?
20    A. That's correct. I requested early on in
21 this case an exemplar to test for that specific

Page 100

1 purpose, along with measurement of surface
2 temperatures, and I asked Mr. Bartolacci to
3 contact Empire to obtain one, and was unable to
4 do that.
5    Q. Were you aware that an exemplar unit was
6 set up at ESI in Chicago for testing?
7    A. I'm aware that a so-called exemplar was
8 tested and ESI provided results of their testing.
9 However, it was not an Empire Corcho CH-18 that
10 they tested.
11    Q. Are you aware that Mr. Bartolacci was
12 informed that any of his experts could come and
13 witness the testing and be involved in the
14 testing of that exemplar, were you ever told
15 that?
16    A. I was told that, yes, I was going to
17 test a heater, but it was not an Empire CH-18
18 heater, and to me, that is not a useful test in
19 determining what this specific heater does.
20    Q. Did you make any efforts to determine
21 the heater that was being tested, what its

Page 101

1 characteristics were, to determine if it was
2 similar to the Empire CH-18?
3    A. I obtained a heater that was of the same
4 design as the one used by ESI, I believe it was a
5 Kozy-World heater, and inspected that, and
6 determined that there were significant
7 differences between that heater and the CH-18,
8 and that as a result, I did not consider that to
9 be an exemplar.
10    Q. We'll get back to that. Your sentence
11 also says, the ventilation louvres at the rear of
12 the heater casing were effectively blocked by the
13 wall surface and other debris that accumulated
14 there. It's true, is it not, Mr. McLauchlan, you
15 have no evidence that there was debris at the
16 back, between the back of the heater and the wall
17 surface; isn't that correct?
18    A. I have in the form of testimony from
19 Bill Smullens evidence that debris was in fact
20 accumulating in the area of the fan and the area
21 of the louvres, and that it had accumulated in

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 102

1 the past to the point that the heater had to be
2 cleaned with compressed air, and in the process
3 it was damaged and had to be replaced.
4    Q. My question is, you have no evidence
5 that at the time of the fire there was debris
6 between the back of the heater and the wall
7 surface; isn't that correct?
8    A. I have no physical evidence because as I
9 previously testified, all that surface burned up
10 in the fire. I'm relying in my opinion on other
11 information other than physical evidence.
12    Q. Well, isn't it a fact that Mr. Smullens
13 did not testify that prior to the fire he
14 observed debris between the wall surface and the
15 back of the heater?
16       MR. BARTOLACCI: Objection to form.
17    A. My review of his testimony is that that
18 entire area had debris in it.
19    Q. At what point in time?
20    A. At the time that the fan was eventually
21 replaced, which would have been in 1994, I

Page 103

1 believe.
2    Q. And this fire was in 2000; isn't that
3 correct?
4    A. Yes.
5    Q. Isn't it a fact he gave no testimony
6 that after that, he observed debris in the back
7 between the back of the heater and the wall
8 surface?
9       MR. BARTOLACCI: Objection to the form.
10    A. I don't recall whether he ever said that
11 or not, no.
12    Q. Isn't it a fact he never said that at
13 any time between '94 and 2000 he observed debris
14 between the back of the heater and the wall
15 surface?
16       MR. BARTOLACCI: Objection to the form.
17    A. I'm not aware of any testimony to that
18 effect.
19    Q. So you're relying on, the only thing
20 you're relying on is some testimony he gave as to
21 what the condition was in '94 when they changed

Page 104

1 the fan?
2       MR. BARTOLACCI: Objection to the form.
3    A. That combined with the fact that the fan
4 was used, the mechanism for the accumulation of
5 debris in that space had not been changed, and I
6 would expect there to be the same phenomenon
7 occurring.
8    Q. So you're just speculating then; isn't
9 that correct?
10       MR. BARTOLACCI: Objection to form.
11    A. It's an opinion based on a prior problem
12 with debris accumulation and the fact that they
13 continued to use the fan, and that there was no
14 change in the installation which would prevent
15 this from occurring again.
16    Q. But the fact is what you're doing is
17 making an assumption, is that correct, you have
18 no evidence from either Mr. Smullens or from what
19 you observed that, prior to the fire, there was
20 debris behind the heater; isn't that correct?
21       MR. BARTOLACCI: Objection to form.

Page 105

1    A. It's an opinion based on the reasoning
2 that I have previously testified to.
3    Q. Which all relates to what Mr. Smullens
4 said he observed in 1994?
5    A. That and the fact that they continued to
6 use the fan with the heater, and that the
7 conditions at the installation were unchanged
8 from the condition that were present at the time
9 of the previous 1994 occurrence.
10    Q. How do you know he didn't clean behind
11 the heater on a periodic basis?
12    A. I believe he testified that he cleaned
13 the exterior surface of the heater, but he did
14 not describe cleaning behind the heater.
15    Q. Does the instruction manual indicate
16 that it should be cleaned, including behind the
17 heater?
18    A. I would have to look at the manual. I
19 don't recall what that said.
20       (McLauchlan Exhibit 12, installation and
21 owner's guide for Empire CH-18 heater, marked for

Case 1:03-cv-00178-WMN    Document 70-9    Filed 12/14/2006    Page 9 of 22

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 114

1 believe that it needed to be cleaned. The other
2 issue, I guess, is he was uncertain as to whether
3 he even had this manual when the heater was
4 installed. If he's not, if he's not informed of
5 this information, then he may not realize that
6 the manufacturer expected him to do that.
7    Q. Well, if he got the manual and threw it
8 away, that's not the manufacturer's fault, is it?
9        MR. BARTOLACCI: Objection to form.
10   A. If he had the manual and threw it away
11 and never read it, that would not be the
12 manufacturer's fault.
13   Q. And if he had the manual, wouldn't you
14 agree, and was aware of the debris, that he was
15 aware in '94 that debris was building up inside
16 the heater, and aware that when he tried to clean
17 it, he damaged it, would you agree that he should
18 have arranged to have it cleaned annually by a
19 professional as per the instructions on the front
20 page of the manual; isn't that correct?
21        MR. BARTOLACCI: Objection to form.

