**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SELECTIVE INSURANCE COMPANY, | : | |
| as subrogee of SMULLENS SALVAGE | : | |
| AND TOWING | : | CIVIL ACTION NO. |
| Plaintiff | : | WMN 03 CV 178 |
| | : | |
| v. | : | |
| | : | |
| EMPIRE COMFORT SYSTEMS and | : | |
| BSH ELECTRODOMESTICOS ESPANA | : | |
| S.A. | : | |
| | : | **PLAINTIFF'S MEMORANDUM OF** |
| Defendants/Third-Party Plaintiffs | : | **LAW IN OPPOSITION TO** |
| | : | **DEFENDANTS MOTION FOR** |
| v. | : | **SUMMARY JUDGMENT** |
| | : | |
| SHARP ENERGY, INC. | : | |
| | : | |
| Third-Party Defendant | : | |

Plaintiff, Selective Insurance Company, as subrogee of Smullens Salvage and Towing, by

and through its undersigned attorneys, submits this Memorandum of Law in Opposition to the

Motion of Defendants Empire Comfort Systems (hereinafter "Empire") and BSH

Electrodomesticos Espana, S.A. (hereinafter "BSH") for Summary Judgment.

                         Respectfully submitted,

                         COZEN O'CONNOR

                         BY:   s/Georgia S. Foerstner
                               PAUL R. BARTOLACCI (*pro hac vice*)
                               GEORGIA S. FOERSTNER (*pro hac vice*)
                               1900 Market St.
                               Philadelphia, PA 19103
                               215-665-2000

Local counsel:
Thomas A. Wood, IV, Esq.                 Attorneys for Plaintiff
NEUBERGER, QUINN, GIELEN,
RUBIN & GIBBER, P.A.
One South Street
27th Floor
Baltimore, MD 21202

I.    **INTRODUCTION**

This is a subrogation action arising from a fire that occurred on November 1, 2000 and damaged the auto parts salvage business owned and operated by plaintiff's insured, Smullens Salvage and Towing (hereinafter "Smullens Salvage") in Princess Anne, Maryland.  The fire originated in the office area of the business.  Plaintiff alleges that the fire was caused by a defective heater designed, manufactured and sold by defendants Empire and BSH.  The fire resulted in significant damage to the building and auto parts inventory.  Plaintiff, Selective Insurance Company (hereinafter "Selective"), reimbursed Smullens Salvage approximately $400,000 for the damages caused by the fire.

Defendants Empire and BSH have filed a Motion for Summary Judgment seeking to dismiss plaintiff's claims.  In addition, they challenge the qualifications of its expert and reliability of his opinions.  As genuine issues of material fact exist, and plaintiff has stated cognizable claims under Maryland law, defendants' motion must be denied.

II.    **STATEMENT OF FACTS**

Smullens Salvage was an automotive recycling facility where auto parts were recovered from wrecked vehicles for resale.  The business was operated out of a large building that consisted of an office, auto parts storage area ("parts area"), and motor vehicle disassembly area.  The downstairs office was separated from the parts area by a wall made of nominal 1/4 inch thick plywood paneling over 2 x 4 wood studs.  (See post fire photographs of office and storage area attached as Exhibit "1.")[1]  The subject heater was mounted on the wall in the office behind a counter.  (See Deposition of William Smullens, pp. 9-25, attached as Exhibit "2.")

**The Heater**

---

[1] These photographs were authenticated and marked as an exhibit during the deposition of plaintiff's expert Terry Wagner.

The heater at issue is an unvented propane fired, wall mounted radiant heater.  It was designed, manufactured and sold by defendants BSH and Empire.   The Smullens purchased the heater from Sharp Energy, Inc. in or about December 1991 and Sharp installed it.  (Complaint.)

The heater had three ceramic "brick" burners at the base in the front of the heater and three heat settings, low, medium and high.  (Report of Kenneth McLauchlan dated 5-12-05,  p. 2, attached as Exhibit "3.")[2]  The front of the heater was open to allow for entry of combustion air and release of combustion products into the heated space.  It had a manual gas control valve as well as a standing oxygen depletion sensor/pilot burner and a piezo pilot ignitor. Id.  The heater is a relatively simple device which incorporates component parts such as gas control valves, pilot burners, piezo starters, ceramic radiants, fans, louvers and sheet metal casings.  These component parts have been in existence and used in various types of heaters for many years. (Affidavit of Kenneth McLauchlan, ¶ 5, attached as Exhibit "4.")

The heater is commonly referred to, and was marketed as, a "zero clearance" heater because it could be attached or mounted directly to a combustible surface.  The label "zero clearance," however, is a misnomer because certain clearances must be maintained in order for the heater to comply with the ANSI standard and not pose a risk of fire.  (Deposition of John Davis, pp.  100-101, attached as Exhibit "5.")  In order for an unvented wall mounted heater to comply with the ANSI standard, the temperature of the rear surface of the heater can not exceed 117 degrees Fahrenheit plus room temperature.  (Deposition of Ken McLauchlan, p. 151, attached as Exhibit "6.")  According to the defendants' installation manual the heater "must be installed no less than 1 ⅜ inch above the top surface of carpeting, tile or other floor covering," and clearance from combustibles must be a minimum of 6" from each side, 36" from the top and 1 ⅜ " from the bottom."  (See Installation Manual, p. 3, attached as Exhibit "5" to defendants'

_____

[2] This report was authenticated and marked as an exhibit at Mr. McLauchlan's deposition.

Motion for Summary Judgment)   The instructions are silent as to any clearance that must be maintained behind the heater.

Empire's Assistant Service Manager, John Davis, testified that a ⅜ inch air gap must be maintained at the rear of the heater in order for it to comply with the ANSI standard.  (Davis depo., pp. 107-108.)  To ensure that this ⅜ inch clearance was maintained, the back of the heater was designed with four raised circles, one at each corner, that protruded outward and were attached directly to the wall surface by screws.  The raised circles were intended to offset the heater from the wall to create a ⅜ inch air gap.  Davis testified that this air gap was necessary to keep the rear surface of the heater cool and maintain the requisite clearance to combustibles.  Id.

