August 11, 2006     Case 1:03-cv-00178-WMN    Document 74-14    Filed 01/18/2007    Page 1 of 5
Multi-Page Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SELECTIVE INSURANCE COMPANY, :

as subrogee of SMULLENS :

SALVAGE AND TOWING, :

        Plaintiff, :

   vs. :

EMPIRE COMFORT SYSTEMS, INC., : Civil Action No.

      Defendant and Third- : WMN 03 CV 178

      Party Plaintiff, :

   vs. :

SHARP ENERGY, INC., :

      Third-Party Defendant:

      --------------------

Deposition of KENNETH R. MCLAUCHLAN,

taken on Friday, August 11, 2006, at 12:12 p.m.,

at the offices of Anderson, Coe & King, LLP, 201

North Charles Street, Baltimore, Maryland, before

Paul A. Gasparotti, Notary Public.

      --------------------

Reported by: Paul A. Gasparotti

Case 1:03-cv-00178-WMN   Document 74-14   Filed 01/18/2007   Page 2 of 5

August 11, 2006 | Multi-Page Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 50

1  A. I was representing, I believe it was the
2  owner of the building where the fire occurred.
3     Q. And was your conclusion in that case
4  that allowing the door to come in contact with
5  the front of the heater was the cause of the
6  fire?
7     A. Yes.
8     Q. Have you ever had a case prior to this
9  case involving an opinion with regard to the
10 design of a zero clearance gas heater for a
11 residence, or a building?
12    A. No.
13    Q. Ever been involved in manufacturing a
14 zero clearance wall heater?
15    A. No.
16    Q. I think you indicated you have a
17 bachelor's degree from the University of
18 Maryland; is that correct?
19    A. Yes.
20    Q. Do you have any degrees beyond that?
21    A. No.

Page 51

1     Q. Have you taken any courses involving the
2  design of gas wall heaters?
3     A. No.
4     Q. Is this the first case where you have
5  been asked to look at the design of a zero
6  clearance gas heater, the design of it?
7     A. I would say in all the prior cases that
8  I had, I considered the design of the heater as
9  part of my investigation.
10    Q. Do you know what kind of heater it was
11 in the case involving the door, who the
12 manufacturer was?
13    A. No, I don't.
14    Q. Was it similar, was the heater similar
15 to the heater in this case in terms of its design
16 and function?
17    A. I would say that it was generally
18 similar.
19    Q. It was gas, what, LP gas?
20    A. It was propane-fired and it had specific
21 clearances from combustibles; however, it was a

Page 52

1  zero clearance.
2     Q. It was a zero clearance?
3     A. Yes, at the rear.
4     Q. Did you examine that heater?
5     A. Yes.
6     Q. Have you ever testified as an expert on
7  the issue of the adequacy of warnings and
8  instructions in owner's manuals for gas or
9  electrical appliances, first of all, for gas
10 appliances?
11    A. I don't believe so.
12    Q. Have you ever been offered and accepted
13 as an expert in a case involving the design of
14 zero clearance gas heaters?
15    A. I have never been offered, no.
16    Q. Have you ever been accepted as an expert
17 on the issue, adequacy of the warnings on an
18 appliance, on a gas heater?
19    A. I can't think of any case.
20    Q. I might have asked you this already.
21 Have you ever previously rendered an opinion on

Page 53

1  the adequacy of warnings and instructions in an
2  owner's manual for a zero clearance gas heater?
3     A. Not that I can recall.
4     Q. Do you have any experience as an expert
5  on the testing of wall-mounted zero clearance gas
6  heaters, prior to this case?
7     A. No.
8     Q. Do you have any experience writing
9  instructional manuals for zero clearance gas
10 heaters?
11    A. No.
12    Q. Do you have any experience as an expert
13 on the issue of design of wall-mounted gas
14 heaters, where the issue was design of the
15 heater?
16    A. No.
17    Q. When did you become involved in this
18 case, when were you first notified?
19    A. It would have been shortly before the
20 joint site inspection that was November 10th of
21 2000.

August 11, 2006 — Case 1:03-cv-00178-WMN Document 74-14 Filed 01/18/2007 Page 3 of 5
Multi-Page Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 126

1  MR. BARTOLACCI: Objection to the form.
2  A. I'm not aware, but I haven't made any
3  attempt to do that research.
4  Q. Are you aware of any studies that
5  existed as of 1990 at the time this heater was
6  manufactured that indicated that this was a
7  hazard, not -- this was a hazard, the
8  accumulation of combustible materials blocking
9  the louvres?
10     MR. BARTOLACCI: Object to form.
11  A. I'm not aware of any studies that would
12  specifically address blockage of louvres on an
13  Empire CH-18 zero clearance heater.
14  Q. Well, how about for any zero clearance
15  heater that had louvres at the back and a gap of
16  three-eighths of an inch between the back of the
17  surface of the heater and the wall, are you aware
18  of any reports, fire reports, studies, anything
19  that indicated this was a hazard for zero
20  clearance heaters with a three-eighths-inch gap
21  that had louvres?

