1

```
 1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND
 2                    - - -
      SELECTIVE INSURANCE    :  CIVIL ACTION
 3    COMPANY, as subrogee   :
      of SMULLENS SALVAGE    :
 4    AND TOWING,            :
           Plaintiffs,       :
 5                           :
           vs.               :
 6                           :
      EMPIRE COMFORT         :
 7    SYSTEMS, INC.,         :
           Defendant and     :
 8         Third-Party       :
           Plaintiff         :
 9                           :
           vs.               :
10                           :
      SHARP ENERGY, INC.,    :
11         Third-Party       :
           Defendant         :  NO. WMN-03-CV-178
12                    - - -
13             November 15, 2006
14                    - - -
15             Oral deposition of PATRICK
      J. McGINLEY, held in the offices of Cozen
16    O'Connor, 1900 Market Street,
      Philadelphia, Pennsylvania 19103,
17    commencing at 2:18 p.m., on the above
      date, before Pamela J. Gober Bracic, a
18    Federally Approved Registered
      Professional Reporter and Commissioner
19    for the Commonwealth of Pennsylvania.
                      - - -
20
21
22        ESQUIRE DEPOSITION SERVICES
          Four Penn Center - Suite 1210
23        1600 John F. Kennedy Boulevard
          Philadelphia, Pennsylvania 19103
24             (215) 988-9191
```

ESQUIRE DEPOSITION SERVICES

30

1    "fire investigative report."
2    BY MR. BARTOLACCI:
3        Q.   What do you understand
4    Exhibit-6 to be?
5        A.   The fire report prepared
6    after the response.
7        Q.   What company responded?
8        A.   The name of the fire
9    company?
10       Q.   Yes.
11       A.   I don't know if it's written
12   on here. I don't see the name of it on
13   here at all, sir.
14       Q.   Do you know whether it was a
15   paid company or a volunteer company?
16       A.   It was clearly volunteer.
17   It says that on here, volunteer fire
18   company. But I don't know what the name
19   of the company was, sir.
20       Q.   And the report that you have
21   was prepared by the chief of the fire
22   company. Is that right?
23       A.   Probably. That's usually
24   the way it works. The chief knocks out

31

1    or prepares this page when he gets back
2    to the station.
3        Q.   And his name was Reynolds?
4        A.   R. Reynolds is correct.
5        Q.   And did Mr. Reynolds render
6    an opinion on that report as to the
7    likely cause of the fire?
8        A.   He wrote in the space
9    identified as Probable Cause, yes, sir.
10       Q.   What did he write?
11       A.   "Gas heater."
12       Q.   Do you understand that to
13   mean the Empire zero-clearance heater?
14       A.   I'm sure. It's the only gas
15   heater that was around there that I'm
16   aware of. I think that's what he meant.
17       Q.   Did you contact Chief
18   Reynolds to ask you him the basis of his
19   opinion?
20       A.   No.
21       Q.   Did you make any contact
22   with any of the first-arriving
23   firefighters to discuss their
24   observations?

32

1        A.   No.
2        Q.   In your report you write, on
3    page three -- actually page two of the
4    report, because you have a cover sheet as
5    the first page. Do you see the paragraph
6    which starts with, "My review of the
7    Complaint?"
8        A.   Yes, sir.
9        Q.   Halfway down you say, "The
10   wooden surfaces to which the heater was
11   attached were not subject to charring or
12   pyrophoric action." Is that correct?
13       A.   That's correct.
14       Q.   What did you mean by
15   "charring?"
16       A.   Charring is the remains of
17   the pyrophoric process whereby wood,
18   which is primarily cellulous and water,
19   when exposed to heat, turns into
20   something else, which is primarily
21   charcoal. That charcoal leaves the
22   alligator-looking indicator of charring.
23   That's what charring is.
24       Q.   And what is this phrase

