## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SELECTIVE INSURANCE COMPANY,     *
As subrogee of SMULLENS SALVAGE
AND TOWING,     *

    Plaintiff and Third-Party Plaintiff     *

v.     *

EMPIRE COMFORT SYSTEMS     *     Civil Action No.
     WMN 03 CV 178

    Defendant, Third-Party Plaintiff,     *
    and Cross Defendant

     *

v.     *

BSH ELECTRODOMESTICOS ESPANA, S.A.     *

    Defendant     *

v.     *

SHARP ENERGY, INC.     *

    Defendant, Third-Party Defendant,     *
    and Cross Claimant

    *   *   *   *   *   *   *   *   *   *

### DEFENDANTS' REPLY TO PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, Empire Comfort Systems (hereinafter "Empire") and BSH Electrodomesticos Espana, S.A. (hereinafter "BSH"), by their attorneys, James A. Rothschild and Ryan S. Perlin, hereby submit this Memorandum of Law in Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

## I.    <u>INTRODUCTION</u>

Plaintiff, in its Opposition Memorandum, tries unsuccessfully to demonstrate that its expert is qualified to testify and that his opinions are scientifically reliable.  Plaintiff improperly introduces an affidavit from its expert that contradicts his prior deposition testimony and then attempts to change its expert's causation opinion.  Plaintiff also fails to show that its expert is qualified to testify, that his opinions are founded on fact rather than speculation, and that his scientific theory – that long term, low-temperature heat from the back of the heater ignited the wall because of pyrolitic decomposition – is scientifically reliable.  Finally, in recognition of the weakness of its expert's opinion, Plaintiff argues now, contrary to well established Maryland law, that an expert opinion is not necessary to determine that the heater was defectively designed in 1989 and that the defect caused the fire in 2000.

Lastly, Plaintiff's individual claims are deficient on the merits.  Plaintiff's strict liability claims are negated by product misuse.  Its failure to warn and negligence claims fail because Defendants expressly warned users of the risk of fire.  Its misrepresentation claim is without merit because, in fact, Defendants made no misrepresentations relating to the space between the heater and the wall.

## II.    <u>PLAINTIFF'S EXPERT, KENNETH R. MCLAUCHLAN, P.E.</u>

### a.    <u>McLauchlan's new affidavit contradicts his prior sworn testimony and should be disregarded.</u>

In apparent recognition of the inadequacy of its expert's knowledge, skill, experience, training and education relative to the design of gas-fired, wall-mounted heaters, Plaintiff

attached to its Opposition Memorandum a new affidavit of its expert, Kenneth R. McLauchlan. (Exhibit 1, McLauchlan Affidavit).  The new affidavit purports to set forth all of McLauchlan's qualifications for expertise on the issue of unvented, gas-fired, wall-mounted space heaters. (Id.)  After the new affidavit is compared to McLauchlan's deposition testimony, though, it is clear that the affidavit conflicts with his earlier deposition testimony and should be disregarded as a sham.  See Rohrbough v. Wyeth Laboratories, Inc., 916 F.2d 970, 975 (4th Cir. 1990).

In McLauchlan's most recent affidavit, he states that he has "personally installed unvented gas-fired wall mounted space heaters for the purpose of testing these devices…to monitor and record temperatures on various surfaces of the heaters."  (Exhibit 1, ¶ 6).  His sworn deposition testimony, excerpts of which follow, was to the contrary:

> Q:    Do you have any experience testing zero-clearance wall-mounted gas heaters, prior to this case?
>
> A:    Not testing them, no.
> ***
> Q:    Have you done any testing to determine the validity of the pyrolytic decomposition in this case?
>
> A:    No.  I've relied on the scientific treatise.
> ***
> Q:    Have you ever tested a heater that was manufactured with the intakes at the top of the heater?
>
> A:    No.
> ***
> Q:    Have you ever tested a heater to the ANSI standards, a wall-mounted heater to the ANSI standards, the applicable ANSI standards?
>
> A:    No.

3

(Exhibit 2, McLauchlan Deposition Excerpts, pp. 47, 149, 167, 177). In addition, McLauchlan testified that he did not test the heater in this case, that he did not participate in the parties' joint testing of an exemplar, that he refused to test a similar model given to him because it was not exactly the same, and that his assumptions are not based on any physical testing he has undertaken. (Id. at pp. 99-101, 161).

McLauchlan testified at his deposition that he has never installed or tested similar heaters nor has he monitored or recorded temperatures of similar heaters. (Exhibit 2, pp. 47, 149, 167, 177). In fact, he admitted that his temperature estimates were "an assumption" based upon ANSI standards and not upon any firsthand knowledge. (Exhibit 2, pp. 150-151). McLauchlan also has no experience in the design or manufacture of heaters like the one in this case. On three different occasions, McLauchlan acknowledged his lack of experience in designing heaters; "I have not designed a heater[,]" "I have not designed any wall-mounted heaters[,]" "I have not designed a heater of this nature, that's correct." (Id. at pp. 50-51, 167, 168, 170).

