Case 1:03-cv-00178-WMN    Document 77-4    Filed 02/07/2007    Page 1 of 18

August 11, 2006

Multi-Page Deposition of  KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SELECTIVE INSURANCE COMPANY,   :

as subrogee of SMULLENS        :

SALVAGE AND TOWING,            :

      Plaintiff,              :

  vs.                           :

EMPIRE COMFORT SYSTEMS, INC., : Civil Action No.

     Defendant and Third- : WMN 03 CV 178

     Party Plaintiff,        :

  vs.                           :

SHARP ENERGY, INC.,            :

     Third-Party Defendant:

     ---------------------

     Deposition of KENNETH R. MCLAUCHLAN,

taken on Friday, August 11, 2006, at 12:12 p.m.,

at the offices of Anderson, Coe & King, LLP, 201

North Charles Street, Baltimore, Maryland, before

Paul A. Gasparotti, Notary Public.

     ---------------------

Reported by:  Paul A. Gasparotti

**EXHIBIT**

tabbies®

2

Case 1:03-cv-00178-WMN    Document 77-4    Filed 02/07/2007    Page 2 of 18

August 11, 2006
Multi-Page™ Deposition of - ___ENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 46

1 at a hardware store, and analyzing the claim of a
2 leak from a propane-fired forklift.
3     Q. Allstate versus Zeiller Plumbing.
4     A. That's a sump pump case.
5     Q. Are these all the cases that you have
6 given testimony in, either in deposition or --
7 oh, these are trial testimony, just trial
8 testimony?
9     A. Yes, that's trial testimony.
10     Q. And then you have a whole other list for
11 deposition testimony?
12     A. Yes. There is probably some overlap
13 there.
14     Q. And I'll ask you the same question I
15 asked you with regard to trial testimony. For
16 the deposition testimony, do any of these cases
17 involve a wall-mounted propane heater such as was
18 the appliance in this case?
19     A. (Perusing.) No.
20     Q. In your work history, did you ever
21 design a wall-mounted gas heater?

Page 47

1     A. No.
2     Q. Do you have any experience designing
3 zero tolerance wall-mounted gas heaters, or zero
4 clearance?
5     A. No.
6     Q. Do you have any experience testing zero
7 clearance wall-mounted gas heaters, prior to this
8 case?
9     A. Not testing them, no.
10     Q. Prior to this case, did you have any
11 involvement with, in any way with zero clearance
12 gas, wall-mounted gas heaters?
13     A. Yes.
14     Q. In what capacity?
15     A. I have had three cases now where the
16 issue in the case was whether a fire started as a
17 result of the operation of a zero clearance
18 gas-fired wall furnace.
19     Q. What were the other two cases?
20     A. Well, actually there are three in
21 addition to the one we're here for today. The

Page 48

1 first one was at a residence in Delaware, I think
2 it's Greensboro, Delaware, and the claim was that
3 the furnace caused ignition of combustibles that
4 were too close to it.
5     Q. When you say furnace, what do you mean?
6     A. I should say the heater, the direct
7 vented heater.
8     Q. And where was the heater in that case,
9 in the Greensboro case?
10     A. It was in a mobile home.
11     Q. And where was it located in the home?
12     A. Unfortunately, I never got to see the
13 fire scene. The fire scene was destroyed and I
14 was simply given the heaters to look at.
15     Q. And what did you determine?
16     A. I determined that I couldn't reach any
17 conclusions simply looking at the heaters
18 themselves.
19     Q. Is that one case?
20     A. Yes.
21     Q. And when were you involved in that case?

Page 49

1     A. I'm thinking that was the early 1990s.
2     Q. Was there another case in which you
3 looked at a zero clearance or what you thought
4 was a zero clearance gas heater?
5     A. Yes.
6     Q. What was that?
7     A. That was a case probably five years ago
8 involving a heater, I believe this also was in
9 Delaware. And in that case the heater was
10 installed so that when the, when a door that was
11 next to it was in the open position, it was in an
12 area which the manufacturer specifically
13 indicated there should be no combustibles.
14     Q. So the door would be against the front
15 of the heater?
16     A. Yes.
17     Q. Who did you testify for in that case?
18     A. I didn't testify.
19     Q. Did you render a report?
20     A. Just an oral report to the client.
21     Q. And who did you represent?

Page 50

1  A. I was representing, I believe it was the
2  owner of the building where the fire occurred.
3  Q. And was your conclusion in that case
4  that allowing the door to come in contact with
5  the front of the heater was the cause of the
6  fire?
7  A. Yes.
8  Q. Have you ever had a case prior to this
9  case involving an opinion with regard to the
10 design of a zero clearance gas heater for a
11 residence, or a building?
12 A. No.
13 Q. Ever been involved in manufacturing a
14 zero clearance wall heater?
15 A. No.
16 Q. I think you indicated you have a
17 bachelor's degree from the University of
18 Maryland; is that correct?
19 A. Yes.
20 Q. Do you have any degrees beyond that?
21 A. No.

Page 51

1  Q. Have you taken any courses involving the
2  design of gas wall heaters?
3  A. No.
4  Q. Is this the first case where you have
5  been asked to look at the design of a zero
6  clearance gas heater, the design of it?
7  A. I would say in all the prior cases that
8  I had, I considered the design of the heater as
9  part of my investigation.
10 Q. Do you know what kind of heater it was
11 in the case involving the door, who the
12 manufacturer was?
13 A. No, I don't.
14 Q. Was it similar, was the heater similar
15 to the heater in this case in terms of its design
16 and function?
17 A. I would say that it was generally
18 similar.
19 Q. It was gas, what, LP gas?
20 A. It was propane-fired and it had specific
21 clearances from combustibles; however, it was a

Page 52

1  zero clearance.
2  Q. It was a zero clearance?
3  A. Yes, at the rear.
4  Q. Did you examine that heater?
5  A. Yes.
6  Q. Have you ever testified as an expert on
7  the issue of the adequacy of warnings and
8  instructions in owner's manuals for gas or
9  electrical appliances, first of all, for gas
10 appliances?
11 A. I don't believe so.
12 Q. Have you ever been offered and accepted
13 as an expert in a case involving the design of
14 zero clearance gas heaters?
15 A. I have never been offered, no.
16 Q. Have you ever been accepted as an expert
17 on the issue, adequacy of the warnings on an
18 appliance, on a gas heater?
19 A. I can't think of any case.
20 Q. I might have asked you this already.
21 Have you ever previously rendered an opinion on

Page 53

1  the adequacy of warnings and instructions in an
2  owner's manual for a zero clearance gas heater?
3  A. Not that I can recall.
4  Q. Do you have any experience as an expert
5  on the testing of wall-mounted zero clearance gas
6  heaters, prior to this case?
7  A. No.
8  Q. Do you have any experience writing
9  instructional manuals for zero clearance gas
10 heaters?
11 A. No.
12 Q. Do you have any experience as an expert
13 on the issue of design of wall-mounted gas
14 heaters, where the issue was design of the
15 heater?
16 A. No.
17 Q. When did you become involved in this
18 case, when were you first notified?
19 A. It would have been shortly before the
20 joint site inspection that was November 10th of
21 2000.