Page 115

1    A. If he was aware of the manual, yes.
2    Q. Let's go back to the report. I want to
3 ask you about, you said, you say on page three,
4 the manufacturer's installation and owner's guide
5 manual indicates, this is in the first full
6 paragraph on page three, that it is necessary to
7 provide adequate clearance around air openings,
8 which would include the louvered openings at the
9 rear. And then you put, there is an
10 inconsistency between the manufacturer's claim
11 that the heater can be installed with zero
12 clearance at the rear of the heater and the
13 presence of louvres at the rear surface of the
14 heater. Do you see that?
15   A. Yes.
16   Q. But in fact, there was a, as we've
17 discussed, it wasn't zero clearance, there was a
18 three-eighths-inch gap between the louvres, which
19 actually were pointed inward, and the wall
20 surface; isn't that correct?
21   A. As long as there is nothing accumulating

Page 116

1 or projecting into that space where the dimples
2 are not forcing that clearance. But if there's a
3 condition where either the wall is warped or
4 there's debris accumulating because of the
5 airflow taking airborne debris into the space
6 where the louvres are, under those conditions you
7 can have zero clearance, even though the dimples
8 are present.
9    Q. Do you have any knowledge of that
10 condition occurring in these types of heaters,
11 where the three-eighths-inch gap disappears? I
12 mean, have you read any studies or performed any
13 testing, are you aware of any testing or studies
14 which indicate that condition is likely to
15 happen?
16   A. I'm not aware of any studies or testing
17 that indicate that.
18   Q. Are you aware that a lot of these zero
19 clearance wall heaters have been manufactured
20 prior to 1990, this was an accepted way of
21 designing a wall-mounted heater?

Page 117

1        MR. BARTOLACCI: Objection to the form.
2    A. I'm aware that there are many zero
3 clearance gas-fired appliances. As far as
4 whether they have louvres in an area where you
5 can create a condition where you lose your zero
6 clearance, that would require, you know, a more
7 exhaustive study of the products that are out
8 there.
9    Q. And you haven't made such a study; isn't
10 that correct?
11   A. That's correct.
12   Q. And you're aware of no one else who's
13 made a study; isn't that correct?
14   A. That's correct.
15   Q. And you're aware that this heater was
16 approved by American Gas Association
17 Laboratories?
18   A. Yes.
19   Q. And they're the standard in the industry
20 for certification of these type of heaters; is
21 that correct?

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 118

1    A. Yes.
2    Q. And it was approved after testing with
3 regard to ANSI standards; is that correct?
4    A. Yes.
5    Q. And ANSI standards are the industry
6 standard for such testing; is that correct?
7    A. That's correct.
8    Q. Would it be correct, is it your, would
9 it be correct or was it your understanding that
10 as of 1989 or 1990, when this heater was
11 manufactured, there were many thousands if not
12 hundreds of thousands of wall-mounted zero
13 clearance heaters that were in use?
14    MR. BARTOLACCI: Objection to the form.
15    A. I'm certain there were many thousands of
16 heaters, not necessarily the Empire Corcho
17 heaters.
18    Q. But similar --
19    A. There were many zero clearance gas-fired
20 heaters in use as of this time.
21    Q. That have the same, that have sort of

Page 119

1 the dimple mounting on the wall surface and about
2 a three-eighths-inch air gap?
3    A. Again, I don't know the specifics of how
4 the other heaters are attached to the combustible
5 surface; I don't know that they're all using
6 similar arrangements that the Empire heater used.
7    Q. Well, the exemplar you got from Kozy had
8 similar arrangements, didn't it?
9    A. No, it had a different arrangement for
10 attaching it to the wall.
11    Q. Did it have a dimple-type projection
12 from the back of the heater?
13    A. No. As I recall, it had slots in the
14 back and then the mounting bracket had an angle
15 and a displacement outward that kept the top
16 surface of the heater three-quarters of an inch
17 away from the surface that the heater was
18 attached to, and then the bottom surface was
19 about three-eighths-inch.
20    Q. The bottom surface was the same
21 three-eighths clearance that this Empire heater

Page 120

1 had?
2    A. Yes.
3    Q. And the top surface was more like, the
4 gap was more like three-quarters of an inch?
5    A. Yes.
6    Q. And was the area of the heater in the
7 Kozy heater where the heat was, the flame was,
8 was that at the bottom or the top of the heater?
9    A. It was closer to the middle of the
10 heater actually.
11    Q. Would it be your understanding that
12 there are many of these types of zero clearance
13 wall-mounted heaters that have approximately a
14 three-eighths-inch air gap?
15    MR. BARTOLACCI: Objection to the form.
16    A. Without having researched the numbers of
17 heaters and their design, I'm really not in a
18 position to answer that question.
19    Q. So the only research you did in this
20 thing was to look at this heater, the Empire
21 heater, and then look at this Kozy heater?

Page 121

1    A. Yes, and my intent really was not to
2 look at the Kozy heater to establish some kind of
3 industry practice, I was looking for a real
4 exemplar to test, and I'm really not interested
5 in what other heater designs incorporate. We're
6 obviously interested in what the Empire CH-18
7 does.
8    Q. So you have no knowledge whether or not
9 the Empire heater as it was manufactured in 1990
10 is not in conformity with industry standards for
11 heaters that were made at that time; is that
12 correct?
13    MR. BARTOLACCI: Objection to form.
14    A. I am only aware that it complies with
15 the ANSI standard, it has complied with the
16 testing at the AGA lab, but as far as whether
17 other heaters are made in the same way or not, I
18 don't know.
19    Q. Now you say on page four, the beginning
20 of the first full paragraph, the heater
21 installation and owner's guide did not provide

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 122

1 any instructions regarding the method or need to
2 maintain the heater to protect against the
3 accumulation of combustible material as a
4 consequence of the blockage of the louvres.
5 We've just gone over the instructions and the
6 recommendation on the front that there should be
7 an annual cleaning, and if this annual cleaning
8 was done by a professional, that would protect
9 against the accumulation of combustible materials
10 that would block the louvres; isn't that correct?
11        MR. BARTOLACCI: Objection to the form.
12     A. That annual cleaning is more of a, I
13 guess a response rather than a preventative
14 measure. There is nothing in the manual that
15 says how you can avoid having any accumulation of
16 material, it only tells you how to maintain it to
17 remove it.
18     Q. But you would agree that it's
19 recommended an annual cleaning by a professional
20 serviceperson; isn't that correct?
21        MR. BARTOLACCI: Objection, that's not