The heater was also designed with louvers at the top rear of the heater, which, again, were intended to keep the back of the heater cool to ensure that the heater complied with the ANSI standard.  Directly behind these louvers, inside the heating cabinet, was a blower fan. The fan would pull fresh air in from the back of the unit to keep the heater cool.  (Davis depo., pp. 105-106.)  However, the drawing in of air would allow dust, lint and other ambient debris to be drawn into and collect in the area of the blower fan and louvers.   Davis testified that lint and dust would be drawn into the heating unit in those areas where air was being drawn into the heater, including at the blower fan.  (Davis depo., p. 130.).  Bill Smullens testified that, in or about January 1994, he attempted to clean the fan because it was caked with dust.[3]  (Bill Smullens depo. pp. 59-60.)

**The Fire**

The fire occurred in the evening hours of November 1, 2000 after the business was closed for the day.  The Smullens, who lived in a trailer next to the building, were alerted to the fire by a passing driver who saw smoke coming from the building.  Although no one was in the building

---

[3] Mr. Smullens attempted to clean the fan by blowing it with compressed air, but because the compressed air was too forceful, he damaged the fan blades and the fan had to be replaced.

at the time, the heater was "on" and set on low.  Plaintiff's fire investigator, Terry Wagner,

conducted a cause and origin investigation and found the origin of the fire to be in and around

the subject heater.  (Deposition of Terry Wagner depo., pp. 90-97, attached as Exhibit "7;" see

also, Wagner Report, attached as Exhibit "8," which was authenticated and marked as an exhibit

at Wagner deposition.)  He will opine that the fire started behind the heater on the wall.  After

igniting the wall and surrounding combustibles in the office, the fire then broke through the

opposite side of the wall into the parts area and burned available combustibles therein. (See

Wagner Report.)

     Mr. Wagner investigated and ruled out all other potential causes for the fire, except for

the heater.  The only other potential ignition sources within the area of origin consisted of the

wiring and gas line to the heater, two outlet boxes and careless smoking.  Upon inspection, Mr.

Wagner found that the wiring and gas line to the heater were secure and there was no beading or

arcing on the wire to indicate a short circuit.  The two outlet boxes were found to have suffered

external heat damage only.  Mr. Wagner also saw no evidence that careless smoking played a

part in causing the fire.  (Wagner depo., pp. 75-76.)  Mr. Wagner inspected the contents of a

bucket that was located near the opposite side of the wall in the parts area to see if it played any

part in starting the fire and found that it did not.  (Wagner depo., pp. 77.)

     Plaintiff's electrical engineering expert, Ken McLauchlan, also inspected the electrical

devices in the area of origin and ruled them out as a potential cause.  (See McLauchlan Report

dated June 30, 2006, attached as Exhibit "9," which was authenticated and marked as an exhibit

at McLauchlan's deposition.)  McLauchlan is a mechanical engineer and a principal in

McLauchlan & Associates, Inc.  (McLauchlan Aff., ¶ 2; see also, McLauchlin *Curriculum Vitae*

attached as Exhibit "10," which was authenticated and marked as an exhibit at McLauchlan's

deposition.)  Among other things, he performs forensic mechanical engineering investigations

relating to fires.  (Id. )  He holds a BSME degree in mechanical engineering and is a licensed

Professional Engineer in the state of Maryland. (Id.)  He is a Certified Fire and Explosion Investigator through the National Association of Fire Investigators.  (Id.) His education and training have included extensive course work in Thermodynamics and Heat Transfer.  He has designed numerous gas-fired heating, ventilation and air conditioning (HVAC) systems in residential, commercial, institutional and government buildings.  (McLauchlan Aff., ¶ 3.)  This design work necessarily requires him to know and understand the operation capacity, internal mechanical workings and functioning of a wide variety of heating equipment, including unvented gas-fired space heaters.  (Id.) The systems he has designed have included unvented gas-fired wall mounted space heaters of the type that are at issue in this matter.  He has conducted approximately 800 to 1000 forensic fire investigations involving heating equipment, four of which related to the use or malfunction of unvented gas-fired wall mounted space heaters.  (Id. at ¶ 4.) In all of these cases, McLauchlan analyzed and rendered opinions about the design of the heating equipment at issue.  (McLauchlan depo., p. 51.)

Unvented gas-fired wall mounted space heaters are relatively simple devices that incorporate component parts such as gas control valves, pilot burners, piezo starters, ceramic radiants, fans, louvers and sheet metal casings.  These component parts have been in existence and use in various types of heaters for many years.  The function and operation of gas fired wall mounted space heaters is easily understood, and does not require specific experience in the design or manufacture of the heaters.  (McLauchlan Aff., ¶ 5.)  McLauchlan has personally installed unvented gas-fired wall mounted space heaters for the purpose of testing these devices. Testing has included use of data acquisition systems to monitor and record temperatures on various surfaces of the heaters.  He has also tested failure modes of these heaters.  (Id.)

**McLauchlan's Opinions as to the Cause of the Fire**

McLauchlan ruled out a mechanical failure of the heater or problem with the gas lines as potential causes.  (McLauchlan Report, Exhibit "3.")  He has concluded that the only potential

cause for this fire was ignition of the wall by the heater.  (Id.)  McLauchlan will opine that the

fire was caused by pyrophoric decomposition of the wood paneling to which the heater was

mounted.  His explanation as to the cause of the fire is set forth on page 5 of his report as

follows:

> Pyrophoric decomposition is a chemical change that occurs as a result of long
> term low temperature heating of wood.  This phenomenon has been known for
> many years and is an identified cause of fires in wood in close proximity to heat
> sources.  The pyrophoric decomposition at the heater was caused by radiant,
> convection and conduction heat transfer from the rear of the heater to the wood
> paneling.  The pyrophoric decomposition resulted in ignition of the wood
> paneling at an abnormally low temperature.  A significant fact in the heat transfer
> that caused the pyrophoric decomposition was the presence of combustible lint,
> dust and other heat conducting debris at the rear of the heater.  This resulted in the
> wood paneling being exposed to significantly higher temperatures than would
> result from exposure to the heat transfer had the appropriate clearance been
> maintained. The failure to maintain an appropriate amount of clearance to
> combustibles was the result of a combination of factors.  The manufacturer and
> distributor misrepresented to consumers and installers that zero clearance was
> required between the back of the heater and combustible material.  The heater was
> screwed directly to the combustible wall paneling, which caused certain portions
> of the back of the heater to be in direct contact with the wall.  Empire's own
> employee, Mr. Davis, testified that in order to comply with ANSI Standard
> Z21.11.2, 3/8 inch of clearance was required between the rear of the heater and
> any combustible material.  The design of the heater was such that dust, lint and
> other ambient debris was able to accumulate in the rear of the heater, building a
> bridge of combustible material that extended from the hot surface of the back of
> the heater to the combustible wall.  The operation of the fan installed in the heater
> exacerbated the accumulation of this material behind the heater.  In addition, the
> design of the heater is such that there is no way to guarantee that the 3/8 inch
> clearance will be maintained throughout the life of the product, e.g. the design of
> the heater does not address the possibility that the wall surface behind the heater
> could be subject to movement or warping, thus eliminating any clearance
> provided by the "dimples" on the casing.

(McLauchlan Report, p. 5, attached as Exhibit "3".)

Defendants challenge the reliability of McLauchlan's opinions and rely primarily on the

10th Circuit's decision in Truck Insurance Exchange. v. MagneTek, Inc., 360 F.3d 1206 (10th Cir.

2004) to support their preclusion.  Since MagneTek was decided in 2004, there have been

additional publications that shed light on and explain why pyrophoric carbonization and the

ignition of wood at lower than expected temperatures is scientifically documented and reliable.

<u>See</u> Vytenis Babrauskas, Ph.D, *'Pyrophoric Carbon' and Long-Term, Low-Temperature Ignition of Wood*, attached as Exhibit "4-A."

To begin with, many describe the ignition process as described by McLauchlan as "pyrolysis," and, therefore, for clarity, that term will be used here to describe McLauchlan's theory.  "Pyrolysis,"  however, is not a theory, but a definition.  Pyrolysis is defined as "decomposition or transformation of a compound caused by heat."  *The American Heritage College Dictionary*, Third Edition.  In fact, pyrolysis is a long established scientific phenomenon that applies in many of the sciences.  See, e.g., *Thermal Degradation*, Schniewind, Arno P., ed. Concise Encyclopedia of Wood & Wood-Based Materials. 1st edition.  Elmsford, NY: Pergamon Press, pp. 271-273, attached as Exhibit "11."  Thus, "pyrolysis" is not a theory that needs to be proven, it is already known and accepted by the scientific community.  Pyrolysis is merely the first step in the pyrophoric carbonization process that eventually leads to ignition.

Another well established scientific principle is that wood is susceptible to pyrolysis.  "It is an observable fact that wood is a material susceptible to pyrolysis . . ."  <u>See</u> Vytenis Babrauskus, *Truck Insurance v. MagneTek: Lessons to Be Learned Concerning Presentation of Scientific* Information, Oct. 2004, Fire and Arson Investigator, p. 9, .attached as Exhibit  "12." As early as 1900, scientists have theorized that the low-temperature, long-term heating of wood converts the wood to "pyrophoric carbon" and that this pyrophoric carbon is much more readily ignitable than virgin wood.  <u>See</u> Vytenis Babrauskas, Ph.D, *'Pyrophoric Carbon' and Long-Term, Low-Temperature Ignition of Wood*, p. 3, attached as Exhibit "4-A."  "Pyrophoric" is an adjective meaning "spontaneously igniting in air," and stems from the Greek word "pyrophorus," meaning "fire-bearing."  *The American Heritage College Dictionary*, Third Edition.

The phenomenon was first observed in 1900 when scientists observed and documented fires caused by long-term, low-temperature wood ignitions.  Around 1900, fires were reported in

areas where steam or hot-water heating pipes had been passed through wood members.  See Vytenis Babrauskas, Ph.D, *'Pyrophoric Carbon' and Long-Term, Low-Temperature Ignition of Wood*, p. 3.  Ignitions were observed 3 months to 15 years after installation.  The installations typically involved hot-water or low-pressure steam pipes, where the temperatures generated did not exceed 212º F.  Id.  It was clear to scientists that such ignitions were different from external-heating ignition and that a different explanation had to be provided.  The scientists who observed and documented these early fires were Prof. Ira Woolson, the "first US professor of fire science," and Voitto Virtala, the "father of fire science" in Finland.  Id.

In 1902, a German scientist postulated that these fires were caused by low-temperature, long-term heating of the wood, which converted the wood to "pyrophoric carbon," and that this pyrophoric carbon was much more readily ignitable than virgin wood.  Id.  Since then, the idea that wood can ignite at temperatures at lower degrees, has been recognized and embraced by the fire science community.

NFPA 921 has been accepted by both fire investigators and the courts as the authoritative text on fire investigations.  See, e.g., See Chester Valley Coach Works v. Fisher-Price, 2001 U.S. Dist. LEXIS 15902 (E.D. Pa. August 29, 2001)(Surrick, J.); Booth v. Black & Decker, 166 F.Supp.2d 215 (E.D. Pa. 2001).  NFPA 921 defines pyrolysis as "the chemical decomposition of a compound by one or more other substances by heat alone; **pyrolysis often precedes combustion.**" NFPA 921 Guide for Fire and Explosion Investigations §3.3.120 (2004)(emphasis added), excerpts cited to herein are attached as Exhibit "13."  During pyrolysis, solid fuels such as wood, when subjected to an external heat flux, will degrade, gasify and release vapors. Id. at §5.3.1.2.  On average, wood ignites between 315 F and 334 F, depending on the type, if it has not been pyrolycized. Id. at Table 5.3.2.3.  Pyrolycized wood will ignite at lower temperatures.  § 5.3.6.2.7.