Page 127

1     MR. BARTOLACCI: Objection to the form.
2  A. I'm not aware of any such studies, but
3  again, I have not attempted to research that
4  issue.
5  Q. Prior to this case, have you done any,
6  did you have any familiarity about the issue of,
7  or any knowledge about the issue of the zero
8  clearance heaters and the gaps they have?
9     MR. BARTOLACCI: Objection to the form.
10  A. No.
11  Q. Did you have any knowledge with regard
12  to the design, or issues of or problems with the
13  design of zero clearance heaters prior to this
14  case?
15     MR. BARTOLACCI: Objection to the form.
16  A. No.
17  Q. Would it be fair to say your information
18  on zero clearance heaters is what you've
19  accumulated to be, as a consequence of being an
20  expert in this case?
21  A. No. I have, as I previously testified,

Page 128

1  investigated fires involving zero clearance
2  heaters in three other cases.
3  Q. Did you ever investigate a fire
4  involving a zero clearance heater that you
5  believed was started because of the accumulation
6  of combustible materials that blocked the louvres
7  in the back of the heater?
8  A. Prior to this case, no.
9  Q. Have you ever heard of such a fire being
10  caused because of that, the mechanics of that?
11  A. No.
12  Q. Now you said you were a member of the
13  National Association of Fire Inspectors, or, I'm
14  sure I got that wrong; what is it?
15  A. National Association of Fire
16  Investigators, and also the International
17  Association of Arson Investigators.
18  Q. And you also have presented, I believe
19  in your CV you say you presented, you've either
20  attended or given seminars on various types of,
21  involving fires, is that correct, and appliances?

Page 129

1  A. Yes.
2  Q. And you receive publications -- have you
3  received publications over the years from fire
4  investigative organizations?
5  A. Yes.
6  Q. What type of publications do you
7  receive?
8  A. I receive the NFPA journal.
9  Q. How often does that come out?
10  A. Monthly.
11  Q. And how long have you been receiving it?
12  A. I think I became a member in the
13  mid 1980s.
14  Q. And have they ever had an article or any
15  mention of the hazards of combustibles
16  accumulating behind the back of a zero clearance
17  heater in the area of the louvres posing a
18  hazard, a fire hazard?
19  A. No.
20  Q. What other publication have you gotten,
21  fire-related publications?

August 11, 2006
Case 1:03-cv-00178-WMN   Document 74-14   Filed 01/18/2007   Page 4 of 5
Multi-Page Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 146

1 Ignition Handbook, marked for identification.)
2  Q. Let me show you this McLauchlan 13; is
3 this the Ignition Handbook that you are relying
4 on?
5  A. Exhibit 13 is an excerpt that I am
6 relying on.
7  Q. And is the ignition -- is the theory of
8 pyrophoric decomposition an accepted scientific
9 theory for how fires can start?
10  A. The concept of pyrolysis is not a
11 theory, it's actually a definition of a process
12 which has been documented in peer-reviewed
13 publications such as the Ignition Handbook.
14  Q. Has it been, to your knowledge, peer
15 reviewed and accepted in the scientific
16 community?
17  A. I know it has been reviewed by the
18 Society of Fire Protection Engineers.
19  Q. And when was that?
20  A. That was in 2003.
21  Q. Prior to this case, did you ever give an

Page 147

1 opinion of, that a fire was caused by, prior to
2 your first draft report of June 28, 2003, had you
3 ever given an opinion that a fire was caused by
4 pyrolytic or pyrophoric decomposition?
5  A. Yes.
6  Q. When was the first time?
7  A. Oh, boy. Many years ago. I can't
8 recall when the first time would have been.
9  Q. Has this theory ever been rejected, to
10 your knowledge, as being unscientific?
11  A. I'm aware of the Magne Tek case in which
12 the Court of Appeals rejected it.
13  Q. Has it ever, to your knowledge, been
14 accepted by a court as scientifically valid?
15  A. I don't know.
16  Q. Have you ever done any testing yourself
17 to determine whether the theory can
18 scientifically be supported?
19  A. I haven't done that, primarily because
20 the nature of pyrolysis requires an extremely
21 long interval of time that you would have to