33

1    "pyrophoric processing;" what does that
2    mean?
3        A.   Heat decomposition.
4        Q.   Can you explain that in a
5    little bit more detail for me?
6        A.   Pyrolysis is the process
7    whereby a material, when exposed to heat,
8    turns into something else prior to
9    ignition. Recognizing that solids, and
10   liquids, for that matter, don't burn,
11   that only gases burn, in order for a
12   solid material, such as paper or wood, to
13   burn, it has to be subjected to pyrolysis
14   or pyrophoric action so that the material
15   itself, when heated, will give off gas,
16   it will break down into another substance
17   and give off a vapor that is ignitable.
18   It's that vapor that burns, not the solid
19   material.
20            Therefore, for any solid
21   material to burn, it has to be subjected
22   to pyrolysis or pyrophoric action. And
23   when it is subjected to pyrolysis, it
24   changes in appearance, it changes in

PATRICK J. McGINLEY

34

1 physical character, and then it ignites
2 at a different temperature than the
3 original material.
4     Q.   So is it fair to say that
5 the materials have a gradual reduction of
6 their ignition temperature over time,
7 which eventually can lead to pyrophoric
8 action?
9     A.   Pyrophoric ignition. That
10 happens primary with wood, but also with
11 cloth or paper, because they burn
12 quickly.
13         Sure, the wood pyrolyses,
14 turns into carbon, and then ignites, if
15 you are just talking about ignition from
16 pyrophoric action.
17     Q.   And the classic example of
18 this is a steam pipe up against a wood
19 lathe?
20     A.   There was evidence reported
21 by the NFPA that theoretically a steam
22 pipe, at a temperature of 212 degrees
23 Fahrenheit, when in direct contact with
24 wood lathe in a partition, caused

35

1 ignition. That is the lowest temperature
2 ever recorded whereby pyrophoric action
3 led to ignition at that temperature, a
4 temperature that low, 212 degrees
5 Fahrenheit.
6     Q.   Do you sometimes see issues
7 involving pyrolysis or pyrophoric
8 ignition with chimneys where you don't
9 have clearance --
10     A.   It's usually a condition
11 whereby you have direct contact with a
12 wooden material. I've seen builders tie
13 floor joists into chimneys. I've seen it
14 happen.
15     Q.   Have you ever rendered an
16 opinion, in all of your years of being a
17 fire investigator, that a fire was caused
18 by pyrophoric process?
19     A.   Certainly.
20     Q.   You think it's a valid
21 scientific theory?
22     A.   I do, sir.
23     Q.   You've read the reports of
24 our experts in this case, ESI?

36

1     A.   Yes, sir.
2     Q.   Do you know whether or not
3 they believe that pyrolysis is a valid
4 scientific theory?
5     A.   I don't recall whether or
6 not they addressed that specific subject
7 in their report, but I read the results
8 of their testing. That's what I was
9 focusing on.
10         I don't remembering them
11 offering an opinion regard the validity
12 of pyrolysis. I think they said it was
13 invalid in this case, but I don't know
14 that they made a general opinion on the
15 process.
16     Q.   Let's go back to that
17 sentence that we talked about earlier in
18 your report where you wrote "The wooden
19 surfaces to which the heater was attached
20 were not subjected to charring or
21 pyrophoric action."
22     A.   Okay.
23     Q.   Were the wooden surfaces
24 directly behind the heater available for

37

1 your evaluation or anyone's evaluation
2 after the fire?
3     A.   Actually, that's two
4 questions. But, yes, some of them were.
5 Some of the plywood was actually there.
6         The initiation of that
7 statement, as you read it in my report,
8 was the surfaces to which the heater was
9 attached. That was the stud, not the
10 plywood. And that was crystal clear in
11 the photographs, that it was not
12 subjected to pyrophoric action.
13     Q.   Let's talk about the
14 plywood, for the time being. Can we
15 agree that this particular heater was
16 mounted directly against the plywood in
17 that office area of the building?
18         MR. ROTHSCHILD: Objection.
19         THE WITNESS: No, we can't
20     agree to that, that's not true.
21 BY MR. BARTOLACCI:
22     Q.   What is inaccurate about
23 that statement?
24     A.   The heater was not attached