Now, five months after his deposition, McLauchlan attempts to mislead the Court by swearing that his experience is based on having "designed numerous gas-fired heating, ventilation and air conditioning (HVAC) systems…" (Exhibit 1, ¶ 3). This is irrelevant since the issue in this case is not whether an HVAC system was defective, but whether a residential wall-mounted gas-fired heater design was defective. Simply stated, McLauchlan does not have the expertise to be admitted as an expert on whether the design of the subject heater was defective and caused the fire.

4

## III.   PYROLYSIS AS A FIRE CAUSATION THEORY

### a.  The scientific basis for pyrolysis is unreliable, unproven and has not been subjected to sufficient testing.

The proponent of expert testimony has the burden to establish its admissibility by a preponderance of proof.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 n. 10 (1993); Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001).  Here, the Plaintiff must establish the scientific reliability and factual support for McLauchlan's theory.  Id.

Repeatedly throughout its Memorandum, Plaintiff argues that the phenomenon of pyrolysis (or "pyrophoric carbonization" or "pyrolytic decomposition") is known and accepted in the scientific community.  (See Plaintiff's Opposition Memorandum, p. 7).  Defendants do not dispute the existence of pyrolysis as a theory in the fire prevention and engineering industries.  Rather, Defendants challenge the pyrolysis theory's lack of scientific reliability as a cause of the fire in this case or any case under the standards of Fed.R.Evid. 702, Daubert and its progeny.  In fact, Vytenis Babrauskas, Ph.D., the primary proponent of the theory, relied on by McLauchlan as the leading expert on pyrolysis, has acknowledged that its viability as a scientific basis for fire causation remains unproven.

In 2001, Babrauskas authored a paper entitled "Pyrophoric Carbon: The Jury is Still Out" where he explained that a "number of things [are] not known about the process" and acknowledged that it may be decades before a sufficiently improved theory is able to prove them.  See Babrauskas, V., Pyrophoric Carbon…The Jury is Still Out, Fire and Arson

5

Investigator 51:2, 12-14 (Jan. 2001); see also, Truck Insurance Exchange v. MagneTek, Inc.,
360 F.3d 1206, 1211-12 (10th Cir. 2004).

In 2003, Babrauskas revised that article to consider further factual findings, and
published the revised article as "'Pyrophoric Carbon' and Long-term, Low-temperature Ignition
of Wood." [1] (Exhibit 4).   Citing numerous studies, Babrauskas concluded that "additional
research is desirable in order to obtain an understanding of the physicochemical details of [long-
term, low-temperature ignition of wood]."  He admitted,

> The chemistry, physics, and thermostructural behavior involved in producing
> spontaneous combustion due to long-term, low-temperature heating of wood are clearly
> very complicated, interrelated phenomena.  It may be many decades before a theory is
> evolved that can give useful numerical results.

(Id., p. 6).

That same year, in an article tellingly entitled, "Properly designed experiments are still
needed in order to understand low-temperature, long-term ignitions of wood[,]" Babrauskas
again concluded that "it is evident that some additional physicochemical phenomena have to be
involved in this problem, *but, in the absence of proper research, what these phenomena may be
can only be hypothesized at this time*."   (Exhibit 5, p. 3) (emphasis added).   The article
concluded with four words that have become common where pyrolysis is involved: "more
research is needed."  (Id.)

---

[1] This article cites Babrauskas' Ignition Handbook which contains "a collection of data on the temperatures
involved in various real-life incidents where wood members ignited after exposure for months-to-years-long time
periods."  (Exhibit 4, p.1).  Each of those real-life incidents involved wood that was in long-term direct contact
with metal steam pipes.  None involved wood that was simply nearby a heat source or which was not producing
heat continuously.

In October 2004, after the <u>MagneTek</u> decision, Babrauskas published his response to the case, entitled "Truck Insurance v. MagneTek: Lessons to Be Learned Concerning Presentation of Scientific Information." (Exhibit 6). Babrauskas' article, despite being written as a "how to" manual for professional expert witnesses, concludes on pyrolysis, "[t]he state-of-the-art of fire science is that we do not have a model that can predict this phenomenon." (<u>Id</u>., p. 2). "[S]ince a theory of long-term, low-temperature ignition of wood is not available, obviously it should be urged that research be carried on so that one day this might become possible." (<u>Id</u>.).

Significantly, other fire safety engineers, including Patrick J. Pagni, Ph.D. and Bernard R. Cuzzillo, Ph.D. of the University of California at Berkeley, have completed numerous scientific studies of low-temperature wood ignition that reject Babrauskas' theories. In a paper presented at the 1999 International Symposium for the International Association of Fire Safety Science, they described, in significant detail, the lack of literature, over the past 125 years, documenting "any controlled laboratory data supporting the 'pyrophoric carbon' hypothesis." (Exhibit 7, The Myth of Pyrophoric Carbon, p. 2). In their most direct indictment of the theory, Cuzzillo, Pagni and other colleagues published an article in Fire & Arson Investigator magazine entitled, "The Verdict is In! Pyrophoric Carbon is Out." (Exhibit 9). In it, they conclude that Babrauskas "clings stubbornly to the old false theory[,]" characterized by overreliance on opinions that are simply based on earlier opinions, but not on science. (<u>Id</u>., pp. 2-3).