August 11, 2006
Case 1:03-cv-00178-WMN   Document 77-4   Filed 02/07/2007   Page 4 of 18
Multi-Page™ Deposition of KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 62

1  the fire.
2      Q. What were the other ignition sources you
3  identified, potential other ignition sources?
4      A. There were computers, there were, there
5  was a microwave oven, there was I believe a
6  coffee pot.
7      Q. These were all electrical appliances?
8      A. Yes.
9      Q. Were they all plugged in to some outlet?
10     A. I believe the computers were plugged
11 into a power strip that was plugged into an
12 outlet. I don't recall what the microwave and
13 the coffee pot were plugged into.
14     Q. Could you tell whether the coffee pot
15 appeared to be, had been there for a while, or
16 did it appear that it had been moved recently?
17     A. I don't know.
18     Q. How about with the microwave oven, could
19 you make any determination of how long it had
20 been in the location that you observed it after
21 the fire?

Page 63

1      A. No.
2      Q. Did you make any determination of
3  whether there was any other type of heater in or
4  near the office area?
5      A. I did not see any other heaters in the
6  office area.
7      Q. Was there an office above the office you
8  walked into?
9      A. Yes, there was an office that you could
10 reach by going up some stairs.
11     Q. Did you go upstairs to observe that
12 office?
13     A. I think I briefly walked up there, yes.
14     Q. Did you notice whether there was any
15 heater in that office?
16     A. I don't know that I noticed it at the
17 time I was there. In reading deposition
18 transcripts, there was a description of a ceramic
19 type heater that was used in that upstairs
20 office.
21     Q. So sitting here today, you don't recall

Page 64

1  whether or not you observed it at the time of
2  your investigation, initial investigation; would
3  that be correct?
4      A. That's correct.
5      Q. Did you make any effort at that time to
6  determine whether people in the office smoked
7  cigarettes or pipes or whatever else you can
8  smoke?
9      A. No, I didn't.
10     Q. Did you see any evidence of ashtrays
11 anyplace?
12     A. I've seen in photos pictures of ashtrays
13 on the counter of the office area.
14     Q. When you were there, did you observe any
15 ashtrays?
16     A. I don't remember that I did, whether I
17 did or didn't.
18     Q. Did you make any effort to ask any of
19 the people who worked in the office, which I
20 think was Mr. Smullens, his wife, his daughter, I
21 think her name was Dee Smullens or Nadine

Page 65

1  Smullens, or Mr. Cameron about the smoking
2  patterns or the smoking activities of any of the
3  people that worked in the office?
4      A. No.
5      Q. And why didn't you do that?
6      A. My understanding was that there was an
7  area of origin type investigator, a cause and
8  origin investigator who was going to be
9  determining the area of origin, and he would be
10 doing things like investigating things other than
11 the heater, which was my area of expertise.
12     Q. If you had known at the time that a
13 number of the people who worked in the office on
14 a daily basis smoked heavily, would you have
15 investigated that, where they smoked and where
16 they kept their ashtrays?
17     A. Again, that really would have been
18 something more that an origin and cause
19 investigator would do rather than myself, who was
20 really brought in to specifically look at the
21 wall-mounted heater.

August 11, 2006                    Multi-Page Deposition of - KENNETH R. MCLAUCHLAN
Case 1:03-cv-00178-WMN    Document 7/4 Filed 02/07/2007 Page 5 of 18
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 66

1    Q. Do you know if the cause and origin
2 person looked at the issue of smoking at all?
3    A. I know that he was able to rule out all
4 other causes, accidental and intentional, in
5 doing his determination of the area of origin,
6 and he placed it at the heater itself.
7    Q. Do you know whether he was aware of the
8 smoking activities of the participants in the
9 office prior to the fire?
10    A. I don't know that.
11    Q. Now you said you saw some pictures that
12 indicated ashtrays. Whose pictures were those?
13    A. I'm not sure which, whose pictures they
14 are. They were pictures that I have seen in file
15 material.
16    Q. Do you have them with you?
17    A. I'm not sure whether I do or not.
18        (Recess.)
19    Q. I think the question to you, Mr.
20 McLauchlan, was did you have -- you made mention
21 of some other photographs. Do you have copies of

Page 67

1 these other photographs?
2    A. Yeah.
3    Q. You're handing me two photographs. Do
4 you have anything more than that?
5    A. No.
6        MR. ROTHSCHILD: Let's have these marked
7 as the next exhibit, I think it's 6.
8        (McLauchlan Exhibits 6 and 7,
9 photographs, marked for identification.)
10    Q. What is Number 6, Mr. McLauchlan?
11    A. Number 6 is a photograph taken looking
12 over the counter in the direction of where the
13 heater is located.
14    Q. And do you know who took that picture?
15    A. I believe that was taken by Terry
16 Wagner.
17    Q. And when did you receive that picture?
18    A. I actually saw it when I met with
19 counsel.
20    Q. How long ago was that?
21    A. That was today.

Page 68

1    Q. Okay. So prior to today, you hadn't
2 seen Number 6?
3    A. I don't think so, no.
4    Q. At the time you wrote your report, you
5 were not aware of Number 6; is that correct?
6    A. I was not relying on anyone else's
7 photographs at the time I wrote my report, no.
8    Q. Were you aware that anyone else had
9 photographs of the fire scene at the time you
10 wrote your report?
11    A. I knew there were investigators that
12 were present when I was present, and we were all
13 taking photographs.
14    Q. And did you make any request for those
15 photographs prior to writing your report?
16    A. No.
17    Q. Number 7, what is that?
18    A. That's a photograph taken from sort of
19 the 180-degree opposite angle, again, looking at
20 the counter top.
21    Q. And was this a photograph that Mr.

Page 69

1 Bartolacci gave you today?
2    A. It's one that I saw today, yes.
3    Q. Did you see any other photographs today
4 other than the photographs that you had taken?
5    A. No, that was probably it.
6    Q. Did you ever make any inquiry as to
7 whether any photographs were taken of the fire
8 scene prior to you being on the scene, that is,
9 between the time of the fire and the time you
10 went there on November 10?
11    A. No.
12    Q. Would you agree that the best
13 photographs of the fire scene would be the ones
14 that were taken as close in time to the fire
15 scene, the ones that were taken the closest in
16 time to when the fire scene occurred?
17    A. It would depend on whether the scene has
18 been altered. They may be no different from
19 photographs that are taken a few days after.
20    Q. Do you have any knowledge whether the
21 fire scene was changed in any way between when

Page 70

1 the fire occurred and when you were on the scene
2 nine days later?
3    A. No.
4    Q. Did you make any inquiry prior to
5 writing your report as to whether there was any
6 change in the fire scene between the time the
7 fire was put out and the time you arrived on the
8 scene on the 10th of November?
9    A. No.
10    Q. These, what we marked previously as
11 Number 2, McLauchlan 2, these were photographs
12 that you took on the fire scene?
13    A. Let's see. Yes.
14    Q. And how many, would you just count the
15 number of photographs there are?
16    A. (Perusing.) 41.
17    Q. Did you make any investigation when you
18 were on the scene or thereafter as to whether
19 there were any combustibles that were touching
20 the front or the sides of the heater at the time
21 of the fire, just prior to the fire?