Page 123

1 what it says. We have been through this. It
2 says annual inspection.
3     Q. Do you know what an annual inspection by
4 a professional serviceperson would be?
5     A. It doesn't indicate in the manual what
6 it is.
7     Q. No, I'm asking you. Do you know,
8 sitting here, what an annual inspection by a
9 professional serviceperson would be for this type
10 of heater?
11     A. No, I don't know what the manufacturer's
12 intent is there.
13     Q. And if an annual inspection included
14 looking at the back of the heater and the
15 louvres, that would protect against the
16 accumulation of combustible material, wouldn't
17 it?
18        MR. BARTOLACCI: Objection to form.
19     A. Could you repeat that?
20     Q. Yes. If an annual inspection included
21 inspecting the back of the heater and inspecting

Page 124

1 the louvres to see if there was any blockage,
2 that would protect against the accumulation of
3 combustible materials, wouldn't it?
4        MR. BARTOLACCI: Objection to form.
5     A. That inspection could really only
6 remove, result in the removal of already
7 accumulated materials, but it wouldn't prevent
8 the materials from accumulating at all.
9     Q. Have you ever designed a heater that
10 would prevent this from happening?
11     A. No.
12     Q. Are you aware of any heater that existed
13 as of 1990 that would prevent the accumulation,
14 of any type of zero clearance wall heater that
15 would prevent the accumulation of combustible
16 materials?
17        MR. BARTOLACCI: Where, anywhere?
18     Q. At the louvres.
19        MR. BARTOLACCI: You haven't even
20 established that he know there are other heaters
21 that have louvres.

Page 125

1        MR. ROTHSCHILD: Would you stop
2 interrupting? It's my deposition, you are not
3 supposed to prompt him, which is what you're
4 doing now. Please don't interrupt.
5        MR. BARTOLACCI: I'm not interrupting,
6 I'm making a proper objection. Your question is
7 just lumping together a whole series of concepts
8 without breaking them down.
9        MR. ROTHSCHILD: You can take your
10 depositions the way you want and I'll take mine
11 the way I want.
12        Would you read back the question?
13        (Record read.)
14        MR. ROTHSCHILD: Let me rephrase that.
15     Q. Are you aware of any design of any
16 heater that existed in 1990 that would, a zero
17 clearance heater that would prevent the
18 accumulation of combustible materials that could
19 block the louvres at the back of the, that could
20 protect against the accumulation of combustible
21 materials blocking the louvres?

CRC-Salomon
(410) 821-4888 fax (410) 821-4889

August 11, 2006

Page 126

1    MR. BARTOLACCI: Objection to the form.
2    A. I'm not aware, but I haven't made any
3  attempt to do that research.
4    Q. Are you aware of any studies that
5  existed as of 1990 at the time this heater was
6  manufactured that indicated that this was a
7  hazard, not -- this was a hazard, the
8  accumulation of combustible materials blocking
9  the louvres?
10    MR. BARTOLACCI: Object to form.
11    A. I'm not aware of any studies that would
12  specifically address blockage of louvres on an
13  Empire CH-18 zero clearance heater.
14    Q. Well, how about for any zero clearance
15  heater that had louvres at the back and a gap of
16  three-eighths of an inch between the back of the
17  surface of the heater and the wall, are you aware
18  of any reports, fire reports, studies, anything
19  that indicated this was a hazard for zero
20  clearance heaters with a three-eighths-inch gap
21  that had louvres?

Page 127

1    MR. BARTOLACCI: Objection to the form.
2    A. I'm not aware of any such studies, but
3  again, I have not attempted to research that
4  issue.
5    Q. Prior to this case, have you done any,
6  did you have any familiarity about the issue of,
7  or any knowledge about the issue of the zero
8  clearance heaters and the gaps they have?
9    MR. BARTOLACCI: Objection to the form.
10    A. No.
11    Q. Did you have any knowledge with regard
12  to the design, or issues of or problems with the
13  design of zero clearance heaters prior to this
14  case?
15    MR. BARTOLACCI: Objection to the form.
16    A. No.
17    Q. Would it be fair to say your information
18  on zero clearance heaters is what you've
19  accumulated to be, as a consequence of being an
20  expert in this case?
21    A. No. I have, as I previously testified,

Page 128

1  investigated fires involving zero clearance
2  heaters in three other cases.
3    Q. Did you ever investigate a fire
4  involving a zero clearance heater that you
5  believed was started because of the accumulation
6  of combustible materials that blocked the louvres
7  in the back of the heater?
8    A. Prior to this case, no.
9    Q. Have you ever heard of such a fire being
10  caused because of that, the mechanics of that?
11    A. No.
12    Q. Now you said you were a member of the
13  National Association of Fire Inspectors, or, I'm
14  sure I got that wrong; what is it?
15    A. National Association of Fire
16  Investigators, and also the International
17  Association of Arson Investigators.
18    Q. And you also have presented, I believe
19  in your CV you say you presented, you've either
20  attended or given seminars on various types of,
21  involving fires, is that correct, and appliances?

Page 129

1    A. Yes.
2    Q. And you receive publications -- have you
3  received publications over the years from fire
4  investigative organizations?
5    A. Yes.
6    Q. What type of publications do you
7  receive?
8    A. I receive the NFPA journal.
9    Q. How often does that come out?
10    A. Monthly.
11    Q. And how long have you been receiving it?
12    A. I think I became a member in the
13  mid 1980s.
14    Q. And have they ever had an article or any
15  mention of the hazards of combustibles
16  accumulating behind the back of a zero clearance
17  heater in the area of the louvres posing a
18  hazard, a fire hazard?
19    A. No.
20    Q. What other publication have you gotten,
21  fire-related publications?