As early as 1980, NFPA recorded instances where wood subjected to pyrolysis ignited at 212ºF, much lower than the average documented temperature by external ignition source of 400ºF.  The Ignition Handbook documents ignitions due to long-term, low-temperature heating of wood members down to a temperature of 170ºF.  See Vytenis Babrauskus, *Truck Insurance v. MagneTek: Lessons to Be Learned Concerning Presentation of Scientific* Information, Oct. 2004, Fire and Arson Investigator, p. 9.  Pyrolysis or the concept of pyrophoric decomposition has been documented in the peer-reviewed publication "Ignition Handbook, which was reviewed by the Society of Fire Protection Engineers.  (McLauchlan depo., 146.)  Defendant's own fire investigator, Patrick McGinley, recognizes pyrolysis or pyrophoric carbonization as a valid scientific theory as well:

Q:    And what is this phrase 'pyrophoric processing;' what does that man?

A:    Heat decomposition.

Q:    Can you explain that in a little bit more detail for me?

Q:    Pyrolysis is the process whereby a material, when exposed to heat, turns into something else prior to ignition.  Recognizing that solids, and liquids, for that matter, don't burn, that only gases burn, in order for a solid material, such as paper or wood, to burn, it has to be subjected to pyrolysis or pyrophoric action so that the material itself, when heated, will give off gas, it will break down into another substance and give off a vapor that is ignitable.  It's that vapor that burns, not the solid material.

      Therefore, for any solid material to burn, it has to be subjected to pyrolysis or pyrophoric action.  And when it is subjected to pyrolysis, it changes in appearance, it changes in physical character, and then it ignites at a different temperature than the original material.

Q:    So is it fair to say that the materials have a gradual reduction of their ignition temperature over time, which eventually can lead to pyrophoric action?

A:    Pyrophoric ignition.  That happens primary [sic] with wood, but also with cloth or paper, because they burn quickly.

      Sure, the wood pyrolysis, turns into carbon, and then ignites, if you are just talking about ignition from pyrophoric action.

9

* * *

Q:    Have you rendered an opinion, in all of your years of being a fire
       investigator, that a fire was caused by pyrophoric process?

A:    Certainly.

Q:    You think it's a valid scientific theory?

A:    I do.

(McGinley depo., pp. 33-34, attached as Exhibit "14.")

Here, the evidence demonstrates that the rear surface of the heater could generate

temperatures exceeding 180º F.  These figures come from defendant's own test results.  (See

Marciniak Affidavit and McLauchlan depo., pp. 150-153.)

## III.    LAW AND ARGUMENT

### A.    MCLAUCHLAN IS QUALIFIED TO GIVE OPINIONS REGARDING THE DEFECTIVE DESIGN OF THE HEATER AND CAUSE OF THE FIRE.

McLauchlan is qualified to give opinions in this case by virtue of his knowledge, skill,

experience, education and training as an electrical engineer.  Defendant has challenged

McLauchlan's qualification to give an opinion regarding a design defect in the heater primarily

because he has never designed or manufactured a zero clearance heater.  This argument has been

considered by the federal courts before and flatly rejected.

Rule 702 requires a witness to be "qualified as an expert by knowledge, skill, experience

training or education" in the relevant field.  F.R.E. 702.  This Court has recognized that "the fit

between an expert's specialized knowledge and experience and the issues before the court need

not be exact."  Shreve v. Sears, Roebuck & Co., 166 F.Supp. 2d 378, 392 (D. Md. 2001).  An

expert need not have manufacturing or design experience with a particular device to qualify as an

expert about the design of that device, especially where the theory is based on general

engineering principles. Garrett v. Desa Industries, Inc., 705 F.2d 721, 724 (4th Cir. 1983); Martin

v. Fleissner GMBH, 741 F.2d 61, 64 (4th Cir. 1984); DaSilva v. Am. Brands, Inc., 845 F.2d 356,

361 (1st Cir 1988). <u>Seeley v. Hamilton Beach/Proctor-Silex</u>, 349 F.Supp.2d 381 (N.D.N.Y. 2004). The courts have recognized the impracticality and limiting impact such a rule would have. "Such an approach would often mean that the only experts who could testify regarding a machine are those who have an interest in defending the design." <u>DaSilva</u>, 845 F.2d at 361. A court should consider all relevant qualifications when ruling on the admissibility of expert testimony. <u>Id.</u>

In <u>Seely</u>, the defendant challenged the qualification of an expert to testify regarding a design defect in a toaster because he lacked experience designing or manufacturing toasters. 349 F.Supp. at 388. The court held that the expert's education and experience in electrical engineering and his experience determining the causes of electrical fires and mechanical malfunctions was a sufficient foundation for him to testify as to the design of a toaster which may have resulted in a fire. <u>Id.</u> The court also relied on the fact that the expert had experience analyzing toaster failures. <u>Id.</u> The court stated "although [the expert's] lack of specific experience with toaster manufacture and design is relevant, his overall education and experience is more than adequate to permit him to testify as an expert in this case." <u>Id.</u>

In <u>Shreve</u>, the case relied on by defendant, this Court held that a mechanical engineer was not qualified to testify about a design defect in a snow thrower because the expert had no professional experience with respect to design of outdoor power equipment, never owned a snow thrower or operated one outside the context of litigation. <u>Id.</u> at 393. In that case, however, the expert's **sole** exposure to the product was the hour and a half he spent with the snow thrower in connection with that case. <u>Id.</u> Unlike the expert in <u>Shreve</u>, McLauchlan has been working with HVAC equipment for the past thirty years. Thus, defendants' reliance on <u>Shreve</u> is misplaced. This is not McLauchlan's first experience with unvented heaters or similar equipment. Indeed, he has performed over 800 forensic investigations involving failures of HVAC equipment, four of which have involved zero clearance wall mounted heaters. While he has never designed an

11

unvented wall mounted heater, he has significant design experience designing HVAC systems, which included wall mounted heaters as part of their design.  He is also knowledgeable in thermodynamics and heat transfer, and has been schooled in the fire sciences.  In addition to being an electrical engineer, he is a Certified Fire Investigator.