Page 148

1 monitor your test equipment. There are also a
2 number of variables which really determine the
3 interval of time and the temperature at which the
4 pyrolysis would go from char to flaming
5 combustion. But to answer your question, I have
6 not undertaken any sort of study.
7  Q. Is there any fire scientist that has
8 created a model that has shown how pyrolytic
9 decomposition works?
10  A. I know that there are people working on
11 that, but to date, I'm not aware of any
12 mathematical model that has been accepted that
13 will basically explain why pyrolysis occurs.
14  Q. Or that can predict when pyrolysis will
15 occur?
16  A. That's correct.
17  Q. Are you aware of any studies besides
18 these articles by Bavrauskas, are you aware of
19 any other, have you seen any other studies that,
20 any studies that support his opinion?
21  A. Actually, one of the things that is

Page 149

1 there is Bavrauskas, but I cite other studies
2 that show that low temperature, long-term heating
3 of cellulosic materials results in this pyrolysis
4 effect and flaming ignition.
5  Q. But your whole basis for this theory is
6 what Dr. Bavrauskas has postulated in the
7 Ignition Handbook?
8  A. I think that is the most concise
9 accumulation of all the literature that is
10 supportive of the pyrolysis phenomenon.
11  Q. Have you done any testing to determine
12 the validity of the pyrolytic decomposition in
13 this case?
14  A. No. I've relied on the scientific
15 treatise.
16  Q. Mr. Bavrauskas?
17  A. Yes.
18  Q. Can you tell me what surface
19 temperature, or isn't it a fact that you don't
20 know what the surface temperature was on the
21 heater at the time of the fire, the surface

August 11, 2006 — Case 1:03-cv-00178-WMN Document 74-14 Filed 01/18/2007 Page 5 of 5
Multi-Page Deposition of KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 150

1 temperature on the back of the heater at the time
2 of the fire?
3   A. I don't know the specific temperature on
4 this Empire CH-18, and obviously that's one of
5 the reasons I wanted an exemplar to test. I'm
6 aware in the ESI testing of a heater, which is
7 not what I would consider a true exemplar, met
8 the ANSI standard, that surface temperatures in
9 excess of 200 degrees were reached.
10   Q. And what were the conditions that
11 existed at that time?
12   A. Well, we would have to actually go to
13 the ESI report to describe the conditions.
14   Q. So it would be correct to say you don't
15 know what the surface temperature was on the back
16 of the heater when it was operating on the night
17 of the fire. Would that be correct?
18   A. In order to, for my opinion, I have made
19 an assumption that the temperature would be in
20 the range of in excess of 180 degrees Fahrenheit.
21   Q. What's your basis of saying that, what

Page 151

1 is your factual basis for that assumption?
2   A. The fact that the standard allows the
3 temperature rise of 117 degrees Fahrenheit on the
4 surfaces behind the heater. In order for the
5 heat to be transferred, the surface temperature
6 of the heater would have to be higher than that,
7 so my opinion would be that it would be in excess
8 of that 117 degrees plus the room temperature,
9 which gets you into the 180-degree range, the
10 surface temperature higher than that.
11   Q. But you're assuming that the heater is
12 the source of the fire, and therefore assuming
13 the temperature is 180 degrees; is that correct?
14   A. No. I'm assuming in a heater that
15 complies with the ANSI standard, which is allowed
16 to have a temperature rise on the wall behind the
17 heater of 117 degrees Fahrenheit above room
18 temperature, that the surface temperature of that
19 rear surface of the heater would have to reach
20 about 180 degrees for the temperature of the wall
21 to reach that temperature, the 117 plus room

Page 152

1 temperature.
2   Q. Now, how many -- as I understand, this
3 heater has three settings?
4   A. Yes.
5   Q. And there is a low, medium and high
6 setting?
7   A. Yes.
8   Q. And as I understand it, the heater was
9 on the lowest setting on the night of the fire?
10   A. It was on the lowest setting. Depending
11 on the deposition transcripts, it was either on
12 the low setting or it may not have been turned
13 back from a higher setting, but there was some
14 testimony that it was at the low setting.
15   Q. And in fact, didn't Nadine Cameron
16 testify that she had turned it to the low setting
17 before she left that night?
18   A. I think what she testified was that she
19 thought she had, but she wasn't positive.
20   Q. Didn't she testify that she always
21 turned it down at night?

Page 153

1   A. Her testimony was that was one of the
2 things she did before she closed up, was turn it
3 down.
4   Q. Would you agree, then, that more likely
5 than not it was turned down to the lowest setting
6 that night, since that was her procedure and
7 that's what she said she did?
8   A. That was her procedure, but she did have
9 doubt as to whether she had turned it down.
10   Q. If it was on a low setting, that would
11 mean that the surface temperature would be less?
12   A. No, it wouldn't, because each heater has
13 a discrete burner, and that burner puts out a
14 fixed amount of heat, and it's independent of
15 what the other burners are doing.
16   Q. So if one or two are turned off, that
17 one is going to produce the same heat independent
18 of the other two, along the entire back surface
19 of the heater?
20   A. No. The temperature is going to stay
21 the same on the operational brick.