Pyrophoric decomposition, as a theory of fire causation, is no different today than it was three years ago when the Tenth Circuit agreed that it is not scientifically valid. Plaintiff's own expert stated that "it is practically not possible to determine a pyrolytic ignition temperature with

the current state of the science." (Exhibit 2, McLauchlan Deposition Excerpts, pp. 154-155). The scientific basis for pyrolysis is unproven and has not been subjected to sufficient testing to allow its presentation to a jury as the cause of the fire in this case.

### b. Plaintiff's reliance on NFPA 921 is misplaced.

In its Opposition Memorandum, Plaintiff asserts that the National Fire Protection Association (NFPA) 921 Guidelines recognize pyrolysis. (See Plaintiff's Opposition Memorandum, p. 8). Again, Plaintiff misunderstands Defendants' argument. Defendants do not dispute that there exists a theory of pyrolysis which is academically debated. This theory (or definition), however, has not been subjected to scientific scrutiny or testing and remains nothing more than a theory. It is not, therefore, a reliable element of fire causation under the standards of Daubert. Accordingly, it should not be presented to a jury.

Plaintiff cites NFPA 921 § 5.3.6.2.7 for the incorrect and misleading proposition that "pyrolycized wood will ignite at lower temperatures." (See Plaintiff's Opposition Memorandum, p. 8). The section cited simply states that "wood, like many other cellulosic materials, is subject to self-heating when exposed to elevated temperatures below its ignition temperature." NFPA 921 § 5.3.6.2.7 (2004). The section explains, though, that the temperatures at which such heating will occur are not intrinsically known; rather, they are dependent on a number of factors. Id.

Plaintiff misleadingly cites Table 5.3.2.3 for the proposition that wood ignites between 315°F and 334°F when not pyrolycized. That table, titled "Time Required to Ignite Wood Specimens," refers to the temperatures required to ignite various woods when exposed to a pilot

8

flame.  NFPA 921 Table 5.3.2.3.  Here, the Plaintiff's theory is that the heating occurred by

conduction.    In fact,  § 5.3.2.4, not cited by Plaintiff, provides the following caveat to be

considered when using Table 5.3.2.3.:

> Caution is needed in using Table 5.3.2.3, as the times and temperatures given are for
> ignition with a pilot flame.  These are good estimates for ignition of wood by an existing
> fire.  These temperatures are not to be used to estimate the temperature necessary for the
> first item to ignite.  The absence of the pilot flame requires that the fuel vapors of the first
> item ignited be heated to their autoignition temperature.  In *An Introduction to Fire
> Dynamics*, Douglas Drysdale reports two temperatures for wood to autoignite or
> spontaneously ignite.  These are heating by radiation, 600°C (1112°F), and **heating by
> conduction, 490°C (914°F)**.

NFPA 921, Table 5.3.2.3 (2004) (emphasis added).

### c. McLauchlan has no factual support for the application of pyrolysis in this case.

Perhaps even more significant than the challenge to the science and reliability of

pyrolysis, is McLauchlan's attempted application of it in this case.  Having performed no testing

and relying only on unsupported, sweeping assumptions, McLauchlan provides no factual

support for his conclusion that pyrolysis was the cause of the Smullens' fire, as required by

Fed.R.Evid. 702.

As the Fourth Circuit recognized in Tyger Const. Co. Inc. v. Pensacola Const. Co., there

is significant danger in permitting an expert, like McLauchlan, from testifying without a factual

basis.

> Here, we have an expert espousing an opinion based on assumptions which find no
> support in the record.  Although McCoy's methods are unusual, the greater danger is that
> the jury may accept as fact not just the faulty assumptions on which he relied, but may
> also accept the conclusions that are drawn through his use of these assumptions.  When

the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court.

29 F.3d 137, 144 (1994).

McLauchlan's lack of foundation is most evident on the issue of the temperature required to heat the wood paneling that he alleges caught fire in this case. After admitting that he did not know the type of wood involved, he was asked directly if he knew the surface temperature of the heater at the time of the fire. (Exhibit 2, pp. 157). He did not know. (Id. at p. 149-50) Pressed further about how he could come to an opinion on the cause of the fire without knowing the temperatures emitted by the heater, he demonstrated the utter circularity of his logic. "In order to, for my opinion," he stated, "I have made an assumption that the temperature would be in the range of in excess of 180 degrees Fahrenheit." (Id. at p. 150). Asked what his factual basis for that assumption was, McLauchlan explained:

> The fact that the [ANSI] standard allows the temperature rise of 117 degrees Fahrenheit on the surfaces behind the heater. *In order for the heat to be transferred*, the surface temperature of the heater would have to be higher than that, so my opinion would be that it would be in excess of the 117 degrees plus the room temperature, which gets you into the 180-degree range, the surface temperature higher than that.