Page 71

1    A. No.
2    Q. And based on your knowledge of fires, if
3 there were combustibles that were in direct
4 contact with either the front or the sides of the
5 heater, would they be a likely source of the
6 fire?
7    A. They could be.
8    Q. If there were papers that were touching
9 the front of the heater, or clothing, could that
10 be a likely source of a fire?
11    A. It could be.
12    Q. Are you aware that the manufacturer of
13 this heater had specific warnings not to have
14 combustibles touching the sides or the front of
15 the heater?
16    A. Yes.
17    Q. And why do manufacturers do that?
18    A. To prevent fires.
19    Q. And how do combustibles being in contact
20 with the heater cause fires?
21    A. The combustion gases and the surfaces of

Page 72

1 the heater can be at temperatures which would
2 result in ignition of lightweight combustible
3 materials.
4    Q. Do you know what the surface temperature
5 would be at the front of the heater where the
6 heat is in this heater?
7    A. I don't have an exact number.
8 Unfortunately, I don't have an exemplar to test.
9    Q. Well, do you have any understanding of
10 what the amount of heat generated by this heater
11 was on, the temperatures of the heater where the
12 flame --
13    A. Where the flame is located, we're
14 talking about several hundreds of degrees.
15    Q. Several hundreds, what would that range
16 be, several hundreds of degrees?
17    A. 500, 600, on up.
18    Q. Would that be sufficient to ignite light
19 combustibles that were adjacent to it?
20    A. It could.
21    Q. Knowing that, did you make any effort to

Page 73

1 determine whether there were any light
2 combustibles adjacent to or touching the heater?
3    A. Yes, I looked for any evidence of
4 lightweight combustible material around the
5 heater. I also reviewed the deposition
6 transcripts of the people working in the office
7 to see if there was any lightweight combustible
8 materials around the heater. And based on my
9 observations and review of the testimony, I
10 concluded there were no lightweight combustibles
11 either in contact with or around the heater.
12    Q. Did you ask Mr. Cameron at the time if
13 there were any lightweight combustibles, or any
14 combustibles in the immediate vicinity of the
15 front or sides of the heater?
16    A. I don't believe I asked him personally,
17 no.
18    Q. Did you observe any combustibles below
19 the heater on the floor?
20    A. What I saw was debris from the ignition
21 of the wall surface underneath the heater.

August 11, 2006
Multi-Page™
Deposition of - KENNETH R. MCLAUCHLAN
Case 1:03-cv-00178-WMN    Document 94    Filed 02/07/2007    Page 7 of 18
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 74

1   Q. Did you see anything else?

2   A. No.

3   Q. Did you make an observation of the

4 amount of charring on the wood studs that the

5 heater was attached to?

6   A. Yes.

7   Q. And did you make any observations on the

8 amount of charring on the opposite side of the

9 wood studs, the side that faced towards the

10 warehouse?

11   A. Yes.

12   Q. And did it appear that there was greater

13 charring on the wood studs that faced the

14 warehouse than the wood studs that were attached,

15 the surface attached to the heater?

16   A. There were places where there was more

17 charring on the side that was, I guess you would

18 say opposite the side where the heater was

19 installed.

20   Q. Did you make any observations of any

21 type of ignition source on the wall facing the

Page 75

1 warehouse?

2   A. I looked for any evidence of any

3 ignition source, yes.

4   Q. And did you find anything?

5   A. No.

6   Q. Did you find any evidence of any

7 clothing or materials that appeared to be burned

8 on the opposite side, on the opposite wall from,

9 opposite from the wall that faced the warehouse,

10 as opposed to facing the opposite direction?

11   A. Yes, I did find evidence of burned

12 clothing, also hangers, and also a rod that had

13 been suspended in the area of the wall that was

14 behind the heater, and the, that material was

15 severely fire-damaged.

16   Q. Did you determine what that material had

17 been prior to the fire?

18   A. It was uniforms.

19      MR. ROTHSCHILD: Let me have this marked

20 as 2-A, this picture on the back.

21      (McLauchlan Exhibit 2-A, photograph,

Page 76

1 marked for identification.)

2   Q. What is this a picture of, Mr.

3 McLauchlan?

4   A. Exhibit 2-A is a photograph that's taken

5 of the office area looking from what we would

6 call the wall area outside of the wall surface

7 where the heater was mounted.

8   Q. And do you see any of the materials you

9 just described that you felt were uniforms in

10 that area?

11   A. Let me see. (Perusing.) I believe you

12 can see toward the center of the photograph some

13 of the remnants of the uniforms.

14   Q. And how about to the right of the

15 photographs on the floor?

16   A. (Perusing.) Well, it's kind of dark in

17 the photograph, but I recall there were some

18 remnants in that area.

19   Q. Did you recover any of these remnants

20 for testing?

21   A. No.

Page 77

1   Q. Did you consider the issue of

2 spontaneous combustion at all as the cause of the

3 fire?

4   A. I didn't. Again, that falls more into

5 the area of the origin and cause investigator.

6   Q. Given the testimony you've given, would

7 it be correct to say that you have not been asked

8 to give an opinion as to the origin or cause of

9 this fire?

10   A. Well, I am giving opinion as to the

11 cause of the fire, and I'm relying on the

12 investigation of the origin and cause

13 investigator to have eliminated all other

14 potential causes of this fire, and also to

15 determine the area of origin.

16   Q. Mr. McLauchlan, looking at this picture

17 again, if there were a fire -- and we're looking

18 at the wall that's facing out to the warehouse;

19 is that correct?

20   A. Yes.

21   Q. And if there had been a fire that

Page 78

1 started at the bottom of that wall, would it
2 produce fire damage as we see in that picture
3 out, you know, the charring of the wood studs?
4     A. I think, I'm not sure I follow your
5 question. Are you asking me to assume that a
6 fire started there?
7     Q. Yes, assuming a fire started there,
8 isn't the damage to the wood studs consistent
9 with a fire starting in that area?
10     A. Again, you're talking about on the
11 walled surface, on the warehouse side of that
12 wall?
13     Q. Yes, on the warehouse side of that wall.
14     A. I think that if you were to ignore the
15 possibility, or ignore the presence of the heater
16 and take that completely out of the picture and
17 look at this picture, this Exhibit 2-A, you would
18 say that that is a possibility.
19     Q. That physical destruction on the studs
20 would lead you to think that the fire started in
21 that area?