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 134

1 made any mention of it today, as a basis of your
2 opinion?
3    A.  Well, I'm providing that information to
4 you in response to a specific question that you
5 asked regarding what the industry may have known
6 at the time this heater was manufactured, and I
7 didn't address that in my own report.
8    Q.  My question was, what evidence did you
9 have that debris, that the industry knew that
10 zero clearance heaters were subject to the
11 blockage of its vents by debris?
12    A.  Well, that's not the way I remember the
13 question.
14    Q.  I'm sorry if I didn't ask the question
15 right, but that's what I meant to ask.
16    A.  I don't know if the industry had
17 considered that in 1990.
18    Q.  Do you have any evidence that they did,
19 publications or anything like that?
20    A.  No.
21    Q.  Now, what evidence do you have that

Page 135

1 pyrolysis was a known hazard for these zero
2 clearance heaters in 1991?
3    A.  The reference that I just cited, which
4 is the NFPA handbook, which as early as the mid
5 1980s was making reference to the pyrolysis
6 hazard associated with temperatures in the
7 200-degree Fahrenheit range.
8    Q.  What evidence do you have that it was
9 known that pyrolysis was a known hazard for zero
10 clearance heaters in 1991?
11    A.  I'm not sure I follow the question.
12    Q.  What evidence do you have that it was
13 known by manufacturers of zero clearance heaters
14 in 1990 or 1991 that pyrolysis was a specific
15 hazard of their product?
16    A.  That would be an assumption on my part,
17 that they are interested in fire safety and would
18 be knowledgeable about information developed by
19 and reported in NFPA documents.
20    Q.  Did you see any, are you aware of any
21 literature or studies that were around in the

Page 136

1 1990-1991 time period to indicate that pyrolysis
2 was a risk for zero clearance wall heaters?
3    A.  I'm not aware that it was a risk
4 specifically for zero clearance wall heaters, but
5 the information was present that it's a risk for
6 any device that would heat the combustible
7 materials to a temperature in the 200-degree
8 Fahrenheit range for a prolonged period of time.
9    Q.  And that's assuming there were
10 combustible materials?
11    A.  Yes.
12    Q.  Now, was the owner's manual in this case
13 reviewed and approved by the American Gas
14 Association Laboratories?
15    A.  Yes.
16    Q.  Were they the industry standard in 1988?
17    A.  Yes.
18    Q.  And would you agree that the owner's
19 manual, therefore, when it was put out in 1990 or
20 1991, met existing industry standards?
21       MR. BARTOLACCI:  Objection to the form.

Page 137

1    A.  Yes.
2    Q.  Are you aware of any other design
3 standards for wall-mounted zero clearance heaters
4 other than the American Gas Association
5 Laboratory standard?
6    A.  We're referring to the ANSI Z.21?
7    Q.  Well, the Gas Association and ANSI, are
8 you aware of other standards besides the American
9 Gas Association and the ANSI testing standard for
10 zero clearance wall-mounted heaters?
11    A.  No.
12    Q.  I may have asked you this before, and if
13 so, I apologize.  Would you agree that
14 wall-mounted gas heaters have been an accepted
15 design for many years prior to 1990?
16    A.  Yes.
17    Q.  Would you agree that zero clearance
18 wall-mounted gas heaters like the heater in this
19 case have been an accepted design for many years?
20       MR. BARTOLACCI:  Objection to the form.
21    A.  Again, without knowing more about the

August 11, 2006

Page 146

1 Ignition Handbook, marked for identification.)
2    Q. Let me show you this McLauchlan 13; is
3 this the Ignition Handbook that you are relying
4 on?
5    A. Exhibit 13 is an excerpt that I am
6 relying on.
7    Q. And is the ignition -- is the theory of
8 pyrophoric decomposition an accepted scientific
9 theory for how fires can start?
10    A. The concept of pyrolysis is not a
11 theory, it's actually a definition of a process
12 which has been documented in peer-reviewed
13 publications such as the Ignition Handbook.
14    Q. Has it been, to your knowledge, peer
15 reviewed and accepted in the scientific
16 community?
17    A. I know it has been reviewed by the
18 Society of Fire Protection Engineers.
19    Q. And when was that?
20    A. That was in 2003.
21    Q. Prior to this case, did you ever give an

Page 147

1 opinion of, that a fire was caused by, prior to
2 your first draft report of June 28, 2003, had you
3 ever given an opinion that a fire was caused by
4 pyrolytic or pyrophoric decomposition?
5    A. Yes.
6    Q. When was the first time?
7    A. Oh, boy. Many years ago. I can't
8 recall when the first time would have been.
9    Q. Has this theory ever been rejected, to
10 your knowledge, as being unscientific?
11    A. I'm aware of the Magne Tek case in which
12 the Court of Appeals rejected it.
13    Q. Has it ever, to your knowledge, been
14 accepted by a court as scientifically valid?
15    A. I don't know.
16    Q. Have you ever done any testing yourself
17 to determine whether the theory can
18 scientifically be supported?
19    A. I haven't done that, primarily because
20 the nature of pyrolysis requires an extremely
21 long interval of time that you would have to

Page 148

1 monitor your test equipment. There are also a
2 number of variables which really determine the
3 interval of time and the temperature at which the
4 pyrolysis would go from char to flaming
5 combustion. But to answer your question, I have
6 not undertaken any sort of study.
7    Q. Is there any fire scientist that has
8 created a model that has shown how pyrolytic
9 decomposition works?
10    A. I know that there are people working on
11 that, but to date, I'm not aware of any
12 mathematical model that has been accepted that
13 will basically explain why pyrolysis occurs.
14    Q. Or that can predict when pyrolysis will
15 occur?
16    A. That's correct.
17    Q. Are you aware of any studies besides
18 these articles by Bavrauskas, are you aware of
19 any other, have you seen any other studies that,
20 any studies that support his opinion?
21    A. Actually, one of the things that is

Page 149

1 there is Bavrauskas, but I cite other studies
2 that show that low temperature, long-term heating
3 of cellulosic materials results in this pyrolysis
4 effect and flaming ignition.
5    Q. But your whole basis for this theory is
6 what Dr. Bavrauskas has postulated in the
7 Ignition Handbook?
8    A. I think that is the most concise
9 accumulation of all the literature that is
10 supportive of the pyrolysis phenomenon.
11    Q. Have you done any testing to determine
12 the validity of the pyrolytic decomposition in
13 this case?
14    A. No. I've relied on the scientific
15 treatise.
16    Q. Mr. Bavrauskas?
17    A. Yes.
18    Q. Can you tell me what surface
19 temperature, or isn't it a fact that you don't
20 know what the surface temperature was on the
21 heater at the time of the fire, the surface