Defendants have blatantly mischaracterized McLauchlan's testimony about his knowledge and experience with unvented wall mounted heaters.  On page 6 of their Memorandum of Law, they write "McLauchlan had no familiarity with the design of this type of wall-mounted heater prior to his retention in this case, " and cite page 127 of McLauchlan's deposition in support.  A review of page 127 shows that that is directly opposite to what McLauchlan said:

> Q:    Would it be fair to say your information on zero clearance heaters is what you've accumulated to be, as a consequence of being an expert in this case?
>
> A:    No.  I have, as I previously testified, investigated fires involving zero clearance heaters in three other cases.

(McLauchlan depo., pp. 127-128.)

McLauchlan is clearly qualified based on his education, design experience and previous experience with HVAC equipment to testify regarding the failure and design inadequacies in the heater.  McLauchlan's opinion regarding the improper design of the heater is based on a fundamental concept of heater design, heat transfer and clearance to combustibles.

## B.    MCLAUCHLAN'S OPINIONS ARE SCIENTIFIECALLY RELIABLE.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon

12

> sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

F.R.E. 702.

Rule 702 was amended effective December 1, 2000.  The advisory committee notes on the amendment point out that "[a] review of the case law after Daubert shows that the rejection of expert testimony is the exception rather than the rule."  To be sure, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."  United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi, 80 F.3d 1074, 1078 (5th Cir. 1996).  In fact, the courts of this Circuit have described the net effect of Daubert as liberalizing the Rule 702 standard for admissibility of expert testimony.  See  Cavallo v. Star Enterprise, 100 F.3d 1150 (4th Cir. 1996); United States v. Dorsey, 45 F.3d 809 (4th Cir. 1995).

The Supreme Court made clear in Daubert that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596.  Further, the advisory committee notes to the 2000 amendment expressly state that, in accordance with the Supreme Court's directive in Kumho Tire Co. v. Carmichael, 527 U.S. 137 (1999), Rule 702 is "not intended to provide an excuse for the automatic challenge to the testimony of every expert."

To be admissible under Daubert, expert testimony must be based on "valid reasoning and reliable methodology."  In re TMI Litig., 193 F.3d 613, 665 (3d Cir. 1999), amended by 199 F.3d 158.  U.S. v. Crisp, 324 F.3d 261, 266 (4th Cir. 2003) (iterating that Daubert's "five factors neither necessarily nor exclusively apply to every expert").  The factors mentioned in Daubert do not constitute a "definite checklist or test."  Kumho Tire, 527 U.S. at 141.  These factors were meant to be helpful, not definitive, and the factors may or may not be pertinent in assessing reliability, depending upon the nature of the issue in the case, the expertise of the particular

witness and the subject of the opinion testimony.  Id. at 150.  See also Maryland Cas. Co. v. Therm-O-Disc, Inc., 137 F.3d 780, 784-85 (4th Cir. 1998) (affirming trial court's decision to admit expert's testimony without explicitly applying any of Daubert's "four non-exclusive 'general observations'").  The focus when assessing the reliability of an expert opinion under Daubert is on the principles and methodology of the expert in arriving at opinions, not on the conclusions that are generated by the expert.  Daubert, 509 U.S. at 595.  In some cases, the reliability of an expert witness may be based upon his personal knowledge or experience.  Kumho Tire, 526 U.S. at 156.

The scientific principles upon which McLauchlan relies to support his opinion as to the cause of the fire are neither new nor novel, and should not be considered unreliable under Daubert.  The ignition of wood at decreased temperatures has been witnessed, studied and researched since the early 1900's. Simply because a mathematical formula does not exist to explain the phenomenon, does not mean that the theory of pyrolysis or pyrophoric carbonization is unreliable.  As noted by Mr. Brabauskus, "scientific knowledge of a phenomenon does *not* require that a theory or an equation exist for it. . . . [T]he fundamental basis of all science is a systematic collection of data.  And a collection of observations is sufficient to form a basis for making scientific conclusions.  Thus . . . it is possible to reliably conclude that any heating device of 77°C or higher, if applied to a wood surface for a protracted period of time, presents a documented ignition hazard." .  See Vytenis Babrauskas, Ph.D, *'Pyrophoric Carbon' and Long-Term, Low-Temperature Ignition of Wood*, p. 6.

The defendants have not presented any evidence of their own to disprove the validity of pyrophoric carbonization.  Indeed, their own expert subscribes to the theory and has relied on it in other cases to explain the cause of a fire.  Defendants rely only on MagneTek to prove that McLauchlan's theory is unreliable.  However, the MagneTek Court acknowledged that the theory has its supporters as well as its detractors.  The trial court in that case simply decided to

14

exercise its discretion and side with the detractors.  On appeal, because there was evidence in the record to support the trial judge's decision, the Court declined to hold that the trial court abused its discretion.

Not having the benefit of knowing exactly what evidence was considered by the trial court in MagneTek, this Court should not simply follow the 10th Circuit's lead and declare McLauchlan's theory unreliable.  Plaintiff has submitted sufficient scientific evidence and facts to establish that McLauchlan's opinions are supported and reliable.  There is nothing in Daubert which requires everyone in the scientific community to agree on or accept a scientific theory.  Indeed, such an approach was expressly rejected by Daubert.  Given the broad discretion afforded trial courts in deciding whether to admit expert testimony, and given the split in authority on the theory's reliability, this Court should exercise its discretion in favor of admitting McLauchlan's opinions, and allow any weaknesses in those opinions to be hashed out at trial.

## C.    MCLAUCHLAN'S THEORY IS SUPPORTED BY THE FACTS IN EVIDENCE.

Defendants argue that McLauchlan's opinions are based on unsupported factual assumptions.  Specifically, defendant argues that there is no evidence to support a finding that lint, dust and debris accumulated between the back of the heater and the wall, or that the wall warped or moved.  Defendants' criticism stems from McLauchlan's alleged inability to provide direct evidence that there was dust and lint behind the Smullens heater and/or that the wall had warped.  This reasoning is contrary to the Rules of Evidence as circumstantial evidence may be used to drawn reasonable inferences or conclusions.