(Id. at p. 151) (emphasis added).

McLauchlan did not rely on any facts in the record. He relied, instead, upon an assumption formulated only after he developed his opinion for no other purpose than to bolster that opinion.[2] McLauchlan's syllogism is backwards. Instead of determining that the heater and

---

[2] It is not mere coincidence that the temperature cited by McLauchlan in this case is also the lowest possible temperature that Babrauskas says has been documented as causing fire by pyrolysis. (See Exhibit 4). In

wall reached certain temperatures and, from that, concluding that they caused the fire, he starts with the assumption that the heater caused the fire and then assumes that the temperature must have been in excess of 180°F.[3] See also, Eastern Auto Distribs., Inc. v. Peugeot Motors of Am., 795 F.2d 329, 338 (4th Cir. 1986) ("Scrutiny of expert testimony is especially proper where it consists of an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." (citations omitted)).

## IV.    PLAINTIFF'S NEW CAUSATION THEORY

Recognizing the weakness of McLauchlan's efforts to attribute the fire to the heater, Plaintiff has proposed, for the first time, a new theory of causation.  Plaintiff argues that Defendants have misunderstood "the significance of the existence of dust and movement of the wall behind the heater."  According to Plaintiff the "significance of the presence of lint and dust and movement of the wood paneling is that it will compromise and effectively eliminate the 3/8 inch air gap…thus increasing the temperatures on the back of the wall."  (See Plaintiff's Opposition Memorandum, p. 17.)  Plaintiff believes "the material issue is whether the presence of lint and dust on the back of the heater served to block or impede the air flow in the 3/8 inch air gap."  (Id., p. 18).

This new overheating theory is contrary to Plaintiff's expert's theory, which states:

---

Babrauskas' example, though, the temperature was from a wood beam in direct contact with a hot steam pipe continuously for several years.

[3] Unlike McLauchlan, Defendants' expert Thomas Marciniak conducted tests on a similarly designed 18,000 BTU wall heater affixed to a paneled wood wall.  To recount his findings, stated in Defendants' Motion for Summary Judgment, Marciniak found that even at the highest setting, the temperature on the back of the heater was 209°F and the temperature on the wall was only 116°F.  (Exhibit 8, Affidavit of Thomas Marciniak, Ph.D.).

> The design of the heater was such that dust, lint and other ambient debris was able to accumulate in the rear of the heater, building a bridge of combustible material that extended from the hot surface of the back of the heater to the combustible wall.

(Exhibit 3, McLauchlan's May 12, 2005 Report, p. 5). This bridge, according to McLauchlan, transferred heat from the back of the heater through the debris to the wall surface, causing the wood paneling to reach a higher temperature than if no lint, dust or ambient debris was present. (Exhibit 2, p. 176). McLauchlan never testified that lint blockage caused the heater to overheat.

### a. Plaintiff's new theory has not been previously disclosed.

Defendants did not learn of Plaintiff's new overheating theory until receiving its Opposition Memorandum. At no prior time had Plaintiff disclosed this theory to Defendants and at no time during discovery or at his deposition, did McLauchlan ever set forth or explain this theory. The Federal Rules of Civil Procedure require that all parties "make full, complete, and advance disclosures of evidence that will be used at trial." Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co., 212 F.R.D. 489, 492 (D.S.C. 2001). "Nowhere is this more important than in the area of expert opinions." Id. Rule 26(b)(4) requires that certain information must be disclosed about all experts, including, "a complete statement of all opinions to be expressed and the basis and reasons therefor." Fed.R.Civ.P. 26(b)(4) (2006). Thus, Plaintiff's overheating theory, disclosed long after McLauchlan's report was furnished, should be disregarded by the Court.

### b. Plaintiff's bases its new theory upon assumptions unsupported by factual evidence.

Rather than support its theory with expert testimony, Plaintiff states that "common

knowledge and experience tells us that, over time, dust and lint will collect in a room's nooks and crannies and on its hard surfaces[,]" that "it is common knowledge and experience that lint and dust block air flow[,]" that "it is common knowledge that wood will expand and contract depending on humidity levels, moisture, etc.[,]" and that it is "common knowledge that buildings are not static, that they move and shift over time."  (See Plaintiff's Opposition Memorandum, p. 16).  These unfounded conclusions are not based on any observation, made at any time, by any witness, of the back of the heater or the wall surface.

There is no evidence of any accumulated material blocking air flow around the time of the fire or at any other time, or that any accumulated material blocked the back louvers of the heater causing it to overheat.  Indeed, McLauchlan admitted he is unaware of any fire ever having been attributed to the accumulation of dust behind a heater.  (Exhibit 2, p. 173).  There is similarly no evidence that the interior office wall ever shifted or was subject to warping.