Page 79

1     A. If there was no heater there, you would
2 have to consider that, yes.
3     Q. Do you know if the origin investigator
4 recovered any of the clothing, the materials that
5 were on the floor here?
6     A. I don't know.
7     MR. ROTHSCHILD: And let me have this
8 marked as 2-B.
9     (McLauchlan Exhibit 2-B, photograph,
10 marked for identification.)
11     Q. I want to show you 2-B. Actually, let
12 me show you 2-A again. There is a red object in
13 the left, bottom left side of that picture. Do
14 you know what that is?
15     A. Yes.
16     Q. What is it?
17     A. It's a battery charger.
18     Q. And is it an electronic battery charger?
19     A. Well, it's an electronic battery charger
20 that would have some electronic components in it
21 to control the charging rate.

Page 80

1     Q. To your knowledge, would that battery
2 charger have to be plugged in someplace?
3     A. Yes. The plug is visible, though, in
4 the photograph. It's not plugged in.
5     Q. It's not plugged in on November 10th; is
6 that correct?
7     A. It's not plugged in at the time I took
8 my photograph.
9     Q. And you don't know whether it was
10 plugged in or not at the time of the fire; isn't
11 that correct?
12     A. I'm not sure whether that question was
13 asked in the deposition testimony of the
14 employees or not. I would have to review their
15 deposition transcripts, because I know that that
16 was addressed in at least one of the deposition
17 transcripts.
18     Q. Could an electrical malfunction of the
19 battery charger be an ignition source for the
20 fire?
21     MR. BARTOLACCI: Objection to the form.

Page 81

1     A. It theoretically could be. However,
2 that's not consistent with the evidence in this
3 case.
4     Q. I'm just asking you whether an
5 electrical malfunction of a battery charger, can
6 that cause a fire?
7     A. That's hypothetically possible.
8     MR. ROTHSCHILD: Let me just show you a
9 couple more pictures.
10     (McLauchlan Exhibits 2-C, 2-D and 2-E,
11 photographs, marked for identification.)
12     Q. Let me go through these quickly. 2-C,
13 this is a photograph you took facing the heater
14 at the time of your, you were on the scene?
15     A. Yes.
16     Q. And 2-D, this is a picture you took of
17 the heater at the time you were at the scene?
18     A. Yes.
19     Q. And 2-E, this is a picture of the wall
20 facing into the warehouse, is that correct, the
21 wall studs facing into the warehouse?

August 11, 2006

Multi-Page Deposition of  KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

---

Page 82

1  A. Correct.

2  Q. And they show a significant amount of

3 charring?

4  A. Yes.

5  Q. Based on the studs facing into the

6 warehouse; is that correct?

7  A. Yes.

8  Q. When Miss Foerster called you, did she

9 indicate to you that she believed that the heater

10 was the source of the fire?

11  A. No.

12  Q. Did she tell you there was a heater?

13  A. Yes.

14  MR. ROTHSCHILD: Let me have this marked

15 as 2-F, please.

16  (McLauchlan Exhibits 2-F and 2-G,

17 photographs, marked for identification.)

18  Q. Can you tell me, please, what 2-F is a

19 picture of?

20  A. 2-F shows some hangers that the uniforms

21 were on. There's also some thermal insulation

---

Page 83

1 visible, and there is visible paneling in the

2 background, and there is a bucket.

3  Q. Can you tell what's in the bucket?

4  A. It looks like fire debris in the bucket.

5  Q. And where is this seen in relationship

6 to inside the office or outside the office?

7  A. This is located outside the office more

8 in the direction away from the heater.

9  Q. Is this on the other side of the wall

10 from the heater?

11  A. Yes. Well, it's not directly on the

12 other side of the wall from the heater, it's

13 displaced laterally in the direction of I believe

14 the exterior wall.

15  Q. The exterior wall that faces the

16 warehouse?

17  A. There is actually a photo that shows its

18 location, that probably makes it easier to look

19 at than me describing it.

20  Q. Let me ask you to look at 2-G. Can you

21 tell me what that is a picture of?

---

Page 84

1  A. Yes. This photograph 2-G shows that

2 area that appeared in the photograph I was

3 looking at last, which was 2-F.

4  Q. And does that show the area to be right

5 behind where the outside wall was facing into the

6 warehouse?

7  A. That photograph is taken looking at the

8 outside surface of the office wall.

9  Q. And why did you take these two pictures,

10 2-F and 2-G?

11  A. To document the area where the heater

12 was, the general area.

13  MR. ROTHSCHILD: Let me have this marked

14 as 2-H.

15  (McLauchlan Exhibit 2-H, photograph,

16 marked for identification.)

17  Q. Is this another picture you took facing

18 the heater? This is 2-H.

19  A. Yes.

20  Q. Did you make any observation, were you

21 able to make any observations as to what was

---

Page 85

1 behind the heater? Was there anything behind the

2 heater when you were on the fire scene?

3  A. Just the remnants of the hangers and

4 uniforms, and really the only thing left was fire

5 debris.

6  Q. How about on the back of the heater, was

7 there anything on the back of the heater,

8 attached to the back of the heater?

9  A. No, the paneling was burned out at the

10 back of the heater.

11  Q. Was there anything on the top of the

12 heater that you observed?

13  A. Could I look at the photos again?

14  Q. Sure. I'll give them all to you.

15  A. (Perusing.) No.

16  Q. Did you at some point remove the heater

17 from the office?

18  A. Yes.

19  Q. When was that?

20  A. That was the day of the joint

21 inspection, which was November 10, 2000.

---

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 98

1  A.  That's correct.

2  Q.  And again, your statement that the
3  ventilation louvres at the rear of the heater
4  casing were effectively blocked by the wall
5  surface, in fact, that's just speculation on your
6  part because the wall surface wasn't there to
7  examine; isn't that correct?

8  A.  It is an opinion that I base on the fact
9  that the wall surface, if it's assuming that it's
10  flat, would be very close to the louvres where
11  they formed into the rear surface of the heater.

12  Q.  But if it was installed as stated in the
13  instruction manual, there should be a
14  three-eighths-inch gap between the louvres and
15  the wall surface; isn't that correct?

16  A.  I'm trying to recall whether the louvres
17  actually projected slightly into that space.  I
18  would have to look at my photographs for a
19  minute.  (Perusing.)  The louvres project inward
20  so they would not reduce that space.

21  Q.  So there was at least a three-eighths,

Page 99

1  if the heater was mounted as per the
2  instructions, there would have been at least a
3  three-eighths-inch air gap between the back
4  surface of the heater where the louvres were and
5  the wall surface; isn't that correct?

6  A.  That would be the way that it should be
7  installed, yes.

8  Q.  And isn't it correct that you have no
9  basis for saying that the louvres were
10  effectively blocked by the wall surface, you have
11  no factual basis in this case?

12  A.  Given that the wall is, and any debris
13  that accumulates there is burned away, I don't
14  have any factual evidence I could point to.

15  Q.  You have never tested one of these, you
16  have never even tested a similar wall heater to
17  determine whether the louvres that are that
18  close, louvres that distance from a wall surface
19  effectively are blocked; isn't that correct?

20  A.  That's correct.  I requested early on in
21  this case an exemplar to test for that specific

Page 100

1  purpose, along with measurement of surface
2  temperatures, and I asked Mr. Bartolacci to
3  contact Empire to obtain one, and was unable to
4  do that.