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 150

1 temperature on the back of the heater at the time
2 of the fire?
3    A.  I don't know the specific temperature on
4 this Empire CH-18, and obviously that's one of
5 the reasons I wanted an exemplar to test.  I'm
6 aware in the ESI testing of a heater, which is
7 not what I would consider a true exemplar, met
8 the ANSI standard, that surface temperatures in
9 excess of 200 degrees were reached.
10    Q.  And what were the conditions that
11 existed at that time?
12    A.  Well, we would have to actually go to
13 the ESI report to describe the conditions.
14    Q.  So it would be correct to say you don't
15 know what the surface temperature was on the back
16 of the heater when it was operating on the night
17 of the fire.  Would that be correct?
18    A.  In order to, for my opinion, I have made
19 an assumption that the temperature would be in
20 the range of in excess of 180 degrees Fahrenheit.
21    Q.  What's your basis of saying that, what

Page 151

1 is your factual basis for that assumption?
2    A.  The fact that the standard allows the
3 temperature rise of 117 degrees Fahrenheit on the
4 surfaces behind the heater.  In order for the
5 heat to be transferred, the surface temperature
6 of the heater would have to be higher than that,
7 so my opinion would be that it would be in excess
8 of that 117 degrees plus the room temperature,
9 which gets you into the 180-degree range, the
10 surface temperature higher than that.
11    Q.  But you're assuming that the heater is
12 the source of the fire, and therefore assuming
13 the temperature is 180 degrees; is that correct?
14    A.  No.  I'm assuming in a heater that
15 complies with the ANSI standard, which is allowed
16 to have a temperature rise on the wall behind the
17 heater of 117 degrees Fahrenheit above room
18 temperature, that the surface temperature of that
19 rear surface of the heater would have to reach
20 about 180 degrees for the temperature of the wall
21 to reach that temperature, the 117 plus room

Page 152

1 temperature.
2    Q.  Now, how many -- as I understand, this
3 heater has three settings?
4    A.  Yes.
5    Q.  And there is a low, medium and high
6 setting?
7    A.  Yes.
8    Q.  And as I understand it, the heater was
9 on the lowest setting on the night of the fire?
10    A.  It was on the lowest setting.  Depending
11 on the deposition transcripts, it was either on
12 the low setting or it may not have been turned
13 back from a higher setting, but there was some
14 testimony that it was at the low setting.
15    Q.  And in fact, didn't Nadine Cameron
16 testify that she had turned it to the low setting
17 before she left that night?
18    A.  I think what she testified was that she
19 thought she had, but she wasn't positive.
20    Q.  Didn't she testify that she always
21 turned it down at night?

Page 153

1    A.  Her testimony was that was one of the
2 things she did before she closed up, was turn it
3 down.
4    Q.  Would you agree, then, that more likely
5 than not it was turned down to the lowest setting
6 that night, since that was her procedure and
7 that's what she said she did?
8    A.  That was her procedure, but she did have
9 doubt as to whether she had turned it down.
10    Q.  If it was on a low setting, that would
11 mean that the surface temperature would be less?
12    A.  No, it wouldn't, because each heater has
13 a discrete burner, and that burner puts out a
14 fixed amount of heat, and it's independent of
15 what the other burners are doing.
16    Q.  So if one or two are turned off, that
17 one is going to produce the same heat independent
18 of the other two, along the entire back surface
19 of the heater?
20    A.  No.  The temperature is going to stay
21 the same on the operational brick.

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 158

1 resulted in ignition of the wood paneling at an
2 abnormally low temperature. Is that what we were
3 just talking about?
4    A. Yes.
5    Q. And that was 170 degrees Fahrenheit or
6 higher?
7    A. Yes.
8    Q. You then say, a significant factor in
9 the heat transfer that caused the pyrophoric
10 decomposition was the presence of combustible
11 lint, dust and other heat-conducting debris at
12 the rear of the heater, and you would agree that
13 you have no direct evidence of that; is that
14 correct?
15        MR. BARTOLACCI: Objection to form.
16    A. I have no physical evidence remaining of
17 that material after the fire.
18    Q. And you have no one that observed the
19 back of the heater, this area between the heater,
20 back of the heater and the wall surface for six
21 years, is that correct, as far as you know?

Page 159

1    A. I'm not aware of anybody at this point.
2    Q. So this is an assumption on your part?
3    A. It's an opinion I reached based on the
4 design of this heater and the prior problems that
5 were observed by Mr. Smullens.
6    Q. When you say based on the design of this
7 heater, have you set up a heater, similar heater,
8 and observed the presence of lint, dust and other
9 heat-conducting debris at the heater?
10    A. No. It's based on the fact that we have
11 a fan that's drawing air from the space directly
12 through louvres to the internal components of the
13 heater, and this phenomenon is going to entrain
14 lightweight material that are airborne and draw
15 them into the area where the louvres are.
16    Q. And when the heater is not operating,
17 would this material then fall to the floor?
18    A. It would, it could fall to the floor,
19 but if it's allowed to operate long enough, it's
20 my opinion that it would actually become trapped
21 in that space.

Page 160

1    Q. And how would it be trapped?
2    A. Just the volume of the material would
3 basically bridge the space between the wall and
4 the rear of the heater.
5    Q. Have you done any studies to see whether
6 that phenomenon occurs?
7    A. No, and I don't have access to an
8 exemplar.
9    Q. Have you done any, did you attempt to
10 recreate that with the Kozy heater you had by
11 putting it on the wall and letting it run to see
12 if it accumulated dust, lint and other debris
13 between the heater, back of the heater and the
14 wall?
15    A. No, for the reasons I previously
16 testified, I didn't attempt to test that heater.
17    Q. Are you aware if the Kozy heater drew in
18 air?
19    A. It had a fan, but it also had a totally
20 different type of fan, instead of a squirrel cage
21 it was like a propeller, and it had a circular

Page 161

1 opening rather than a series of louvres.
2    Q. Did it have an opening in the back that
3 would suck in air?
4    A. It had a circular opening as opposed to
5 louvres.
6    Q. Was the purpose of that to bring air
7 into the fan?
8    A. Yes.
9    Q. Would that also attract dust and lint
10 towards the circular opening?
11    A. It could.
12    Q. So this assumption you have made has not
13 been tested; is that correct?
14    A. The opinion is not based on any physical
15 testing that I've done.
16    Q. Nor is it based on any observation made
17 at or near the time of the fire; is that correct?
18    A. None that I'm aware of.
19    Q. And have you seen any articles, in the
20 various publications you get on fires, have you
21 seen anything stating that with a zero clearance

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 162

1 heater there is a buildup of combustible lint,
2 dust and debris between the rear of the heater
3 and the wall surface?
4     A. No.
5     Q. And then you say, the manufacturer and
6 distributor misrepresented to consumers and
7 installers that zero clearance was required
8 between the back of the heater and combustible
9 materials. What were the misrepresentations that
10 were made in this case?
11     A. That the heater is a zero clearance
12 heater when in fact it requires a gap between the
13 heater and combustibles apparently, based on
14 Mr. Davis' testimony.
15     Q. And does it assume that there is going
16 to be a gap because of the presence of the
17 dimples on the back of the heater?
18     A. Yes.
19     Q. So you would agree there is no
20 misrepresentation in the installation manual, is
21 there?