If defendants' argument is accepted and used as a basis for precluding McLauchlan's opinions, then the vast majority of fire investigators will be hard pressed to support their opinions due to the damage and destruction that normally accompanies any fire.  With most fires, much of the direct evidence proving its cause is destroyed.  Therefore, to support their opinions,

fire investigators rely on circumstantial evidence which stems from witness testimony, documents, personal observations and experience. In this case, the wall behind the heater, and any dust or lint on it, were consumed by the fire. However, the witness testimony supports a reasonable assumption that dust and lint collected in the 3/8 inch air gap and that, overtime, the wall behind the heater may have shifted, moved or warped.

Empire's own employee, John Davis, acknowledged that dust and lint would be drawn in through the louvers on the back of heater. Moreover, Mr. Smullens testified that the blower fan, located at the louvers, was "caked" with dust. In fact, the fan had so much dust on it that he had to used an air compressor to get it clean. In addition, common knowledge and experience tells us that, over time, dust and lint will collect in a room's nooks and crannies and on its hard surfaces. The only way the back of the heater could have been cleaned was if the Smullens removed the heater from the wall. (Davis depo., p. 152.) It is undisputed that this was never done.

As for movement or warping of the wall, again, it is common knowledge that buildings are not static, they will move and shift overtime. Wood may expand and contract depending on humidity and moisture levels. John Davis testified that one of the concerns raised by using the subject heater on a continuous basis was due to the moisture it produced. (Davis depo., p.147.)

Under Federal Rule of Evidence 703, the court must determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony. See Johnson Elec.N.America v. Mabuchi Motor America, 103 F.Supp.2d 268, 284 (S.D.N.Y. 2000). Considering the evidence in this case, it is wholly reasonable for McLauchlan to assume that there was dust, lint and ambient debris behind the back of the heater and the wall may have moved or warped over the nine years that the heater was attached to it. McLauchlan's factual assumptions are neither speculative nor conjectural, but are based upon credible evidence in the record considered against his years of education, training and experience. Defendants' criticisms

of McLauchlan's factual findings simply go to the weight of his opinions, not their admissibility, and are best challenged on cross-examination, not by way of a summary judgment motion.

In addition, defendants and their expert misapprehend the significance of the existence of dust and movement of the wall behind the heater. Plaintiff's theory is not based on the wall warping and coming into contact with the rear of the heater. The significance of the presence of lint and dust and movement of the wood paneling is that it will compromise and effectively reduce or eliminate the ⅜ inch air gap, which Empire maintains must exist in order for the heater to comply with the ANSI standard and not pose a fire hazard. Davis himself testified that if you do not maintain the ⅜ inch air gap, then the temperatures on the wall will increase:

> Q:    I think you said the purpose of that 3-8ths inch air gap behind the unit was to serve to cool the unit.
>
> A:    Right.
>
> Q:    Is that right?
>
> A:    It keeps it cool that way also, yes.
>
> Q:    Does the 3-8th inch air gap that is behind the unit and/or any of the clearances that are associated with the heater, do they help to maintain the allowable temperatures that the heater can reach under the ANSI standard? Is that generally what the purpose is?
>
> A:    Yes. You want to have, if you have things too close that can keep the warm air in there and can raise the temperatures of the wall.

(Davis depo., pp. 107-108.)

⅜ inch is an extremely small distance and presents a very small margin of error. Any dust or lint in that space or slight warping of the wall could effectively reduce the ⅜ inch gap and air flow, thus increasing the temperatures on the back wall. It is common knowledge that wood will expand and contract depending on humidity levels, moisture, etc. Davis testified that prolonged use of the heater could produce excessive moisture. Therefore, it is wholly reasonable to conclude that the wall board may have warped during the lifetime that the heater was attached

17

to it.  Given the evidence in this case, one cannot say that McLauchlan did not act reasonably in reaching his factual assumptions.

Defendant also argues that McLauchlan's opinions are not factually supported because dust and lint are insulator and not conductors.  To support this claim, they have introduced an Affidavit of their expert Tom Marciniak.  This evidence does not serve to render McLauchlan's opinions factually unsupported or inadmissible and is a red herring interjected in the case due to their misunderstanding of McLauchlan's theory.  It really is of no moment as to whether the experts agree or disagree on whether lint and dust are conductors or insulators because the material issue is whether the presence of lint and dust on the back of the heater served to block or impede the air flow in the ⅜ inch air gap.  It is common knowledge and experience that lint and dust block air flow.  In addition, Davis explained that it was important that the heater be cleaned of lint because "[i]f you have too much lint, you are not getting enough air. . . ."  (Davis depo., p. 131.)  Thus, Empire recognizes that lint is a material that can block the flow of air.

### D.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as any material fact and that the moving party is entitled to judgment as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A fact is material for purposes of summary judgment, if when applied to the substantive law, it effects the outcome of the litigation.  Id. at 248, 106 S. Ct. 2505.  A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact.  Anderson, 477 U.S. at 248-249, 106 S.Ct. 2505.  All facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the non-moving party.  Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### E.    DEFENDANTS HAVE MISSTATED PLAINTIFF'S BURDEN OF PROOF ON ITS STRICT LIABILITY CLAIM.

Maryland first adopted the theory of strict liability in Phipps v. General Motors Corp., 278 Md. 337, 363 A.2d 955 (1976).  To prove a claim for strict liability, plaintiff must show: (1) the product was in a defective condition when it left the seller; (2) it was unreasonably dangerous to the consumer; (3) the defect was the cause of injuries; and (4) the product was expected to and did reach the consumer without substantial change in its condition.  Halliday v. Sturm, Ruger & Co., 368 Md. 186, 194, 792 A.2d 1145, 1150 (2002).  In general, courts across the country have adopted and applied two different standards by which a claimant can prove a defect, "the consumer expectation test" and "risk-utility test."  Defendants maintain that plaintiff must prove its product claim in this case by using the risk-utility test.  They are incorrect.   "To determine whether a product is defective in its design, Maryland cases have generally used the 'consumer expectation test.'"  Halliday, 368 Md. at 199, quoting Simpson v. Standard Container Co, 72 Md.App. 1999, 527 A.2d 1337 (1987).