With McLauchlan's unsupported conclusions under attack, Plaintiff's counsel abandoned his lint bridge causation theory and developed a new theory which is similarly unsupported by any factual evidence.  "An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record."  See Tyger Const. Co. Inc. v. Pensacola Const. Co., 29 F.3d 137, 142 (4th Cir. 1994).  Plaintiff's entire causation theory is based on unreasonable assumptions which have no factual support, and should be disregarded. See Harrison v. Bill Cairns Pontiac of Marlow Heights, Inc., 77 Md.App. 41, 54, 549 A.2d 385, 392 (1988) (holding that plaintiff must do more than simply show that "what might possibly

have happened did probably happen."). To permit a jury to consider facts for which there is no factual support is contrary to the purpose of Fed.R.Evid. 702.

### c.  Proof of Plaintiff's claims requires expert testimony.

Plaintiff argues that even if the Court excludes McLauchlan's opinion, it may rely on circumstantial evidence to prove its case because a reasonably jury could infer that the heater was defective. (See Plaintiff's Opposition Memorandum, pp. 20-21). However, expert testimony is necessary in a product liability case whenever "the subject of the inference is so particularly related to some science or profession that it is beyond the ken of the average layman." Wood v. Toyota Motor Corp., 134 Md.App. 512, 518, 760 A.2d 315, 319, cert. denied, 362 Md. 189 (2000). As was determined by Judge Smalkin, "a heater involves mechanical parts, combustion, and electrical circuits, and is not so simple a device that the average layperson's understanding and knowledge permit proceeding…without expert testimony." Moser v. Agway Petroleum Corp., 866 F.Supp. 262, 264 (D.Md. 1994).

Proof of a product defect may be proven in a number of ways, but there "can be no products liability recovery in Maryland simply on the *post hoc* conclusion that the mere happening of the accident shows the existence of a defective product." Stalnaker v. General Motors Corp., 934 F.Supp. 179, 180 (D.Md. 1996), aff'd., 120 F.3d 262 (4th Cir. 1997) (citations omitted). This is exactly what Plaintiff would like to do in this case. Yet with eleven years having elapsed between the time of manufacture and the accident, a reasonable jury could not simply infer that the product was defective in design at the time of manufacture and that the

defect caused the fire, without expert testimony.  See Bill Cairns Pontiac, 77 Md.App. at 49, 549 A.2d at 389.

As the advisory committee notes to Fed.R.Evid. 702 state, "[a]n intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge."  "It would confound logic and legitimate deductive reasoning to permit a jury to draw inferences concerning a technical subject matter that trained experts in the field cannot legitimately draw."  Waytec Electronics Corp. v. Rohm and Haas Electronic Materials, LLC, 459 F.Supp.2d 480, 489 (W.D.Va. 2006).  As the Supreme Court has stated, "[i]nference is capable of bridging many gaps. But not, in these circumstances, one so wide and deep as this." Galloway v. United States, 319 U.S. 372, 386 (1943).  Accordingly, Plaintiff cannot rely on circumstantial evidence and summary judgment is appropriate.

## V.    PLAINTIFF'S INDIVIDUAL CLAIMS

### a.  Strict Liability

Plaintiff argues that Defendants have misstated the applicable test for strict liability in this case and that the proper test is the "consumer-expectation test."  (See Plaintiff's Opposition Memorandum, p. 19).  However, this argument does not assist the Plaintiff who, under either test, cannot prevail.  The defenses of product misuse and failure to read or follow a product's instructions apply in this case, such that even if the consumer expectation test is applied, Defendants are still entitled to summary judgment.

When Sharp installed the heater, the Smullens were provided with an Installation and Owner's Guide, the front page of which says:

15

> Due to high temperatures, the appliance should be located out of traffic and away from furniture and draperies.
>
> Children and adults should be alerted to the hazard of high surface temperature and should be kept away to avoid burns or clothing ignition.
> *   *   *
>
> The appliance should be inspected before use and at least annually by a professional service person.   More frequent cleaning may be required due to excessive lint from carpeting, bedding material, etc.  It is imperative that control compartments, burners and circulating air passageways of the appliance be kept clean.

(Exhibit 11, Installation and Owner's Guide, p. 1).  A warning on page two of the guide states, "Keep the burner and control compartment clean."  (Id. at p. 2).  Page three warns the user to "[p]rovide adequate clearance around air openings" and to "[p]rovide for an adequate combustion and ventilation air supply."  (Id. at p. 3).  Page five warns that "[p]eriodic cleaning of the unit is required, dust the surface of the unit and vacuum clean burner surfaces and the control compartment."  (Id. at p. 5).  Page six instructs the user to "[b]low air pressure through holes as indicated with arrows in figure 7.  This will blow out foreign materials such as dust."  (Id. at p. 6).   Page eight, under the heading, "Optional Blower Assembly Installation Instructions[,]" contains a subheading entitled, "Cleaning" which warns that "[t]he blower wheel will collect lint and could require cleaning once a year.  If the air output decreases, or the noise level decreases, it indicates a dirty wheel." (Id. at p. 8).  It is undisputed that the Smullens did not have their heater inspected annually by a professional service person.  (Exhibit 2, p. 108).