5  Q.  Were you aware that an exemplar unit was
6  set up at ESI in Chicago for testing?

7  A.  I'm aware that a so-called exemplar was
8  tested and ESI provided results of their testing.
9  However, it was not an Empire Corcho CH-18 that
10  they tested.

11  Q.  Are you aware that Mr. Bartolacci was
12  informed that any of his experts could come and
13  witness the testing and be involved in the
14  testing of that exemplar, were you ever told
15  that?

16  A.  I was told that, yes, I was going to
17  test a heater, but it was not an Empire CH-18
18  heater, and to me, that is not a useful test in
19  determining what this specific heater does.

20  Q.  Did you make any efforts to determine
21  the heater that was being tested, what its

Page 101

1  characteristics were, to determine if it was
2  similar to the Empire CH-18?

3  A.  I obtained a heater that was of the same
4  design as the one used by ESI, I believe it was a
5  Kozy-World heater, and inspected that, and
6  determined that there were significant
7  differences between that heater and the CH-18,
8  and that as a result, I did not consider that to
9  be an exemplar.

10  Q.  We'll get back to that.  Your sentence
11  also says, the ventilation louvres at the rear of
12  the heater casing were effectively blocked by the
13  wall surface and other debris that accumulated
14  there.  It's true, is it not, Mr. McLauchlan, you
15  have no evidence that there was debris at the
16  back, between the back of the heater and the wall
17  surface; isn't that correct?

18  A.  I have in the form of testimony from
19  Bill Smullens evidence that debris was in fact
20  accumulating in the area of the fan and the area
21  of the louvres, and that it had accumulated in

August 11, 2006    Multi-Page™ Deposition of ~ KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 146

1 Ignition Handbook, marked for identification.)
2    Q. Let me show you this McLauchlan 13; is
3 this the Ignition Handbook that you are relying
4 on?
5    A. Exhibit 13 is an excerpt that I am
6 relying on.
7    Q. And is the ignition -- is the theory of
8 pyrophoric decomposition an accepted scientific
9 theory for how fires can start?
10    A. The concept of pyrolysis is not a
11 theory, it's actually a definition of a process
12 which has been documented in peer-reviewed
13 publications such as the Ignition Handbook.
14    Q. Has it been, to your knowledge, peer
15 reviewed and accepted in the scientific
16 community?
17    A. I know it has been reviewed by the
18 Society of Fire Protection Engineers.
19    Q. And when was that?
20    A. That was in 2003.
21    Q. Prior to this case, did you ever give an

Page 147

1 opinion of, that a fire was caused by, prior to
2 your first draft report of June 28, 2003, had you
3 ever given an opinion that a fire was caused by
4 pyrolytic or pyrophoric decomposition?
5    A. Yes.
6    Q. When was the first time?
7    A. Oh, boy. Many years ago. I can't
8 recall when the first time would have been.
9    Q. Has this theory ever been rejected, to
10 your knowledge, as being unscientific?
11    A. I'm aware of the Magne Tek case in which
12 the Court of Appeals rejected it.
13    Q. Has it ever, to your knowledge, been
14 accepted by a court as scientifically valid?
15    A. I don't know.
16    Q. Have you ever done any testing yourself
17 to determine whether the theory can
18 scientifically be supported?
19    A. I haven't done that, primarily because
20 the nature of pyrolysis requires an extremely
21 long interval of time that you would have to

Page 148

1 monitor your test equipment. There are also a
2 number of variables which really determine the
3 interval of time and the temperature at which the
4 pyrolysis would go from char to flaming
5 combustion. But to answer your question, I have
6 not undertaken any sort of study.
7    Q. Is there any fire scientist that has
8 created a model that has shown how pyrolytic
9 decomposition works?
10    A. I know that there are people working on
11 that, but to date, I'm not aware of any
12 mathematical model that has been accepted that
13 will basically explain why pyrolysis occurs.
14    Q. Or that can predict when pyrolysis will
15 occur?
16    A. That's correct.
17    Q. Are you aware of any studies besides
18 these articles by Bavrauskas, are you aware of
19 any other, have you seen any other studies that,
20 any studies that support his opinion?
21    A. Actually, one of the things that is

Page 149

1 there is Bavrauskas, but I cite other studies
2 that show that low temperature, long-term heating
3 of cellulosic materials results in this pyrolysis
4 effect and flaming ignition.
5    Q. But your whole basis for this theory is
6 what Dr. Bavrauskas has postulated in the
7 Ignition Handbook?
8    A. I think that is the most concise
9 accumulation of all the literature that is
10 supportive of the pyrolysis phenomenon.
11    Q. Have you done any testing to determine
12 the validity of the pyrolytic decomposition in
13 this case?
14    A. No. I've relied on the scientific
15 treatise.
16    Q. Mr. Bavrauskas?
17    A. Yes.
18    Q. Can you tell me what surface
19 temperature, or isn't it a fact that you don't
20 know what the surface temperature was on the
21 heater at the time of the fire, the surface

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

**Page 150**

1 temperature on the back of the heater at the time
2 of the fire?
3    A. I don't know the specific temperature on
4 this Empire CH-18, and obviously that's one of
5 the reasons I wanted an exemplar to test. I'm
6 aware in the ESI testing of a heater, which is
7 not what I would consider a true exemplar, met
8 the ANSI standard, that surface temperatures in
9 excess of 200 degrees were reached.
10    Q. And what were the conditions that
11 existed at that time?
12    A. Well, we would have to actually go to
13 the ESI report to describe the conditions.
14    Q. So it would be correct to say you don't
15 know what the surface temperature was on the back
16 of the heater when it was operating on the night
17 of the fire. Would that be correct?
18    A. In order to, for my opinion, I have made
19 an assumption that the temperature would be in
20 the range of in excess of 180 degrees Fahrenheit.
21    Q. What's your basis of saying that, what

**Page 151**

1 is your factual basis for that assumption?
2    A. The fact that the standard allows the
3 temperature rise of 117 degrees Fahrenheit on the
4 surfaces behind the heater. In order for the
5 heat to be transferred, the surface temperature
6 of the heater would have to be higher than that,
7 so my opinion would be that it would be in excess
8 of that 117 degrees plus the room temperature,
9 which gets you into the 180-degree range, the
10 surface temperature higher than that.
11    Q. But you're assuming that the heater is
12 the source of the fire, and therefore assuming
13 the temperature is 180 degrees; is that correct?
14    A. No. I'm assuming in a heater that
15 complies with the ANSI standard, which is allowed
16 to have a temperature rise on the wall behind the
17 heater of 117 degrees Fahrenheit above room
18 temperature, that the surface temperature of that
19 rear surface of the heater would have to reach
20 about 180 degrees for the temperature of the wall
21 to reach that temperature, the 117 plus room

**Page 152**

1 temperature.
2    Q. Now, how many -- as I understand, this
3 heater has three settings?
4    A. Yes.
5    Q. And there is a low, medium and high
6 setting?
7    A. Yes.
8    Q. And as I understand it, the heater was
9 on the lowest setting on the night of the fire?
10    A. It was on the lowest setting. Depending
11 on the deposition transcripts, it was either on
12 the low setting or it may not have been turned
13 back from a higher setting, but there was some
14 testimony that it was at the low setting.
15    Q. And in fact, didn't Nadine Cameron
16 testify that she had turned it to the low setting
17 before she left that night?
18    A. I think what she testified was that she
19 thought she had, but she wasn't positive.
20    Q. Didn't she testify that she always
21 turned it down at night?