Page 163

1     A. I guess the -- no.
2     Q. In fact, the heater was sold by Empire
3 to Sharp Energy; is that correct?
4     A. Yes.
5     Q. And Sharp Energy is an installer of, a
6 distributor of these heaters?
7     A. I don't know whether they're a
8 distributor.
9     Q. Wasn't it purchased also from Sharp
10 Energy?
11     A. Yes.
12     Q. And Sharp Energy was aware that this
13 heater would be installed with a
14 three-eighths-inch gap between the back of the
15 heater and the wall surface; isn't that correct?
16     A. I don't know what the folks at Sharp may
17 or may not have known.
18     Q. Well, isn't it a fact you have no way of
19 knowing whether there was any misrepresentation
20 between Empire and Sharp Energy?
21     A. Again, I don't know what Sharp Energy

Page 164

1 knew concerning this heater.
2     Q. Well, if they read the manual, they
3 would have known that there was a gap, isn't that
4 correct, if they read the installation
5 instructions, they would have known there was a
6 gap?
7     A. They would know that the dimples are
8 present. Whether they would know that there can
9 be, that there must be that three-eighths-inch
10 space throughout the entire surface of the back,
11 I don't know.
12     Q. Well, a knowledgeable installer would
13 know that if there are three-eighths-inch dimples
14 at four points on the rear of the heater and
15 they're installing it on a flat surface, that
16 would create a gap; isn't that correct?
17     A. If it's a flat surface, but again, that
18 assumes that the surface is flat and always will
19 remain flat.
20     Q. I'm talking about at the time. You
21 state that they made a misrepresentation, and you

Page 165

1 can't really support that statement, isn't that
2 correct, that there was a misrepresentation?
3         MR. BARTOLACCI: Objection to the form.
4     Q. You can't support the statement that the
5 manufacturer misrepresented to the consumer, the
6 installer or anyone else that there was zero
7 clearance required between the back of the heater
8 and combustible material, can you?
9     A. It's my opinion that there, that they
10 are not telling the installer and the customer
11 that zero clearance doesn't mean that you have to
12 have, or that you have to have three-eighths-inch
13 clearance or whatever the dimples are.
14     Q. What evidence do you have that the
15 manufacturer ever said to the installer, this
16 heater just requires zero clearance?
17     A. The only place that three-eighths-inch
18 is even described in is the manual, and it shows
19 up as a dimension on the drawings.
20     Q. You're not answering my question. What
21 evidence do you have that the manufacturer ever

August 11, 2006
Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 166

1 said to the installer in this case that the
2 heater is going to be installed flat against the
3 wall with no clearance whatsoever?
4   A. None.
5   Q. And how about, what evidence do you have
6 that there was any representation from the
7 manufacturer to the consumer in this case prior
8 to the consumer buying the heater?
9   A. None.
10   Q. You say the design of the heater was
11 such that dust, lint and other ambient debris was
12 able to accumulate in the rear of the heater,
13 building a bridge of combustible material that
14 extended from the hot surface of the back of the
15 heater to the combustible wall. We've already
16 discussed how that is an assumption on your part.
17 What alternative design should the manufacturer
18 have used to prevent this? Are you aware of any
19 design that would eliminate what you say was an
20 accumulation of combustible material between the
21 back of the heater and the wall?

Page 167

1   A. If the fan had drawn the air from, for
2 example, the top of the heater, rather than the
3 space between the heater and the back of the
4 wall, then there would be less chance of you
5 trapping material between a hot surface and a
6 combustible surface.
7   Q. And are you aware of any such heaters
8 existing in 1990?
9   A. No, I'm not, but I have not attempted to
10 find one.
11   Q. Have you ever designed such a heater?
12   A. I have not designed a heater. I've
13 designed various ductwork systems.
14   Q. My question was have you designed a
15 wall-mounted heater like this where the air
16 intakes were on the top of the heater?
17   A. No.
18   Q. Have you ever tested a heater that was
19 manufactured with the intakes at the top of the
20 heater?
21   A. No.

Page 168

1   Q. Would you agree that you don't even know
2 if a heater that was designed as you say with the
3 intakes at the top of the heater, was, would be
4 functional?
5   A. As I testified, I haven't attempted to
6 look for a heater of that design, and I don't
7 know whether one exists now or whether one
8 existed at that time.
9   Q. You don't even know if such a heater is
10 functional, do you?
11   A. It would certainly be functional if the
12 only change is the area where you're drawing the
13 inlet air from. And when you have a squirrel
14 cage fan as we have in this Empire heater, it can
15 draw air from other locations, it doesn't have to
16 be directly at the back of the heater.
17   Q. How do you know it will work properly if
18 where the air came in was changed, if the air
19 intake was changed, without testing it?
20   A. Obviously if I was going to design a
21 fan, I would not, or design a heater, I would do

Page 169

1 calculations and determine if my proposed design
2 was functional.
3   Q. But you haven't done that; isn't that
4 correct?
5   A. No, that obviously was not my charge.
6   Q. You have not designed or constructed a
7 prototype of your contemplated design; isn't that
8 correct?
9   A. That's correct.
10   Q. And before getting this case, you never
11 even were involved in design of wall-mounted
12 heaters; isn't that correct?
13   A. I have not designed any wall-mounted
14 heaters.
15   Q. You don't hold yourself out as an expert
16 in the design of wall-mounted heaters, do you?
17   A. I would consider myself to be an
18 engineer who's capable of evaluating fire hazards
19 associated with the design.
20   Q. But you don't hold yourself out as an
21 engineer who has any experience, education or

August 11, 2006

Multi-Page™ Deposition of – KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 170