The issue of what test to apply in a given products case was discussed and analyzed at length in Halliday.  There, the plaintiff's three year old son was killed while playing with a gun.  The plaintiff sued the gun manufacturer and asked the Court to apply the risk-utility test.  The court refused because it found that the risk-utility test applied only "when something goes wrong with a product."  Halliday, 368 Md. at 197, 792 A.2d at 1152.  Meaning, the use of that test was limited to cases where the product had malfunctioned.  In cases where the product at issue has not malfunctioned, but has operated as intended, the consumer expectation test is to be applied.  Id., see also, Kelley v. R.G. Industries, Inc., 304 Md. 124, 497 A.2d 1143 (1985).  Here, plaintiff does not allege that the heater malfunctioned.  Rather, it alleges that the product, as designed, was unreasonably dangerous when used in an expected and ordinary manner.  Thus, the consumer expectation test applies.

Under the consumer expectation test, a product is defectively dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased it with the ordinary knowledge common to the community as to the product's characteristics. Halliday, 268 Md. at 193, 497 A.2d at 1150. Assessing the evidence under this standard, genuine issues of material fact exist as to whether defendants may be held strictly liable to plaintiff. Indeed, reasonable minds could conclude that there was no way the Smullens could have contemplated that by installing the heater in accordance with the manufacturer's instructions, it could result in a fire and loss of their business. It is undisputed that the heater was installed in accordance with the manufacturer's instructions. It is also undisputed that if the ⅜ inch air gap was compromised, the heater would cease to comply with the ANSI standard and increased temperatures on the back of the heater could occur. Based upon the evidence, reasonable minds can also conclude that the ⅜ inch air gap was compromised by the build up of dust and lint or movement of the wall. There is sufficient evidence in this case to create a genuine issue of material fact on plaintiff's strict liability claim, which must be submitted to the jury for resolution.

### F.    PLAINTIFF MAY RELY ON ONLY CIRCUMSTANTIAL EVIDENCE TO PROVE ITS CASE.

Defendants argue that plaintiff's claim for strict liability must be dismissed because McLauchlan's opinion as to the cause of the fire is inadmissible. Even if McLauchlan is precluded from testifying at the cause of the fire and/or defective design of the heater, plaintiff may nonetheless prove its product case by relying only on circumstantial evidence. In Maryland, a product defect may be adduced by one or more of three legitimate paradigms: (1) direct proof based on the nature of the accident in the context of the particular product involved; (2) circumstantial proof based on an inference of a defect from a weighing of several factors; and (3) direct affirmative proof through opinion testimony by an expert witness. Shreve v. Sears,

Roebuck & Co., 166 F.Supp.2d 378 (D. Md. 2001). The following factors must be weighed in determining whether a product defect may be inferred from circumstantial evidence: (1) expert testimony as to possible causes; (2) the occurrence of the accident a short time after the sale; (3) same accidents in similar products; (4) the elimination of other causes of the accident; (5) the type of accident that does not happen without a defect. Harrison v. Bill Cairns Pontiac of Marlow Heights, Inc., 77 Md. App. 41, 549 A.2d 385 (Md. Ct.Spec. App. 1988). A plaintiff also must present evidence sufficient for a jury inference that the product was defective and that this defect existed at the time of the manufacture. Shreve, 166 F.Supp.2d at 408 quoting Harrison, 549 A.2d at 390.

There is sufficient evidence in this case upon which a jury could reasonably infer that the heater was defective, the defect existed at the time of manufacture and the heater caused the fire. As explained above, all other potential causes for the fire were investigated and eliminated. This is not the type of accident that happens without a defect. Indeed, the heater is an inanimate object that was merely sitting on the wall operating under normal conditions. There were no modifications made to the heater and the heater was not misused.

In addition, contrary to defendants assertions, this is not the one and only claim or accident relating to this product. As of March 22, 2005, the time that John Davis was deposed, defendants had received notice of at least 12 claims pertaining to unvented heaters that they have manufactured and sold. (Davis depo., pp. 49-51.) Defendants' statement that "the sale of 160,000 units without the occurrence of any fire related to the hazards about which plaintiff complains, compels the conclusion that the defendants had no basis for believing there was a hazard about which plaintiff should have been warned," is disingenuous and lacking in foundation. Davis testified that of the 10 or 11 claims that were reported to Empire prior to 2000, he had no idea what they entailed because everything was tendered to BSH in Spain and Empire did not retain any file. (Davis depo., p. 50.) By failing to investigate these claims,

21

Empire remained intentionally ignorant of potential hazards associated with its product.  While ignorance may be bliss, it cannot be a basis for claiming that no heaters manufactured and sold by the defendants ever caused a fire in the manner alleged by plaintiff.[4]

### G.    THERE ARE GENUINE ISSUES OF FACT WITH REGARD TO PLAINTIFF'S FAILURE TO WARN CLAIM.

A manufacturer has a duty to warn if the item produced has an inherent and hidden danger that the producer knows or should know could be a substantial factor in causing and injury.  Virgil v. "Kash N' Karry" Service Corp., 61 Md. App. 23, 33, 484 A.2d 652, 657 (1984). The duty warn includes risks involved in the intended uses of the product as well as reasonably foreseeable misuses.  Id.

According to defendants own representative, in order for the heater to comply with the ANSI standard and not pose a fire hazard, a ⅜ inch clearance had to be maintained between the back of the heater and the wall to which it was attached.  It is undisputed that the Installation Guide contains no such instruction or warning, despite that it instructs installers and consumers as to other necessary clearances.  It is also undisputed that the instructions do not warn the consumer that if the ⅜ inch air gap is clogged or obstructed, it could result in increased temperatures and pose a fire hazard.  This evidence alone is sufficient to submit plaintiff's failure to warn claim to the jury.