In strict products liability cases premised upon a design defect, Maryland has adopted the RESTATEMENT (SECOND) OF TORTS § 402A (1965). See Ellsworth v. Sherne Lingerie, Inc., 303

Md. 581, 495 A.2d 348 (1985). The Court of Appeals discussed the defenses available to a

seller in such cases:

> Under § 402A, various defenses are [ ] available to the seller in an action based on strict
> liability in tort. These defenses are set forth and explained in the official comments
> following § 402A. For example, *the seller is not liable where injury results from*
> *abnormal handling or use of the product* (Comment h), where mishandling or alteration
> after delivery of the product renders it unsafe (Comment g), *or if warnings or instructions*
> *supplied with the product are disregarded by the consumer where, if used in accordance*
> *with these warnings, the product would be safe* (Comment j).

Lightolier, A Div. of Genlyte Thomas Group, LLC v. Hoon, 387 Md. 539, 555, 876 A.2d 100,

110 (2005) (citing Ellsworth, 303 Md. at 591-92) (emphasis original).

The Court in Lightolier explained that in product liability actions, "misuse of a product, if

proven, negates a design defect claim and occurs when the product in question is used in a

manner not reasonably foreseeable to the manufacturer and/or seller." Id. at 553-54. But the

Court cautioned that the foreseeability test must be applied carefully "because, with the benefit

of hindsight, any accident could be foreseeable. Without care, the imposition of strict products

liability could result in a manufacturer's becoming an insurer for every injury that may result

from its product." Id. at 554 (citing Simpson v. Standard Container Co., 72 Md.App. 199, 206,

527 A.2d 1337, cert. denied, 311 Md. 286 (1987)).

The defenses of product misuse and failure to read or follow instructions were the basis

of the Court of Special Appeals' decision in Halliday v. Sturm, Ruger & Co., Inc., 138 Md.App.

136, 770 A.2d 1072, aff'd, 368 Md. 186, 792 A.2d 1145 (2002). There, parents sued a gun

manufacturer after their three-year old child found his parents' gun under their mattress and

accidentally fired it, suffering a fatal bullet wound to the head. Id. at 189-190. The court found

that the gun's instruction manual warned that the gun should be locked, secured, and kept away from children and careless adults. Id. at 189. In the suit for defective design, the intermediate appellate court held that the father's placement of the handgun under the mattress was a misuse. Id. at 174. "There can be no debate that this was an affirmative action on [the father's] part that clearly contravened the warnings contained in the instruction manual." The finding of misuse "defeat[ed] appellant's defective design claim." Id. at 174.

The plaintiff's claim in Lightolier met the same fate. There, the Court of Appeals found that the plaintiff misused a light fixture by installing it too closely to insulation. Lightolier, 387 Md. at 555. Though finding that the plaintiff's installation near dangerous insulation was reasonably foreseeable, the Court held that the defendant properly warned users about the danger of installing the fixture too close to insulation, relieving defendants of liability. "Warnings on products, by their very nature, are generally meant to counteract reasonably foreseeable situations that may pose a danger to the consumer or others." Id. The Court then restated the following well-settled principle:

> Failure to read or follow instructions or warnings also involves conduct that may be considered negligent…If a product otherwise unreasonably dangerous can be made safe for reasonably foreseeable uses by adequate warnings or instructions, liability will be avoided, and the focus in such cases is generally upon the adequacy of the notice. If the warnings or instructions are adequate the product is not defective, and the plaintiff cannot recover under a theory of strict liability in tort. The cause of the injury in such cases is the failure to read or follow the adequate warnings or instructions, and not a defective product.

Id. at 556 (citing Ellsworth, 303 Md. at 598 n. 12); see also Hood v. Ryobi America Corporation, 181 F.3d 608, 611 (4th Cir. 1999) ("Maryland imposes no duty to predict that a

18

consumer will violate clear, easily understandable safety warnings…");

In this case, the heater functioned exactly as the Smullens expected at the time of purchase, with no evidence of a malfunction.  Assuming, *arguendo*, that Plaintiff's expert's opinions are viable and that lint, dust and other ambient debris accumulated between the heater and the wall and caused the fire, the evidence is clear that the Smullens misused the product. Defendants had every right to assume that the Smullens would read the Installation and Owner's Guide.  Had they done so, they would have known about the danger of lint accumulation and the need for annual inspection by a professional service person.  In fact, Mr. Smullens had actual notice of dust accumulation on the blower blades of the heater in 1994.  (Exhibit 10, Smullens Deposition Excerpt, pp. 59-60).  By failing to have their heater annually inspected, failing to keep all circulating air passageways clean, failing to read and follow the product's instructions and warnings, and failing to take the proper steps to remedy a condition of which they had actual notice, the Smullens misused the product.   That misuse defeats Plaintiff's defective design claim.