**Page 153**

1    A. Her testimony was that was one of the
2 things she did before she closed up, was turn it
3 down.
4    Q. Would you agree, then, that more likely
5 than not it was turned down to the lowest setting
6 that night, since that was her procedure and
7 that's what she said she did?
8    A. That was her procedure, but she did have
9 doubt as to whether she had turned it down.
10    Q. If it was on a low setting, that would
11 mean that the surface temperature would be less?
12    A. No, it wouldn't, because each heater has
13 a discrete burner, and that burner puts out a
14 fixed amount of heat, and it's independent of
15 what the other burners are doing.
16    Q. So if one or two are turned off, that
17 one is going to produce the same heat independent
18 of the other two, along the entire back surface
19 of the heater?
20    A. No. The temperature is going to stay
21 the same on the operational brick.

August 11, 2006
Case 1:03-cv-00178-WMN   Document 77-4   Multi-Page™   Filed 02/07/2007   Deposition of KENNETH R. McLAUCHLAN Page 16 of 18
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 154

1    Q. And if it's 180 degrees on the surface
2 of the operational brick, what would it be on the
3 other surface, on the other bricks?
4    A. Something lower.
5    Q. Well, like, what would be the range?
6    A. I don't know.
7    Q. So you're assuming because the heater
8 complied with ANSI and ANSI allowed up to a
9 certain temperature, that part of the heating
10 system was at least at that temperature?
11    A. Yes, and that also, again, is based on
12 testing that ESI did.
13    Q. Was that the testing with just one
14 burner on?
15    A. I would have to look again at the ESI
16 test results.
17    Q. Have you done any testing to determine
18 the combustibility of the wall surfaces?
19    A. No.
20    Q. Can such testing be done?
21    A. My opinion is that you can establish

Page 155

1 that it is combustible by normal means, in other
2 words, short-term combustibility. However, it is
3 practically not possible to determine a pyrolytic
4 ignition temperature with the current state of
5 the science.
6    Q. What would the normal combustion, do you
7 know what the normal combustion temperature of
8 the wood surface behind the heater would be?
9    A. It's entirely dependent on things such
10 as the time the heat source is applied, whether a
11 pilot flame is used. There is no single ignition
12 point for wood, and I think that's one of the
13 problems with the Magne Tek case, that you simply
14 can't define a single temperature, particularly
15 if you're considering the possibility of
16 pyrolysis.
17    Q. So in this case, you would agree that
18 you can't define what the temperature would be to
19 make the wood surface combustible at the time of
20 the fire?
21    A. It would depend on how soon do you want

Page 156

1 it to ignite, and then you can, based on that
2 information, you can determine a temperature. If
3 you want to have a sooner ignition or later
4 ignition, the auto ignition temperature is going
5 to be different.
6    Q. But in this case, you would agree that
7 you are unable to determine the combustible
8 nature of the wood surface, or the temperature it
9 would have to reach before the pyrolysis that
10 occurs?
11    A. It's my opinion based on the literature
12 that I cited in Bavrauskas that it's going to be
13 at some temperature of 170 degrees or higher, I
14 believe that was.
15    Q. 170 degrees on what?
16    A. I'm sorry.
17       MR. ROTHSCHILD: That's okay.
18       (Recess.)
19       MR. ROTHSCHILD: Would you read my
20 question?
21       (Record read.)

Page 157

1    A. 170 degrees on the actual surface of the
2 paneling behind the heater.
3    Q. And that is just based on the ANSI
4 standards of how high it can get?
5    A. That's based on Bavrauskas' literature
6 and the testing that was done by ESI.
7    Q. And do you have an opinion of what the
8 temperature of the wood paneling itself was under
9 your theory at the point of ignition?
10    A. Again, it's my opinion that it was in
11 the range of 170 degrees.
12    Q. Do you know in this case what the type
13 of wood is?
14    A. No, but it's entirely subject to how
15 long you want to apply the heat source until you
16 get ignition. The range can be anywhere from 400
17 degrees to 900 degrees depending on how quickly
18 you want to ignite it. That again, is in a non,
19 a long-term heating pyrolysis mode.
20    Q. Now, on, I'm looking at page five of
21 your letter, you say the pyrophoric decomposition

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 158

1 resulted in ignition of the wood paneling at an
2 abnormally low temperature. Is that what we were
3 just talking about?
4    A. Yes.
5    Q. And that was 170 degrees Fahrenheit or
6 higher?
7    A. Yes.
8    Q. You then say, a significant factor in
9 the heat transfer that caused the pyrophoric
10 decomposition was the presence of combustible
11 lint, dust and other heat-conducting debris at
12 the rear of the heater, and you would agree that
13 you have no direct evidence of that; is that
14 correct?
15       MR. BARTOLACCI: Objection to form.
16    A. I have no physical evidence remaining of
17 that material after the fire.
18    Q. And you have no one that observed the
19 back of the heater, this area between the heater,
20 back of the heater and the wall surface for six
21 years, is that correct, as far as you know?

Page 159

1    A. I'm not aware of anybody at this point.
2    Q. So this is an assumption on your part?
3    A. It's an opinion I reached based on the
4 design of this heater and the prior problems that
5 were observed by Mr. Smullens.
6    Q. When you say based on the design of this
7 heater, have you set up a heater, similar heater,
8 and observed the presence of lint, dust and other
9 heat-conducting debris at the heater?
10    A. No. It's based on the fact that we have
11 a fan that's drawing air from the space directly
12 through louvres to the internal components of the
13 heater, and this phenomenon is going to entrain
14 lightweight material that are airborne and draw
15 them into the area where the louvres are.
16    Q. And when the heater is not operating,
17 would this material then fall to the floor?
18    A. It would, it could fall to the floor,
19 but if it's allowed to operate long enough, it's
20 my opinion that it would actually become trapped
21 in that space.