1 background in the actual design of wall-mounted
2 heaters such as this one; isn't that correct?
3      A.  I have not designed a heater of this
4 nature, that's correct.
5      Q.  Then you say, in addition, the design of
6 the heater is such that there is no way to
7 guarantee that the three-eighths-inch clearance
8 will be maintained throughout the life of the
9 product.  You would agree that there are a lot of
10 heaters, wall-mounted heaters that are in use
11 that have a three-eighths-inch clearance?
12      A.  To the extent that there are more
13 heaters of the Empire CH-18 type, I would say
14 yes.  I'm not aware of other manufacturers that
15 use that specific clearance.
16      Q.  Well, the Kozy used a three-eighths to
17 three-fourths-inch clearance?
18      A.  That's two different ranges of
19 clearance.
20      Q.  And have you ever seen it reported
21 anyplace that there is a problem because the wall

Page 171

1 surface behind the heater had been subject to
2 warping?
3      A.  No.
4      Q.  So this is just something you're
5 postulating for this case; isn't that correct?
6      A.  It's a hazard that is foreseeable if you
7 have a situation where a wall is subjected to
8 high humidity and warps in a way that reduces the
9 clearance.
10      Q.  Do you have any evidence that the wall
11 behind the heater had warped and, therefore, the
12 three-eighths-inch gap had gotten smaller?
13      A.  No, and once again, the fire burned that
14 wall away.
15      Q.  But this is just a theoretical opinion
16 you're offering?
17      A.  It is a foreseeable condition based on
18 the properties of materials such as wood when
19 they are subjected to high humidity and moisture.
20      Q.  Well, you're saying it's a foreseeable
21 condition, but the fact is, there has never been

Page 172

1 a report of this ever occurring; isn't that
2 correct?
3      A.  I don't know whether there has or not.
4      Q.  But you have no knowledge of it; isn't
5 that correct?
6      A.  I have, again, I have not attempted to
7 find out if there has been any sort of fire
8 related to that type of scenario.
9      Q.  You belong to various fire
10 organizations and you pride yourself on being a
11 certified fire expert, and the fact is you have
12 never heard anyone, read anyplace, of this ever
13 happening; is that correct?
14      A.  I'm not aware of this being an
15 identified cause of a fire.
16      Q.  And it's never been, you have never
17 heard of it being identified as a risk for these
18 type of heaters; isn't that correct?
19      A.  No.
20      Q.  That is correct?
21      A.  That's correct.

Page 173

1      Q.  And you have never heard of the backup
2 of lint or dust being listed as a known risk for
3 this type of heater; isn't that correct?
4      A.  I'm aware that reduction in the
5 clearance of the back to combustibles is
6 considered to be a risk of fire that can occur
7 after the initial installation occurs, and in the
8 case of the accumulation of material or warping
9 of the surface reducing the clearance to
10 combustibles, that is considered a risk because
11 it would place combustible material near a hot
12 surface.
13      Q.  But with regard to a wall-mounted heater
14 with a three-eighths inch clearance or a
15 three-quarters-inch clearance, you have never
16 heard it ever reported that this has created a
17 risk of fire and that a fire has occurred because
18 of it; isn't that correct?
19      A.  I'm not aware of any fire that has been
20 attributed to this occurring on this specific
21 product.

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 174

1    Q. Or a product like it, isn't that
2 correct?
3    A. Or a wall-mounted heater, zero clearance
4 heater. I am aware of clearance problems,
5 specifically changes in clearance resulting in
6 fires in other equipment.
7    Q. Such as?
8    A. Such as venting systems where they are
9 conducting high temperature combustion gases
10 away.
11    Q. Isn't it a fact that all the opinions
12 you have given in this case are -- scratch that.
13 Isn't it a fact that the opinions you developed,
14 these two opinions you have expressed were
15 developed for the purposes of this case?
16    MR. BARTOLACCI: Objection to the form.
17    A. The opinions that I have stated in my
18 report are based on the inspection that I did and
19 the evaluation of the testimony. They're based
20 on the facts of this case, yes.
21    Q. If the clearance in this case was

Page 175

1 greater, would more or less debris accumulate
2 behind the heater?
3    A. If the clearance were increased, you
4 would have less debris accumulating.
5    Q. Why is that?
6    A. Because the size of the debris would
7 have to be large enough, so that it would be less
8 likely to be entrained in the air stream.
9    Q. And tell me again, what keeps the debris
10 there?
11    A. The debris initially accumulates in the
12 louvres and accumulates, I guess the debris
13 accumulation tends to filter out other debris
14 until you're eventually bridging the space
15 between the rear of the heater and the wall.
16    Q. In your opinion, how much debris, over
17 what surface of the back of the heater did the
18 debris bridge the wall surface?
19    A. How much?
20    Q. Yeah. Do you know, do you have any way
21 of quantifying it?

Page 176

1    A. I can't quantify it, no.
2    Q. How much would have to bridge, have you
3 determined how much debris would have to bridge
4 the back of the heater to the wall surface to
5 transfer the heat, have you been able to
6 determine that?
7    A. I haven't quantified that.
8    Q. Would there be a decrease in temperature
9 as the heat transferred from the back of the
10 heater through the debris to the wall surface?
11    A. Yes.
12    Q. And have you quantified what that would
13 be?
14    A. No.
15    Q. Are you able to quantify that, without
16 knowing how much debris and what type of debris?
17    A. You probably could do calculations
18 making some assumptions about the heat conductive
19 properties of the debris.
20    Q. You would have to know what the debris
21 was before you could calculate the heat

Page 177

1 conduction quantities, wouldn't you?
2    A. Yes.
3    Q. And in this case you don't know what
4 debris was there, what type of debris was there,
5 if any, prior to the fire, isn't that correct,
6 you have no evidence of what the debris was?
7    A. The information that I base my opinion
8 on would be that it's similar to the material
9 that Mr. Smullens observed when he cleaned it in
10 1993 or '4.
11    (Pause.)
12    Q. Have you ever worked for the American
13 Gas Association Laboratories?
14    A. No.
15    Q. Have you ever tested a heater to the
16 ANSI standards, a wall-mounted heater to the ANSI
17 standards, the applicable ANSI standards?
18    A. No.
19    Q. Is the American Gas Association
20 Laboratories considered to be a reputable testing
21 laboratory?