To prove a warnings case, expert testimony regarding the adequacy of the warnings is not necessary.  The Maryland Courts have recognized that expert testimony is not always required in

---

[4] Davis has submitted an Affidavit which states "prior to the claim in this case, there have been no reports that Corcho CH-18, Ch-18T, Empire SR-18 or Empire 18T unvented heaters that were attached to walls caused fires on the walls on which they were attached."  This paragraph, and others, must be stricken and not considered by this Court as his Affidavit does not provide a proper factual foundation for these statements.  As evidenced by his deposition testimony, Davis has no knowledge of the specifics of the 11 other claims involving defendants' heaters and, therefore, he cannot attest to whether they involved reports similar to those made by plaintiff in this case.

order to establish a defect. <u>Virgil</u>, 61 Md.App. at 30, 484 A.2d at 656.  Expert testimony is only required when the subject of the inference is so particularly related to some science or profession that it is beyond the ken of the average layman. <u>Id.</u>  The installation instructions and warnings affixed to the heater are not complex.  Indeed, they are intended by defendants to be read and understood by the lay person.  The adequacy of the warnings and instructions in this case is not something that is so particularly related to some science or profession that it is beyond the ken of the average laymen.  The jury should be entitled to examine the warnings and instructions and determine for themselves whether they were clear and adequate.  For purposes of summary judgment plaintiff must be given the benefit of any factual inferences including that the instructions and warnings were inadequate.

### H.    THERE ARE GENUINE ISSUES OF FACT WITH REGARD TO PLAINTIFF'S NEGLIGENCE AND MISREPRESENTATION CLAIMS.

Likewise, there is sufficient evidence in this case to submit plaintiff's claims for negligence and misrepresentation to the jury.  A jury could find that the defendants were negligent in the preparation of, and misrepresented the requisite clearances in, their installation instructions by failing to advise the consumer about the necessary ⅜ inch clearance on the back of the heater.   Both BSH and Empire played a role in drafting the installation instructions.  (Davis depo., pp. 91 -92.)   BSH originally drafted the instructions and then Empire reviewed and revised them as necessary to ensure they were properly translated into English.  Davis also testified that one of Empire's engineers, Bruce Cepicky, was responsible for ensuring that the instructions correctly reflected the necessary clearances to combustibles.  (Davis depo., p. 93.)

To prove a negligence claim, plaintiff must show a duty, a breach of that duty, an injury proximately caused by the breach and damages.  To prove misrepresentation, plaintiff must show (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has

knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff justifiably takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence. <u>Gross v. Sussex, Inc.</u>, 332 Md. 247, 630 A.2d 1156 (Md. 1993).

      "[T]he duty to furnish correct information so as to avoid liability for negligent misrepresentation arises when the relationship is of the nature that one party has the right to rely upon the other for information." <u>Giant Food v. Ice King</u>, 74 Md.App. 183, 536 A.2d 1182, 1185 (Md. App. 1988).  "The precise degree of the relationship that must exist before recovery will be allowed is a question that defies generalization." <u>Id</u>.  Each case must be decided on the peculiar facts presented. <u>Id</u>.  The relationship of the Smullens to defendants BSH and Empire gives rise to a duty owing from defendant to the Smullens.  Indeed, Empire and BSH are in the business of selling heaters to consumers.  The law is settled that product manufacturers and sellers owe a duty to consumers concerning the design, manufacture and sale of a product.  A jury can reasonably conclude that the defendants negligently asserted a false statement, to wit: the requisite clearance to combustibles.  The law recognizes claims for misrepresentation to hold people accountable for giving correct information.  As explained by the court in <u>Giant Food</u>, '[l]iability in such cases arises only where there is a duty, if one speaks at all, to give the correct information." 536 A.2d at 1184.  Here, defendants gave incorrect information about the necessary clearances.  They spoke only about the required clearances for the bottom, top and sides of the unit.  They made no mention of the required ⅜ inch gap at the back of the heater and instead led consumers to believe that the heater could be mounted directly to combustibles.  They also never mentioned anything about needing to keep the air gap open continuously so as to avoid a fire hazard.

      Moreover, the defendants can hardly deny that they intended for purchasers of their heaters to comply with their installation instructions.  Based upon the evidence in this case, a

jury can conclude that the defendants had knowledge that the Smullens would reasonably rely on the statements set forth in their installation manual.  There is no bright line test for determining "reasonable reliance."  The test is to "view the act in its setting, which will include the implications and the promptings of usage and fair dealing."  Id. at 1186.

Defendants' attempt to avoid liability because Mr. Smullens does not remember seeing or reading the Installation and Owner's Guide should not be sanctioned.  In this case, the Smullens purchased the heater from Empire's distributor, Sharp Energy.  In fact, the Smullens had to purchase the heater from a distributor because the heaters are not sold directly to consumers. The installation entailed hooking up gas lines and electrical wiring, tasks beyond the expertise of most lay people.  Therefore, the Smullens had to retain Sharp Energy to install the heater.  The Smullens justifiably relied on Sharp Energy to install the heater in accordance with the manufacturer's instructions.  Sharp Energy, in turn, justifiably relied on the Installation instructions to install the heater.  It is undisputed that the heater was installed in accordance with the installation instructions.  Under these circumstances, it is appropriate to hold the defendants liable for any misrepresentation contained in the instructions, even though the Smullens may not have read the installation instructions.  If this were not the case, then manufacturers and sellers of products could draft their installation instructions without care knowing that the product would be installed by a third party and the end user may never have occasion to read the installation instructions. A jury can also find that plaintiff suffered damage proximately caused by the defendants' misrepresentations. Hence, there is sufficient evidence in this case to submit plaintiff's claims for negligence and misrepresentation to the jury.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, plaintiff respectfully requests that defendants' motion with respect to plaintiff's claims for negligence, strict liability and misrepresentation be denied.

Respectfully submitted,

COZEN O'CONNOR

BY:   s/Georgia S. Foerstner

        PAUL R. BARTOLACCI (*pro hac vice*)
        GEORGIA S. FOERSTNER (*pro hac vice*)
        1900 Market St.
        Philadelphia, PA 19103
        215-665-2000

        Attorneys for Plaintiff

Local counsel:
Thomas A.. Wood, IV, Esq.
NEUBERGER, QUINN, GIELEN,
RUBIN & GIBBER, P.A.
One South Street
27th Floor
Baltimore, MD 21202

26

**CERTIFICATE OF SERVICE**

I hereby certify that on January 18, 2007, a copy of the foregoing Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

_____ s/ Georgia S. Foerstner _____
GEORGIA S. FOERSTNER, ESQUIRE
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103