### b.  Plaintiff's Failure to Warn and Negligence Claims

Plaintiff alleges that there are genuine issues of fact with respect to Plaintiff's failure to warn claims, arguing that Defendants "failed to advise the consumer about the necessary 3/8 inch clearance on the back of the heater."  (See Plaintiff's Opposition Memorandum, pp. 22-23).

To establish a failure to warn claim against a seller arising out of either negligence or strict liability principles, a plaintiff must show that (1) the defendant knew or had reason to know that the product was likely to be dangerous for the use for which it was supplied; (2) the

defendant had reason to believe that the product's users would not realize its dangerous condition; and (3) the defendant failed to exercise reasonable care to inform them of the dangerous condition. Dechello v. Johnson Enterprises, 74 Md.App. 228, 235, 536 A.2d 1203, cert. denied, 312 Md. 601 (1988).

Assuming, solely for the sake of this argument, that the product was dangerous, Plaintiff cannot establish that Defendants knew or had any reason to know of that danger. In 1988, Defendants submitted an identical heater to the American Gas Association Laboratories ("AGAL"), an industry group that tests all gas appliances to standards set by the American National Standards Institute ("ANSI") for gas-fired room heaters. (See Exhibit 12, Plaintiff's Admissions, No. 3). It was certified on November 30, 1988 as meeting all AGAL and ANSI design standards. (Id. at No. 5).

Between 1988 and 2004, almost 160,000 units of this identical model were sold by Empire. In that time, there were eleven claims relating to unvented heaters, but only one involving a unit similar to the CH-18. (Exhibit 13, Davis Deposition Excerpts, p. 53). None of those claims involved reports of fire caused by debris accumulation or warping of an adjacent wall. Based on the heater's certification by the governing certification body and the lack of reports of fires involving debris accumulation or wall warping, Plaintiff has failed to establish that Defendants knew or had any reason to know that the heater may be dangerous for heating. See Eagle-Picher Indus., Inc. v. Balbos, 326 Md. 179, 194-95, 604 A.2d 445 (1992); Owens-Illinois, Inc. v. Zenobia, 325 Md. 420, 437, 601 A.2d 633 (1992).

Under the second element of proof, Plaintiff must establish that the Defendants had reason to believe that the heater's users would not realize its allegedly dangerous condition. Here again, Defendants assume, for the sake of argument, that debris accumulation and wood warping hazards are dangerous conditions with respect to this heater. Even in making such an assumption, though, there is no reason to believe that Mr. Smullens would fail to realize those problems. At his deposition, Mr. Smullens agreed that he was "aware at the time the heater was installed that you should keep anything that was combustible away from direct contact with the heater." (Exhibit 10, p. 56). In addition, Mr. Smullens noticed caked dust on the heater's blower and knew enough to remove the dust. (Id. at p. 56-57). As Mr. Smullens' testimony demonstrates, the average heater user knew that combustibles should be kept away from the heater and that dust in the heater should be removed.

Lastly, Plaintiff must demonstrate that Defendants failed to exercise reasonable care to inform heater users of the allegedly dangerous condition. Page one of the Installation and Owner's Guide, however, instructs users to have the appliance inspected annually by a professional service person. (Exhibit 11, p. 1). The Smullens failed to follow that instruction. The guide goes on to warn that "more frequent cleaning may be required due to excessive lint from carpeting, bedding material, etc." (Id.) There is no evidence that Plaintiffs cleaned the heater at all, let alone frequently. Lastly, and most significantly, the guide warns that, "[i]t is imperative that control compartments, burners, and circulating air passageways of the appliance be kept clean." The Installation and Owner's Guide clearly warns users to beware of lint

accumulation and to keep circulating air passageways clean.  Plaintiff fails on each of the three primary elements of proof.

Plaintiff must also establish two separate elements of causation: (1) that the condition that should have been warned against was the actual cause of the injuries, and (2) that if the defendant had warned the plaintiff, the plaintiff would have altered his behavior so as to avoid the accident.  See 63 Am.Jur. 2d Products Liability § 358 (1964); see also, Owens-Illinois, Inc. v. Armstrong, 326 Md. 107, 117, 604 A.2d 47 (1992).

As argued above, Plaintiff relies on McLauchlan's testimony, unsupported by factual or scientific proof, and, thus, fails to establish that obstruction of the 3/8 inch gap clearance was the actual cause of the accident.  Under the second element of causation, there has been no evidence that a warning about the 3/8 inch gap clearance would have caused Mr. Smullens to alter his behavior so as to avoid the accident.  Mr. Smullens testified that he does not remember reading the Installation and Owner's Guide or following the instructions set forth therein.  (Exhibit 10, Smullens Deposition Excerpts, pp. 49-50).  Moreover, it is undisputed that Mr. Smullens failed to follow the other instructions set forth in the Installation and Owner's Guide.  He did not have a professional service person inspect the heater annually and he did not keep clean the control compartments, burners and circulating air passageways of the heater.   Thus, even if Mr. Smullens had been warned, the evidence demonstrates that those warnings would have fallen upon deaf ears.