Page 160

1    Q. And how would it be trapped?
2    A. Just the volume of the material would
3 basically bridge the space between the wall and
4 the rear of the heater.
5    Q. Have you done any studies to see whether
6 that phenomenon occurs?
7    A. No, and I don't have access to an
8 exemplar.
9    Q. Have you done any, did you attempt to
10 recreate that with the Kozy heater you had by
11 putting it on the wall and letting it run to see
12 if it accumulated dust, lint and other debris
13 between the heater, back of the heater and the
14 wall?
15    A. No, for the reasons I previously
16 testified, I didn't attempt to test that heater.
17    Q. Are you aware if the Kozy heater drew in
18 air?
19    A. It had a fan, but it also had a totally
20 different type of fan, instead of a squirrel cage
21 it was like a propeller, and it had a circular

Page 161

1 opening rather than a series of louvres.
2    Q. Did it have an opening in the back that
3 would suck in air?
4    A. It had a circular opening as opposed to
5 louvres.
6    Q. Was the purpose of that to bring air
7 into the fan?
8    A. Yes.
9    Q. Would that also attract dust and lint
10 towards the circular opening?
11    A. It could.
12    Q. So this assumption you have made has not
13 been tested; is that correct?
14    A. The opinion is not based on any physical
15 testing that I've done.
16    Q. Nor is it based on any observation made
17 at or near the time of the fire; is that correct?
18    A. None that I'm aware of.
19    Q. And have you seen any articles, in the
20 various publications you get on fires, have you
21 seen anything stating that with a zero clearance

Case 1:03-cv-00178-WMN    Document 77-4    Filed 02/07/2007    Page 15 of 18

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 166

1 said to the installer in this case that the
2 heater is going to be installed flat against the
3 wall with no clearance whatsoever?
4    A. None.
5    Q. And how about, what evidence do you have
6 that there was any representation from the
7 manufacturer to the consumer in this case prior
8 to the consumer buying the heater?
9    A. None.
10    Q. You say the design of the heater was
11 such that dust, lint and other ambient debris was
12 able to accumulate in the rear of the heater,
13 building a bridge of combustible material that
14 extended from the hot surface of the back of the
15 heater to the combustible wall. We've already
16 discussed how that is an assumption on your part.
17 What alternative design should the manufacturer
18 have used to prevent this? Are you aware of any
19 design that would eliminate what you say was an
20 accumulation of combustible material between the
21 back of the heater and the wall?

Page 167

1    A. If the fan had drawn the air from, for
2 example, the top of the heater, rather than the
3 space between the heater and the back of the
4 wall, then there would be less chance of you
5 trapping material between a hot surface and a
6 combustible surface.
7    Q. And are you aware of any such heaters
8 existing in 1990?
9    A. No, I'm not, but I have not attempted to
10 find one.
11    Q. Have you ever designed such a heater?
12    A. I have not designed a heater. I've
13 designed various ductwork systems.
14    Q. My question was have you designed a
15 wall-mounted heater like this where the air
16 intakes were on the top of the heater?
17    A. No.
18    Q. Have you ever tested a heater that was
19 manufactured with the intakes at the top of the
20 heater?
21    A. No.

Page 168

1    Q. Would you agree that you don't even know
2 if a heater that was designed as you say with the
3 intakes at the top of the heater, was, would be
4 functional?
5    A. As I testified, I haven't attempted to
6 look for a heater of that design, and I don't
7 know whether one exists now or whether one
8 existed at that time.
9    Q. You don't even know if such a heater is
10 functional, do you?
11    A. It would certainly be functional if the
12 only change is the area where you're drawing the
13 inlet air from. And when you have a squirrel
14 cage fan as we have in this Empire heater, it can
15 draw air from other locations, it doesn't have to
16 be directly at the back of the heater.
17    Q. How do you know it will work properly if
18 where the air came in was changed, if the air
19 intake was changed, without testing it?
20    A. Obviously if I was going to design a
21 fan, I would not, or design a heater, I would do

Page 169

1 calculations and determine if my proposed design
2 was functional.
3    Q. But you haven't done that; isn't that
4 correct?
5    A. No, that obviously was not my charge.
6    Q. You have not designed or constructed a
7 prototype of your contemplated design; isn't that
8 correct?
9    A. That's correct.
10    Q. And before getting this case, you never
11 even were involved in design of wall-mounted
12 heaters; isn't that correct?
13    A. I have not designed any wall-mounted
14 heaters.
15    Q. You don't hold yourself out as an expert
16 in the design of wall-mounted heaters, do you?
17    A. I would consider myself to be an
18 engineer who's capable of evaluating fire hazards
19 associated with the design.
20    Q. But you don't hold yourself out as an
21 engineer who has any experience, education or

Case 1:03-cv-00178-WMN    Document 77-4    Filed 02/07/2007    Page 16 of 18

August 11, 2006    Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 170

1 background in the actual design of wall-mounted
2 heaters such as this one; isn't that correct?
3    A. I have not designed a heater of this
4 nature, that's correct.
5    Q. Then you say, in addition, the design of
6 the heater is such that there is no way to
7 guarantee that the three-eighths-inch clearance
8 will be maintained throughout the life of the
9 product. You would agree that there are a lot of
10 heaters, wall-mounted heaters that are in use
11 that have a three-eighths-inch clearance?
12    A. To the extent that there are more
13 heaters of the Empire CH-18 type, I would say
14 yes. I'm not aware of other manufacturers that
15 use that specific clearance.
16    Q. Well, the Kozy used a three-eighths to
17 three-fourths-inch clearance?
18    A. That's two different ranges of
19 clearance.
20    Q. And have you ever seen it reported
21 anyplace that there is a problem because the wall

Page 171

1 surface behind the heater had been subject to
2 warping?
3    A. No.
4    Q. So this is just something you're
5 postulating for this case; isn't that correct?
6    A. It's a hazard that is foreseeable if you
7 have a situation where a wall is subjected to
8 high humidity and warps in a way that reduces the
9 clearance.
10    Q. Do you have any evidence that the wall
11 behind the heater had warped and, therefore, the
12 three-eighths-inch gap had gotten smaller?
13    A. No, and once again, the fire burned that
14 wall away.
15    Q. But this is just a theoretical opinion
16 you're offering?
17    A. It is a foreseeable condition based on
18 the properties of materials such as wood when
19 they are subjected to high humidity and moisture.
20    Q. Well, you're saying it's a foreseeable
21 condition, but the fact is, there has never been

Page 172

1 a report of this ever occurring; isn't that
2 correct?
3    A. I don't know whether there has or not.
4    Q. But you have no knowledge of it; isn't
5 that correct?
6    A. I have, again, I have not attempted to
7 find out if there has been any sort of fire
8 related to that type of scenario.
9    Q. You belong to these various fire
10 organizations and you pride yourself on being a
11 certified fire expert, and the fact is you have
12 never heard anyone, read anyplace, of this ever
13 happening; is that correct?
14    A. I'm not aware of this being an
15 identified cause of a fire.
16    Q. And it's never been, you have never
17 heard of it being identified as a risk for these
18 type of heaters; isn't that correct?
19    A. No.
20    Q. That is correct?
21    A. That's correct.

Page 173

1    Q. And you have never heard of the backup
2 of lint or dust being listed as a known risk for
3 this type of heater; isn't that correct?
4    A. I'm aware that reduction in the
5 clearance of the back to combustibles is
6 considered to be a risk of fire that can occur
7 after the initial installation occurs, and in the
8 case of the accumulation of material or warping
9 of the surface reducing the clearance to
10 combustibles, that is considered a risk because
11 it would place combustible material near a hot
12 surface.
13    Q. But with regard to a wall-mounted heater
14 with a three-eighths inch clearance or a
15 three-quarters-inch clearance, you have never
16 heard it ever reported that this has created a
17 risk of fire and that a fire has occurred because
18 of it; isn't that correct?
19    A. I'm not aware of any fire that has been
20 attributed to this occurring on this specific
21 product.