Case 1:03-cv-00178-WMN   Document 70-9   Filed 12/14/2006   Page 21 of 22
August 11, 2006                                          Multi-Page
Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 190

1    A.  It appears that as the paneling burned
2  away underneath the heater, the lower portion of
3  the heater actually moved in closer to the stud,
4  the remaining stud, and the top part of the
5  heater basically stayed where it was.
6        MR. ROTHSCHILD:  Objection, move to
7  strike, not in his expert report.
8    Q.  And let me show you Exhibit 16.  What
9  does that show?
10   A.  That shows the heater looking at it from
11 what would be the right side if you're facing the
12 heater head on.
13   Q.  And again, in this photograph, do you
14 see a larger gap?
15   A.  Yes.
16   Q.  Now let me show you Exhibit 15.  What
17 does that photograph show?
18   A.  That's the rear of the heater.
19   Q.  And does that appear to show a larger
20 gap at the top of the heater where it's attached
21 to the studs?

Page 191

1    A.  Yes.
2        MR. ROTHSCHILD:  Move to strike all this
3  testimony, beyond what's in his expert report.
4        MS. MAHER:  Join.
5    Q.  Now you recall that you were asked
6  earlier in your deposition by Mr. Rothschild
7  about the potential for the fire to have started
8  on the wall behind the heater and whether you
9  might expect to see the same type of burn
10 pattern?
11   A.  Yes.
12   Q.  Can you explain how if a fire starts at
13 the heater in the manner in which you have
14 postulated it starts, you can get those burn
15 patterns that we see in the rear or over there?
16       MR. ROTHSCHILD:  Objection, beyond the
17 scope of his report.
18   A.  The fire has a very sort of limited
19 lightweight combustibles at the front, primarily
20 being the paneling, but behind the heater in the
21 wall area is where these uniforms are, and I believe

Page 192

1  Mrs. Smullens testified they had 15 uniforms they
2  typically kept in that area.  I would expect that
3  to be a specific fuel hold, so that once it got
4  ignited, it would produce significant fire damage
5  to that other side of the wall.
6    Q.  You had a chance to look at the report
7  created by Engineering Systems, Inc., correct?
8    A.  Yes.
9    Q.  Is it in your file?
10   A.  Yes.
11   Q.  And you have had a chance to look at the
12 ANSI standards with regard to temperature rises
13 that are allowed for a heater like this; is that
14 right?
15   A.  Yes.
16   Q.  And what's your understanding of what
17 the temperature rise limit is on the wall surface
18 behind the heater as set forth in those
19 standards?
20   A.  The ANSI standard that's applicable to
21 this is a maximum of 117 degrees Fahrenheit

Page 193

1  temperature rise above ambient for all surfaces
2  on the wall, including the area behind the
3  heater.
4    Q.  And I think you have indicated that some
5  of the testing that was done by ESI reflected
6  wall temperatures behind the heater; is that
7  right?
8    A.  Yes.
9    Q.  What do you recall the highest wall
10 temperature reading being behind the heater?
11   A.  I believe the highest recorded
12 temperature was 186 degrees Fahrenheit.
13   Q.  And was that measured without there
14 being any type of lint, dust or debris filling
15 the gap between the rear of the heater and the
16 wall?
17   A.  That's correct, my understanding is they
18 did not attempt to place any materials between
19 the rear of the heater and the wall.
20   Q.  Based upon your review of the scientific
21 literature, would the 186-degree temperature for

August 11, 2006

Case 1:03-cv-00178-WMN    Document 70-9    Filed 12/14/2006    Page 22 of 22

Multi-Page Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 194

1 a prolonged period cause you to start a
2 pyrolysis?
3    A. Yes.
4    Q. And on what do you base that answer?
5    A. 186 degrees Fahrenheit would actually
6 be higher than the 170-degree Fahrenheit
7 temperature which is documented in the Bavrauskas
8 treatise.
9    Q. You talked a little bit earlier about
10 the C-channel at the bottom of the heater; do you
11 recall that?
12    A. Yes.
13    Q. Did the absence of the C-channel affect
14 the clearances at all?
15    A. I'm not certain whether it did or not.
16 It appeared that that C-channel was intended
17 strictly for vertical support of the heater and
18 it did not have an effect on the clearances.
19    Q. Do you recall, Mr. McLauchlan,
20 performing an additional evaluation of the
21 physical evidence just within the last month or

Page 195

1 so?
2    A. Yes.
3    Q. And what was the nature of that
4 investigation?
5    A. I conducted a joint inspection with
6 representatives from Empire of the electrical
7 components that were recovered from the fire
8 scene.
9    Q. And what was the purpose of looking at
10 those electrical components?
11    A. It was my understanding that the experts
12 from Empire had not previously looked at them
13 when they were either out at the fire scene or at
14 the initial joint inspection in 2001, and this
15 was to give them an opportunity to see them.
16    Q. And did you participate in the
17 inspection?
18    A. Yes.
19    Q. Was there any type of testing done in
20 terms of continuity meters, anything of that
21 nature?

Page 196

1    A. Yes, I measured resistance between the
2 conductors for the neutral, and the line voltage
3 and ground on the branch circuit wiring through
4 the receptacle to the power cord wiring for the
5 heater fan, and what I discovered is that even
6 after the fire, we had good continuity in those
7 connections in both the line voltage and the
8 neutral.
9    Q. Now based upon that additional
10 investigation, did you reach any conclusions as
11 to whether there was any electrical cause for the
12 fire?
13        MR. ROTHSCHILD: Objection.
14    A. Yes. I concluded there was no evidence
15 of any electrical cause for the fire.
16    Q. Had you looked at that issue earlier on
17 in your investigation?
18    A. Yes.
19    Q. And did you prepare a supplemental
20 report after this most recent investigation?
21    A. Yes.

Page 197

1    Q. Let me show you a copy of this document
2 and ask you whether you can identify that
3 report.
4    A. Yes. This is the report I made after
5 this most recent inspection of the electrical
6 components.
7    Q. It's dated June 30th, 2006?
8        MS. MAHER: Are you going to mark that?
9        MR. BARTOLACCI: Yes.
10        MS. MAHER: Did you give that to us?
11        MR. BARTOLACCI: On July 5th.
12        (McLauchlan Exhibit 18, report of
13 witness of 6/30/06, marked for identification.)
14    Q. Just so we can make it clear for the
15 record, would you look at the document that has
16 been marked as Deposition Exhibit 18 and identify
17 that, please?
18    A. Exhibit 18 is a report that I prepared
19 on June 30th, 2006, after the joint inspection of
20 electrical components from the subject Smullens
21 Salvage facility.