Lastly, Defendants had no duty to warn consumers about the operation of a heater characteristic that was inherent in the heater's design.  As McLauchlan testified, the design of

the heater was such that, when properly installed, a 3/8 inch gap was present between the heater and the surface on which it is affixed.  (Exhibit 2, McLauchlan Deposition Excerpts, pp. 98-99). Unlike the clearance of combustibles from the front of the heater, which is a variable controlled by the user, the amount of space between the heater and the wall upon which it is affixed is built into the heater's design and any alteration thereof is prima facie evidence of product misuse. Defendants need not warn consumers that it is dangerous to alter the heater's design or improperly install it. However, out of an abundance of caution and to prevent frivolous failure to warn claims, Defendants made such a warning anyway.  On page one of the Installation and Owner's Guide, in all caps, it states that

> ANY ALTERATION OF THE ORIGINAL DESIGN, INSTALLED OTHER THAN AS SHOWN IN THESE INSTRUCTIONS OR USE WITH A TYPE OF GAS NOT SHOWN ON THE RATING PLATE IS THE RESPONSIBILITY OF THE PERSON AND COMPANY MAKING THE CHANGE.

(Exhibit 11, p. 1).  To reiterate this otherwise obvious point, the guide further warns that "[a]ny change to this heater or its controls can be dangerous."  (Id.)  Plaintiff has failed to establish the required elements of causation under a failure to warn theory.

### c.  Plaintiff's Misrepresentation Claim

Next Plaintiff argues that Defendants "misrepresented the requisite clearances in, their installation instructions by failing to advise the consumer about the necessary 3/8 inch clearance on the back of the heater."  (See Plaintiff's Opposition Memorandum, p. 23).  More specifically, Plaintiff alleges:

> Here, defendants gave incorrect information about the necessary clearances.  They spoke only about the required clearances for the bottom, top and sides of the unit.  They made

no mention of the required 3/8 inch gap at the back of the heater and instead led customers to believe that the heater could be mounted directly to combustibles. They also never mentioned anything about needing to keep the air gap open continuously so as to avoid a fire hazard.

(Id., p. 24).

To sustain a claim for negligent misrepresentation in Maryland, a plaintiff must prove the following: 1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; 2) the defendant intends that his statement will be acted on by the plaintiff; 3) the defendant has knowledge that the plaintiff will probably rely on the statement which, if erroneous, will cause loss or injury; 4) the plaintiff, justifiably, takes action in reliance on the statement; and 5) the plaintiff suffers damage proximately caused by the defendant's negligence. Foster v. American Home Products Corp., 29 F.2d 165, 171 (4th Cir. 1994) (citing Martens Chevrolet v. Seney, 292 Md. 328, 439 A.2d 534 (1982); see also Paul M. Sandler & James K. Archibald, Pleading Causes of Action in Maryland § 3.29, at 222-23 (2d. ed. 1998) (citing Gross v. Sussex, Inc., 332 Md. 247, 630 A.2d 1156 (1993)).

Plaintiff states that Defendants "made no mention" of the required 3/8 inch gap and that "[t]hey also never mentioned" the need to keep the air gap open. (See Plaintiff's Opposition Memorandum, p. 24). But by making those allegations, Plaintiff concedes that they cannot prove the first element – a false statement. Plaintiff accuses Defendant of misrepresentation but, according its own argument, maintain that Defendants made no statement at all. Ordinarily, non-disclosure cannot constitute fraud or misrepresentation. See Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc., 283 Md. 296, 323, 389 A.2d 887 (1978).

24

In addition, Plaintiff's allegation that Defendants never mentioned the need to keep the air gap open is patently untrue.  As discussed above, page one of the Owner's Guide expressly states that "[i]t is imperative that control compartments, burners and **circulating air passageways** of the appliance be kept clean."  (Exhibit 11, p. 1) (emphasis added).

The fact there were no misrepresentations ends the analysis where it begins.  However, even if Plaintiff could prove the initial elements of the claim, they still fail because there is no proof of causation.    Specifically, they never established that Defendants' alleged misrepresentations proximately caused the fire.  In fact, the evidence demonstrates that Mr. Smullens never even read the Installation and Owner's Guide, so the warnings set forth therein played no role in the fire.

## VI.    CONCLUSION

For all the foregoing reasons, as well as all reasons stated in Defendants' Motion for Summary Judgment, Defendants, Empire Comfort Systems, Inc. and BSH Electrodomesticos España, S.A., respectfully request that this Court grant Defendants' Motion for Summary Judgment against Plaintiff.

_____/s/_____

James A. Rothschild (Bar No. 00624)
Ryan S. Perlin (Bar No. 28040)
ANDERSON, COE & KING, LLP
201 North Charles Street, Suite 2000
Baltimore, Maryland 21201
(410) 752-1630
*Attorneys for Empire Comfort Systems, Inc. and BSH Electrodomesticos Espana, S.A.*

25