August 11, 2006

Multi-Page™ Deposition of - KENNETH R. MCLAUCHLAN
Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 174

1  Q. Or a product like it, isn't that
2 correct?
3    A. Or a wall-mounted heater, zero clearance
4 heater. I am aware of clearance problems,
5 specifically changes in clearance resulting in
6 fires in other equipment.
7    Q. Such as?
8    A. Such as venting systems where they are
9 conducting high temperature combustion gases
10 away.
11   Q. Isn't it a fact that all the opinions
12 you have given in this case are -- scratch that.
13 Isn't it a fact that the opinions you developed,
14 these two opinions you have expressed were
15 developed for the purposes of this case?
16     MR. BARTOLACCI: Objection to the form.
17   A. The opinions that I have stated in my
18 report are based on the inspection that I did and
19 the evaluation of the testimony. They're based
20 on the facts of this case, yes.
21   Q. If the clearance in this case was

Page 175

1 greater, would more or less debris accumulate
2 behind the heater?
3    A. If the clearance were increased, you
4 would have less debris accumulating.
5    Q. Why is that?
6    A. Because the size of the debris would
7 have to be large enough, so that it would be less
8 likely to be entrained in the air stream.
9    Q. And tell me again, what keeps the debris
10 there?
11   A. The debris initially accumulates in the
12 louvres and accumulates, I guess the debris
13 accumulation tends to filter out other debris
14 until you're eventually bridging the space
15 between the rear of the heater and the wall.
16   Q. In your opinion, how much debris, over
17 what surface of the back of the heater did the
18 debris bridge the wall surface?
19   A. How much?
20   Q. Yeah. Do you know, do you have any way
21 of quantifying it?

Page 176

1    A. I can't quantify it, no.
2    Q. How much would have to bridge, have you
3 determined how much debris would have to bridge
4 the back of the heater to the wall surface to
5 transfer the heat, have you been able to
6 determine that?
7    A. I haven't quantified that.
8    Q. Would there be a decrease in temperature
9 as the heat transferred from the back of the
10 heater through the debris to the wall surface?
11   A. Yes.
12   Q. And have you quantified what that would
13 be?
14   A. No.
15   Q. Are you able to quantify that, without
16 knowing how much debris and what type of debris?
17   A. You probably could do calculations
18 making some assumptions about the heat conductive
19 properties of the debris.
20   Q. You would have to know what the debris
21 was before you could calculate the heat

Page 177

1 conduction quantities, wouldn't you?
2    A. Yes.
3    Q. And in this case you don't know what
4 debris was there, what type of debris was there,
5 if any, prior to the fire, isn't that correct,
6 you have no evidence of what the debris was?
7    A. The information that I base my opinion
8 on would be that it's similar to the material
9 that Mr. Smullens observed when he cleaned it in
10 1993 or '4.
11     (Pause.)
12   Q. Have you ever worked for the American
13 Gas Association Laboratories?
14   A. No.
15   Q. Have you ever tested a heater to the
16 ANSI standards, a wall-mounted heater to the ANSI
17 standards, the applicable ANSI standards?
18   A. No.
19   Q. Is the American Gas Association
20 Laboratories considered to be a reputable testing
21 laboratory?

August 11, 2006    Case 1:03-cv-00178-WMN   Document 77-4   Deposition of KENNETH B. McLAUCHLAN   Multi-Page™

Selective Insurance Co., et al. vs. Empire Comfort Systems, Inc

Page 178

```
1    A. Yes.
2    Q. And are the ANSI standards considered to
3  be reputable standards for testing a wall mounted
4  propane gas heater?
5    A. Yes.
6    Q. And was, to your knowledge, was the, did
7  the American Gas Association properly test this
8  subject heater, the CH-18, using the ANSI
9  standards before certifying it for use?
10    A. I have a copy of the test report which
11  certifies that the heater was in compliance with
12  the standards, so I have no reason to doubt that.
13       MR. ROTHSCHILD: Well, I'm going to turn
14  it over to Pat, and I may have some follow-up
15  questions afterwards. Let me just accumulate all
16  the exhibits here so we don't lose them.
17       (Discussion off the record.)
18       EXAMINATION BY COUNSEL FOR
19         THIRD-PARTY DEFENDANT
20       BY MS. MAHER:
21    Q. Mr. McLauchlan, I represent Sharp Energy
```

Page 179

```
1  in this particular case, I think I told you that
2  before. Sharp Energy was the installer of this
3  fan. Can you tell me what they did, what was
4  wrong with the installation of this heater?
5    A. The installation, I don't have any
6  opinion that the installation was wrong.
7    Q. Okay. Do you have any opinion about
8  Sharp Energy at all?
9    A. I don't believe so.
10    Q. Well, that's shortened my questions up
11  completely. Let me just ask you, though, while
12  we're here, have you been charged with any
13  further duty to look into this by the attorney?
14    A. The opinions that I express in my report
15  are the ones that I'm prepared to give, and I
16  don't believe I have any opinions with regard to
17  Sharp.
18    Q. Let me say this to you as well. Sharp
19  also sold the heater to the Smullens, it was as
20  you said before, it went from Empire to Sharp
21  Energy to the Smullens. Do you have any opinion
```

Page 180

```
1  that Sharp Energy had any role in that?
2    A. No. I think it's reasonable for Sharp
3  to sell an ANSI ASG-certified product and not
4  have any concerns about doing that.
5    Q. So as we sit here today, you don't have
6  any opinion that Sharp Energy was negligent in
7  this case at all?
8    A. No. As I say, the opinions that are in
9  my report are the opinions I intend to state at
10  trial.
11    Q. I understand that, but I want to be
12  clear. Do you have any opinions today that Sharp
13  Energy was negligent or liable in this case that
14  we're talking about at all?
15       MR. BARTOLACCI: Let me just make an
16  objection in that it calls for a legal
17  conclusion, and whether Sharp is a reseller,
18  merchant, and the applicable law might be
19  something that Mr. McLauchlan is not qualified to
20  answer.
21    Q. I'm not asking him for a legal
```

Page 181

```
1  conclusion or opinion. As an expert, as an
2  engineer, do you have any opinion as we sit here
3  today about Sharp Energy with respect to this
4  fire?
5    A. No. The only opinion that would be
6  applicable to Sharp would be if they didn't send
7  or provide the owners a manual, and I don't have
8  enough information to testify one way or the
9  other as to whether they did or not, because the
10  Smullens were not sure whether they had a manual
11  or not.
12    Q. So you have no opinion as to that?
13    A. Correct.
14    Q. And you have no other opinions
15  concerning Sharp with respect to this case?
16    A. That's correct.
17       MS. MAHER: That's it.
18       MR. ROTHSCHILD: I have a follow-up
19  question.
20    FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
21       BY MR. ROTHSCHILD:
```